Randall WESTON and
James Strecansky,

v.

NORTHAMPTON PERSONAL CARE,
INC. and James Kusko,
Individually,

Appeal of Randall Weston.

Superior Court of Pennsylvania.

Argued October 2, 2012.

Filed Jan. 25, 2013.

Douglas M. Marinos, Allentown, for appellant.

Charles E. Shoemaker, Jr., Allentown, for Northampton, appellee.

BEFORE: STEVENS, P.J., FORD ELLIOTT, P.J.E., and ALLEN, J.

OPINION BY STEVENS, P.J.

Appellant, Randall Weston, challenges an August 12, 2011 entry of judgment in the Court of Common Pleas of Northampton County.[1]

This matter stems from a Complaint filed by Weston and James Strecansky against Appellees James Kusko and Northampton Personal Care, Inc. ("Northampton, Inc.").[2] The Complaint alleged that Weston and Strecansky are two of five limited partners in Northampton Personal Care Associates, LP ("Northampton, LP"), that Northampton, Inc. is the general partner of Northampton, LP., and that Kusko is the President of Northampton, Inc. Complaint filed 8/5/05 at 2–3. The first count of the Complaint asserted that Appellees "breached the fiduciary relationship to the Partnership" by engaging in various acts of self-dealing. *Id.* at 3. Although Count I claimed breaches of fiduciary duty to the Partnership, it demanded compensatory damages for Weston and Strecansky only, not for the other limited partners. *Id.* at 4. The second count of the Complaint alleged that the breaches of fiduciary duty were "intended to defraud plaintiffs," and demanded "all profits obtained by the Defendants through the fraudulent conduct." *Id.* at 4.[3] The Honorable Edward G. Smith has authored an extensive Pa.R.A.P. 1925(a) Opinion which contains a comprehensive explanation of the factual and procedural background of this case, making it unnecessary to set forth that history in greater detail here. Pa.R.A.P. 1925(a) Opinion filed 3/19/12 at 1–73.

On December 4, 2008, Defendant/Appellees filed a Motion for Summary Judgment, which was denied, and a non-jury trial before Judge Smith was eventually conducted in March of 2010.[4] During the proceedings, it was clarified that Weston and Strecansky were bringing a direct action on their individual behalves, not a derivative action on behalf of the limited partnership. N.T. 3/15/10 at 5; 8, 10, 48.

In their Proposed Conclusions of Law submitted to Judge Smith at the conclusion of trial, Defendant/Appellees argued as follows with regard to the issue of Plaintiffs' standing:

> 4. ... Pennsylvania law has provided a mechanism for a limited partner to pursue an action on behalf of the limited partnership:
>
>> A limited partner may bring an action in the right of a limited partnership to recover a judgment in its favor if general partners with authority to do so have refused to bring the action or if an effort to cause those general partners to bring the action is not likely to succeed. The derivative action may not be maintained if it appears that the plaintiff cannot fairly and adequately represent the interests of the limited partners in enforcing the rights of the partnership.

---

1. Appellant's brief mistakenly indicates that he appeals from an order of November 9, 2010. As his September 8, 2011 Notice of Appeal indicates, however, final judgment on the verdict was entered on August 12, 2011, thus the appeal properly lies from that entry of judgment.

2. At the time the Complaint was filed Plaintiffs were represented by Attorney Dennis DeEsch.

3. The Complaint contained one additional count demanding an accounting of the business and financial condition of Northampton, LP., but that count was later withdrawn. Complaint filed 8/5/05 at 5; N.T. 3/23/10 at 86.

4. Weston and Strecansky were represented during trial by Attorney DeEsch, and Lowel F. Raeder, Esq., who had entered his appearance as co-counsel on December 18, 2009.

15 Pa.C.S.A. § 8591.

5. Plaintiffs Weston and Strecansky have brought claims for harm allegedly done to the Limited Partnership, but have done so in their individual capacities and not on behalf of the Limited Partnership or even on behalf of all of the limited partners.

6. Because the claims asserted may only be brought on behalf of the Limited Partnership, Plaintiffs' claims must be dismissed. *Kenworthy v. Hargrove*, 855 F.Supp. 101, 104 (E.D.Pa.1994).

7. Because Plaintiffs Weston and Strecansky do not have standing to pursue the claims set forth in their Complaint in their individual capacities, this action must be dismissed with prejudice. *Kenworthy v. Hargrove*, 855 F.Supp. 101, 104 (E.D.Pa.1994).

8. The Plaintiffs do not have standing to bring the within action in their individual capacities as direct claims against Defendants Northampton Personal. Care, Inc., and James Kusko, since the claims asserted may only be properly brought on behalf of the Limited Partnership as a derivative claim pursuant to 15 Pa.C.S.A. § 8591.

9. Any harm that has been alleged on behalf of Plaintiffs is an indirect harm to Plaintiffs, not a direct harm.

Defendant/Appellees Proposed Conclusions of Law filed 5/28/10 at 2–3. Asserting that the Pennsylvania Supreme Court had not yet provided binding authority on the issue of an individual limited partner's standing to pursue indirect claims against a general partner of a limited partnership for alleged wrongs to the limited partnership, Defendant/Appellees suggested the applicability of the decision of the Federal District Court for the Eastern District of Pennsylvania in *Kenworthy, supra,* as well several decisions from other states, and urged that whether an individual limited partner has the right to pursue a claim in his or her individual capacity depends on whether the injury alleged is to that individual, or to the partnership itself. *Id.* Weston and Strecansky's Proposed Findings of Fact, Conclusions of Law and Discussion countered that:

> [t]he claims of Weston and Strecansky in the present case can are [sic] easily distinguished from the facts of *Kenworthy* because there is no separate action by the partnership for the same wrongdoing, and thus no risk of double recovery. Plaintiffs have direct claims against Kusko in his dual capacity as Chair of the Management Committee and President of the General Partner that this Court can rule on.

Proposed Findings of Fact, Conclusions of Law and Discussion filed 6/1/10 at 31.

After reviewing the parties' submissions, Judge Smith entered a verdict in favor of Defendant/Appellees as follows:

> **AND NOW,** this 9th day of November, 2010, after a seven-day non-jury trial in this matter, and after reviewing the applicable record and the parties' submissions;[1] and

> **IT APPEARING THAT** the plaintiffs, Randall Weston ("Weston") and James Strecansky ("Strecansky"), are two of the limited partners of the Pennsylvania limited partnership known as Northampton Personal Care Associates, L.P., and it appearing that the defendant, Northampton Personal Care, Inc., is the general partner of Northampton Personal Care Associates, L.P., and it appearing that the defendant, James Kusko, is the president of Northampton Personal Care, Inc.,[2] and it appearing that Northampton Personal Care Associates, L.P. is one of two general partners of Sacred Heart Assisted Living Partnerships ("SHALP I"), a Pennsylvania general partnership that owns and oper-

ates the Sacred Heart Assisted Living Faculty ("SHALF") located in Northampton, Pennsylvania,[3] and

**IT APPEARING THAT** the plaintiffs brought claims against the defendants for breach of fiduciary duty and fraud,[4] and it appearing that these claims are direct claims brought in the plaintiffs' individual capacities and not derivative claims on behalf of the partnership, Northampton Personal Care Associates, L.P.; and

**IT APPEARING THAT** the defendants challenge the plaintiffs' standing to bring their claims in this action insofar as the defendants argue that as limited partners, the plaintiffs cannot bring direct claims against the defendants for breach of fiduciary duty and fraud; and it appearing that the plaintiffs do not have standing to bring their claims in this action as, *inter alia,* almost all of the particular breaches or harms complained of were not suffered directly by the individual limited partners; rather, the claims essentially allege injury to SHALP I; and it further appearing that regardless of whether the plaintiffs have standing to bring the aforementioned direct claims against the defendants, the plaintiffs have failed to establish an entitlement to relief on their claims for breach of fiduciary duty or fraud; and

**IT APPEARING THAT** as to the plaintiffs' causes of action for breach of fiduciary duty, the plaintiffs have not demonstrated by a preponderance of evidence that Kusko breached any fiduciary duty to the plaintiffs insofar as they did not show that Kusko abused his positions of trust or used the various resources of SHALP I to unjustly enrich himself to the plaintiffs' detriment; and it further appearing in this regard that the plaintiffs failed to prove by a preponderance of the evidence that (1) Kusko acted improperly or breached his fi-

duciary duty to the plaintiffs regarding the management agreement between SHALP I and Weston's management company, Northampton Village, insofar as (a) SHALP I ceased using Northampton Village as manager; (b) SHALP I replaced Northampton Village and substituted Kusko as manager of SHALF, (c.) SHALP I paid Kusko a higher fee for his managing services then [sic] it paid Weston or Northampton Village, and (d) SHALP I paid for employees that Weston had previously provided (and paid for) out of his own pocket, (2) Kusko acted improperly or breached his fiduciary duty to the plaintiffs when SHALP I entered into a twenty-year lease for the second floor of the medical office building, which he owned,[5] (3) Kusko used partnership assets for his own benefit when SHALP I loaned $664,385 to Sacred Heart so Sacred Heart could submit a capital contribution to Sacred Heart Assisted Living Partnership II ("SHALP II") in return for a partnership interest in SHALP II,[6] (4) Kusko inappropriately or improperly directed or breached his fiduciary duty to the plaintiffs insofar as he required SHALP I employees assist with business activities at SHALP II or vice versa, or otherwise directed the sharing of said employees, or (5) improperly ran, operated, or chaired the management committee meetings for SHALP I, particularly insofar as the plaintiffs allege Kusko failed to notify each management committee of the membership of SHALP I and SHALP II to determine potential conflicts of interest;[7] and

**IT APPEARING THAT** the plaintiffs failed to prove by clear and convincing evidence that Kusko defrauded them; and it appearing further in this regard that the plaintiffs failed to show that Kusko defrauded them with respect to

the aforementioned conduct complained of with respect to their breach of fiduciary duty claims; and it appearing that the plaintiffs have failed to show that Kusko defrauded them insofar as to (1) any issue related to the management contract of Northampton Village, SHALP I hiring Kusko as manager for higher management fees, or Kusko's use or Carol Blazo after SHALP I replaced Northampton Village as manager of SHALF, (2) any alleged representations by Kusko to Strecansky regarding a possible ownership interest in the medical office building, (3) SHALP I entering into a twenty-year lease for the second floor of the medical office building, (4) Kusko's alleged failure to develop a succession plan in return for his annual management fee, (5) any alleged failures to disclose the $664,385 loan to Sacred Heart, the sharing of employees between SHALP I and SHALP II, and the identities of the partners of SHALP I and SHALP II so the management committee could evaluate potential conflicts of interest; and

**IT APPEARING THAT** the plaintiffs have not shown that they are entitled to punitive damages as they have not shown any outrageous acts performed by the defendants;[8] and, accordingly, for good cause shown,

**IT IS HEREBY ORDERED** that the verdict is entered in favor of the defendants, Northampton Personal Care, Inc., and James Kusko, on the plaintiffs' causes of action for breach of fiduciary duty and fraud. The parties shall have a period of ten (10) days to file post-trial motions. Judgment shall be entered by the prothonotary upon praecipe of either party filed in accordance with Pennsylvania Rule of Civil Procedure 227.4.

1. We commend counsel for both the outstanding presentation of the evidence at trial as well as their exhaustive and well-written post-trial submissions.

2. Kusko is also a limited partner of Northampton Personal Care Associates, L.P.

3. Sacred Heart Healthcare Systems, Inc. is the other general partner on SHALP I.

4. At trial, the plaintiffs withdrew their claim for an accounting.

5. As the defendants point out, it appears that the plaintiffs did not bring their claim for breach of fiduciary duty relating to the ownership of the medical office building and the twenty-year lease term within two years after they were aware of the ownership and the lease to satisfy the applicable statute of limitations for breach of fiduciary duty claims.

6. SHALP II was created to own and operate another assisted living facility, Sacred Heart Assisted Living at Saucon Creek.

7. The plaintiffs also failed to show that the defendants breached a fiduciary duty owed to them when SHALP I terminated the lease of Northampton Village, Inc. At the medical office building, even though Northampton Village, Inc. was not a tenant at the time.

8. The plaintiffs enumerated the alleged outrageous acts on pages 28 and 29 of their Proposed Findings of Fact, Conclusion of Law and Discussion.

Order filed 11/9/10.

Still represented by Attorneys DeEsch and Raeder, Weston and Strecansky filed a Motion for Judgment Notwithstanding the Verdict or, in the alternative For a New Trial, arguing, among other things, that Judge Smith erred in finding that Plaintiffs lacked standing. Motion for Judgment Notwithstanding the Verdict or, in the alternative For a New Trial filed 11/24/10.[5] The Motion was denied on June 30, 2011, and judgment was subsequently entered on August 12, 2011.

Although neither Attorney DeEsch nor Attorney Raeder had withdrawn their appearance on behalf of Weston or Strecan-

5. The Motion was deemed timely by the lower court, as having been filed within ten days of the date of the mailing of the verdict. Pa. R.A.P. 1925(a) Opinion at 4.

sky, on September 8, 2011, Attorney Douglas M. Marinos entered his appearance "on behalf of Plaintiff, Randall Weston." Entry of Appearance filed 9/8/11. Through Attorney Marinos, Weston then filed a timely Notice of Appeal. Notice of Appeal filed 9/8/11. The Notice of Appeal was served on Attorneys DeEsch and Raeder, among others. Proof of Service filed 9/8/11.[6] No Notice of Appeal was filed on behalf of Strecansky.

On September 15, 2011, Judge Smith ordered Weston to file a Pa.R.A.P. 1925(b) Statement. Orders filed 9/1511 and 10/6/11. The statement filed by Attorney Marinos, however, named not only Weston, but also Strecansky, as "Appellants/Plaintiffs." Rule 1925(b) Statement filed 10/21/11.[7] The addition of Strecansky to the caption did not go unnoticed by Judge Smith, who, in his Rule 1925(a) Opinion, pointed out Strecansky's failure to file an appeal in this matter, and suggested that Weston is the only proper appellant. Rule 1925(a) Opinion filed 3/19/12 at 74–75.[8]

Therefore, before addressing the issues raised on appeal, we clarify that Strecan-

sky is not an appellant in this matter. It is undisputed that Attorney Marinos entered his appearance on behalf of Weston only, not Weston and Strecansky. Entry of Appearance filed 9/8/11. As a result, the Pennsylvania Appellate Court Management System lists Attorney Marinos as counsel of record for Weston, and Attorney DeEsch as counsel of record for Strecansky.[9] On the same day Attorney Marinos entered his appearance for Weston, he also filed the instant appeal on Weston's behalf. Notice of Appeal filed 9/8/11. It is undisputed that the Notice of Appeal names Weston, alone, as Appellant.

 Further, the Notice of Appeal filed on behalf of *Weston* simply does not conform to the Rules of Appellant Procedure in such a way as to render *Strecansky* an appellant in this matter. The form of a notice of appeal is governed by Pa. R.A.P. 904, pertaining to the Content of Notice of Appeal.[10] Rule 904 requires that the caption state the parties to the appeal "as they stood upon the record of the lower court at the time the appeal was taken." Pa.R.A.P. 904(b). Thus, Strecan-

6. Attorney Raeder subsequently filed a Praecipe for Withdrawal of Appearance asking to withdraw his representation of "the Plaintiffs," indicating that "their interests are represented by Dennis A. DeEsch, Esq. and Douglas M. Marinos, Esq." Praecipe for Withdrawal of Appearance filed 9/28/11.

7. Because of a service error, Weston was given until October 21, 2011 to file his Rule 1925(b) Statement, thus it was timely filed.

8. Judge Smith bases this conclusion on the contents of the Notice of Appeal filed by Attorney Marinos, which specifically names Weston only, and is signed by Attorney Marino as "Attorney for Plaintiff" in the singular form (as contrasted to the signature on the Rule 1925(b) Statement, which indicates "Attorney for Plaintiffs" in the plural form). Rule 1925(a) Opinion filed 3/19/12 at 74. Additionally, Judge Smith noted that Attorney Marino specifically entered his appearance on behalf of Weston only, and that "appellate

docket sheets in this matter also indicate that Weston in the only appellant in this appeal." *Id.* at 74–75.

9. Pursuant to Pa.R.A.P. 120, pertaining to Entry of Appearance, any counsel filing papers required or permitted to be filed in an appellate court must enter his or her appearance with the prothonotary of that court, unless counsel has been previously noted on the docket. Here, as we noted, Attorney Marinos' entry of appearance on Weston's behalf was docketed in the lower court, as was the entry of appearance of Attorney DeEsch for Strecansky. Attorney Marinos has never entered his appearance on behalf of Strecansky.

10. "In order to perfect an appeal, parties must strictly adhere to the statutory provisions for filing an appeal." *Criss v. Wise,* 566 Pa. 437, 781 A.2d 1156, 1159 (2001).

sky's name properly appears in the caption of the Notice of Appeal, since he was a party to the underlying action, but the appearance of his name in that caption is, alone, insufficient to place him in the position of appellant. Rule 904 further sets forth that the body of the Notice of Appeal state "Notice is hereby given that [name of party, plaintiff or defendant], hereby appeals...." Pa.R.A.P. 904(a). In the Notice of Appeal at issue here, the body does *not* name Strecansky as an appealing party, it only names Weston.

■ Although the "[f]ailure of an appellant to take any step *other than the timely filing of a notice of appeal* does not affect the validity of the appeal ...", the Notice of Appeal filed on behalf of Weston by his counsel of record, Attorney Marinos, does not function as a notice of appeal on behalf of Strecansky, and Strecansky has never taken that vital, initial step of filing a timely notice of appeal. Pa.R.A.P. 902 (emphasis added).[11]

■ Further, we agree with Judge Smith that Strecansky is not automatically rendered an appellant by virtue of his position as co-plaintiff in the underlying matter. Any aggrieved party *may* appeal. Pa.R.A.P. 501. Parties interested jointly in a matter *may* join as appellants. Pa.R.A.P. 512.[12] While it is clear that Strecansky *could have* appealed in his own right, or joined in Weston's appeal, he simply did not do so. Pa.R.A.P. 902, 904.

■ Because there has been no Notice of Appeal filed to place Strecansky in the position of appellant, his status in this appeal is governed by Rule 908, pertaining to "Parties on Appeal," which directs that:

All parties to the matter in the court from whose order the appeal is being taken shall be deemed parties in the appellate court, unless the appellant shall notify the prothonotary of the appellate court of the belief of the appellant that one or more of the parties below have no interest in the outcome of the appeal. A copy of such notice shall be served on all parties to the matter in the lower court, and a party noted as no longer interested may remain a party in the appellate court by filing a notice that he has an interest in the appeal with the prothonotary of the appellate court. All parties in the appellate court other than the appellant shall be appellees, but appellees who support the position of the appellant shall meet the time schedule for filing papers which is provided in these rules for the appellant.

Pa.R.A.P. 908. As such, under Rule 908, Strecansky must be considered an appellee. *See also Twp. of Concord v. Concord Ranch, Inc.*, 664 A.2d 640 (Pa. Commw.Ct.1995).[13]

---

11. "An appeal permitted by law as of right from a lower court to an appellate court shall be taken by filing a notice of appeal with the clerk of the lower court within the time allowed by Rule 903 (time for appeal)." Pa. R.A.P. 902.

12. Pursuant to Rule 512:
Parties interested jointly, severally or otherwise in any order in the same matter or in joint matters or in matters consolidated for the purposes of trial or argument, may join as appellants or be joined as appellees in a single appeal where the grounds for appeal are similar, or any one or more of them may appeal separately or any two or more may join in an appeal.
Pa.R.A.P. 512.

13. Therein, the Commonwealth Court noted that a party to the underlying action had not appealed, and explained:
Pursuant to Pa. R.A.P. 908, "[a]ll parties to the matter in the court below shall be deemed parties in the appellate court ... [and a]ll parties in the appellate court other than the appellant shall be appellees...." Commentary to Pa.R.A.P. 908 states that "any 'deemed' appellee who supports the

We thus turn to the allegations of error Weston raises on appeal.

Our standard of review in non-jury trials is to assess whether the findings of facts by the trial court are supported by the record and whether the trial court erred in applying the law. Upon appellate review the appellate court must consider the evidence in the light most favorable to the verdict winner and reverse the trial court only where the findings are not supported by the evidence of record or are based on an error of law. *Allegheny County Housing Authority v. Johnson*, 908 A.2d 336, 340 (Pa.Super.2006). Our scope of review regarding questions of law is plenary. *Skiff re Business, Inc. v. Buckingham Ridgeview, LP*, 991 A.2d 956 (Pa.Super.2010).

The court's findings are especially binding on appeal, where they are based upon the credibility of the witnesses, "unless it appears that the court abused its discretion or that the court's findings lack evidentiary support or that the court capriciously disbelieved the evidence." *Fudula v. Keystone Wire & Iron Works, Inc.*, 283 Pa.Super. 502, 424 A.2d 921, 927 (1981).

Judicial discretion requires action in conformity with law on facts and circumstances before the trial court after hearing and consideration. Consequently, the court abuses its discretion if, in resolving the issue for decision, it misapplies the law or exercises its discretion in a manner lacking reason.

*Miller v. Sacred Heart Hosp.*, 753 A.2d 829, 832 (Pa.Super.2000) (internal citations omitted). "To the extent that the trial court's findings are predicated on errors of law, we review the court's findings de novo." *John B. Conomos, Inc. v. Sun Co., Inc. (R & M)*, 831 A.2d 696, 704 (Pa.Super.2003), appeal denied, 577 Pa. 697, 845 A.2d 818 (2004).

*Hart v. Arnold*, 884 A.2d 316, 331 (Pa.Super.2005).

■ Weston first asks us to determine: 1. Whether the lower court erred as a matter of law by entering verdict in favor of the Defendants on the basis that almost all of the particular breaches or harms complained of by Plaintiffs were not suffered directly and, therefore, Plaintiffs lacked standing to bring their claims against Defendants for breach of fiduciary duty and fraud?

Appellant's brief at 7, 71. A review of the argument provided by Weston in support of this issue reveals his first allegation to essentially be that Judge Smith erred in relying on "no other authority" than *Kenworthy v. Hargrove*, 855 F.Supp. 101 (E.D.Pa.1994) when finding that Weston did not have standing to bring individual claims for breach of fiduciary duty and fraud. *Id.* at 71–73.[14]

position of the appellant would seem to be limited to the issues raised by the appellant.... Accordingly, it behooves a party who seeks to challenge a trial court order ... to file a separate appeal or cross appeal, thus becoming an appellant in the appellate court." 1 Pennsylvania Appellate Practice 2d, § 908:3 (1994).

*Twp. of Concord*, 664 A.2d at 650.

**14.** *Kenworthy* involved ten limited partners of a Pennsylvania private bank who brought suit "to redress the individual losses suffered by each limited partner" after the bank's assets and deposits were seized by Pennsylvania's Secretary of Banking and transferred to another institution. *Kenworthy*, 855 F.Supp. at 103. The defendants filed a motion for partial summary judgment, asserting that the plaintiffs lacked standing to sue in their individual capacity. *Id.* at 104. The United States District Court for the Eastern District of Pennsylvania evaluated the motion under Pennsylvania Partnership law, noting that:

Although the Pennsylvania Supreme Court has not yet offered us guidance for determining whether such claims may be brought derivatively, on behalf of the partnership, or whether they may be brought individually by plaintiffs, we believe we can predict Pennsylvania's law by looking to other state courts' interpretations of similar provisions of the ULPA. In New York, courts have held that the answer to this question depends on whether the primary injury alleged in the complaint is to the partnership or to the individual plaintiffs.... When a limited partner alleges wrongs to the limited partnership that indirectly damaged a limited partner by rendering his contribution or interest in the limited partnership valueless, the limited partner is required to bring his claim derivatively on behalf of the partnership.... We believe Pennsylvania courts will adopt this approach and, therefore, will apply New York's interpretation of the ULPA to the facts of this case.[8]

-------

[8] Indeed, the Honorable Forrest G. Schaeffer, President Judge of the Court of Common Pleas of Berks County, Pennsylvania, already has ruled on this precise issue in the Limited Partner Plaintiffs' attempt to assert similar claims in a state court action. See Order of February 4, 1994, *Dinnocenti v. Hargrove*, Civ. No. 5475–92, AD (P.J. Schaeffer, Court of Common Pleas, Berks County, Pa.) Judge Schaeffer dismissed all claims of the Limited Partners, with the exception of a claim for fraudulent misrepresentation, "because the [limited partners] cannot be parties to a proceeding by a partnership and because this is not a proceeding to enforce the limited partners' right against or liability to the partnership." *Id.* at 4.

*Kenworthy* at 105–106 (some citations omitted). In the process of reviewing Pennsylvania's partnership law, the *Kenworthy* Court explained:

In Pennsylvania, a limited partnership is a creation of the state legislature, through which the state "permits a manner of doing business whereby individuals may invest their money free of the fear of unlimited liability and of the responsibilities of management." *Freedman v. Tax Review Board of City of Philadelphia*, 212 Pa.Super. 442, 449, 243 A.2d 130, 135 (1968), aff'd, 434 Pa. 282, 258 A.2d 323 (1969). Pennsylvania has adopted the Uniform Limited Partnership Act ("ULPA"), 59 Pa.C.S.A. §§ 501–

569, Act of December 19, 1975 (P.L. 524, No. 155),[6] which provides in relevant part:

§ 511. Limited Partnership defined

A limited partnership is a partnership formed by two or more persons under the provisions of section 512 (relating to formation), having as members one or more general partners and one or more limited partners. The limited partners as such shall not be bound by the obligations of the partnership.

\* \* \* \* \* \*

§ 545. Parties to actions

A contributor, unless he is general partner, is not a proper party to proceedings by or against a partnership, except where the object is to enforce a limited partner's right against or liability to the partnership.

Accordingly, limited partners surrender the right to participate in the conduct of the partnership in exchange for the benefits of limited liability. The Pennsylvania Supreme Court has expressly noted the restricted role of limited partners:

In exchange for exposure to only limited liability, and the tax advantages available because of the use of the limited partnership entity [], the limited partners must abstain from participation in the conduct of the business.

*In re Estate of Hall*, 517 Pa. 115, 134, 535 A.2d 47, 56 (1987) (emphasis added).

Despite these operational restrictions, federal courts have held that a limited partner may bring a derivative action on behalf of the partnership for malfeasance of the general partners, pursuant to Section 545 of the Pennsylvania ULPA. *Engl v. Berg*, 511 F.Supp. 1146, 1152–53 (E.D.Pa.1981). *See Klebanow v. New York Produce Exchange*, 344 F.2d 294, 297–98 (2d Cir.1965) (upholding right to bring derivative action under identical provision of ULPA in New York); *Riviera Congress Associates v. Yassky*, 18 N.Y.2d 540, 547–48, 223 N.E.2d 876, 879–80, 277 N.Y.S.2d 386, 392 (1966) (confirming *Klebanow's* prediction of New York law).[7]

-------

[6] In December 1988, the General Assembly of Pennsylvania replaced the ULPA with the Revised Uniform Limited Partnership Act ("RULPA"), 15 Pa.C.S.A. § 8501–8594, Section 302(e)(1) of Act of December 21, 1988 (P.L. 1444, No. 177). However, Section 304(a)(5) of the RULPA states that it:

Judge Smith's Rule 1925(a) Opinion explains his reasoning on this issue as follows:

[W]e note that there is a dearth of Pennsylvania appellate case law addressing whether a limited partner may maintain a direct against a general partner in a limited partnership for breach of fiduciary duty or fraud.[88] In *Kenworthy v. Hargrove*, 855 F.Supp. 101 (E.D.Pa.1994), the court noted this lack of guidance and predicted how the Supreme Court of Pennsylvania would rule when addressed with the issue as to whether limited partners could bring direct claims against a general partner. 855 F.Supp. at 106.

The court examined other states' interpretations of the Uniform Limited Partnership Act, and focused particularly on New York jurisprudence on the issue. *Id.* The court then determined

"... shall take effect 90 [ninety] days after the Governor publishes a proclamation in the Pennsylvania Bulletin stating that the Governor has found that the United States Internal Revenue Service has determined that 15 Pa.C.S. ch. 85 (relating to limited partnerships) corresponds to the Uniform Limited Partnership Act for purposes of 26 C.F.R. § 301.7701–2. The Governor shall issue such a proclamation upon being furnished with a copy of a ruling by the Internal Revenue Service to that effect. Delay in the repeal of 59 Pa.C.S. ch. 5 and enactment of 15 Pa.C.S. § 8502(a) shall not postpone the effective date of 15 Pa.C.S. ch. 85, and pending repeal of 59 Pa.C.S. ch. 5, persons may utilize either statute at their election, which shall be expressed in the partnership agreement, for the government and regulation of the affairs of the limited partnership. A partnership agreement that fails to identify expressly the statute applicable to the partnership shall be deemed to contain an election to be governed by 59 Pa.C.S. ch. 5. On the effective date of the repeal of 59 Pa.C.S. ch. 5, any partnership then governed by that chapter shall thereafter be governed by 15 Pa.C.S. ch. 85.

that Pennsylvania courts would adopt the New York approach, which is as follows:

[T]he answer to this question depends on whether the primary injury alleged in the complaint is to the partnership or to the individual plaintiffs. When a limited partner alleges wrongs to the limited partnership that indirectly damaged a limited partner by rendering his contribution or interest in the limited partnership valueless, the limited partner is required to bring his claim derivatively on behalf of the partnership. [Further,]

[A] limited partner's power to vindicate a wrong done to the limited partnership and to enforce redress for the loss or diminution in value to his interest is no greater than that of a stockholder of a corporation.

Because no proclamation has yet been issued by the Governor, and since the parties in this case had not expressed their intention to elect to use the RULPA for the regulation of Knoblauch Private Bank, the older statute, the ULPA, 59 Pa.C.S. ch. 5, would govern here.

The determination of whether to apply the ULPA or the new RULPA in this matter is not material, however, since the RULPA contains a similar provision to that found in the older ULPA, governing the ability of limited partners to bring an action on behalf of the partnership. See infra note 7, quoting from 15 Pa.C.S.A. § 8591.

[7] The right of limited partners to bring a derivative suit on behalf of the partnership has been codified in the RULPA. The relevant provision of that statute, as adopted by the Pennsylvania legislature, states:

A limited partner may bring an action in the right of a limited partnership to recover a judgment in its favor if general partners with authority to do so have refused to bring the action or if an effort to cause those general partners to bring the action is not likely to succeed.

15 Pa.C.S.A. § 8591 (emphasis added). *Kenworthy*, 855 F.Supp. at 104–105.

As a general proposition, where a corporation suffers loss because of the acts of officers, directors, or others which diminish or render valueless the shares of stock of a stockholder, the stockholder does not have a direct cause of action for such damages, but has a derivative cause of action on behalf of the corporation to recover the loss for the benefit of the corporation.

*Id.* (internal citations omitted).

While the court in *Kenworthy* also noted that since the general partners had also filed suit seeking to enforce the rights of the partnership, the limited partners could not also maintain their causes of action, the defendant had argued that the plaintiffs had brought their claims as derivative actions on behalf of the partnership. *Id.* at 104. Thus, the court addressed two concerns. The court first determined that the limited partners' argument that they could proceed with a direct action was not sustainable. Then, the court concluded that even if the limited partners were attempting to proceed with a derivative claim, the general partners were already pursuing an action on behalf of the limited partnership and Pennsylvania law would not permit a double recovery. *Id.* at 107–08 (citations omitted).

The same rationale espoused in *Kenworthy* has been followed by at least a couple unpublished federal court decisions. See generally *Weaver v. Mobile Diagnostech, Inc.,* No. CIV–A 02–1719, 2007 WL 1830712 (W.D.Pa. June 25, 2007) (describing cases and analyzing difference with direct and derivative suits in partnership context). We also note that the test espoused in *Kenworthy* is similar to that of determining whether a shareholder's action is direct or derivative in the corporate context. *See, e.g., Tyler v. O'Neill,* 994 F.Supp.

603, 609–10 (E.D.Pa.1998). As such, we followed the rationale in *Kenworthy* even though we recognize that as a federal district court decision, it is not binding authority on this court.

As we indicated in our decision in November 2010, almost all of the plaintiffs' claims for breach of fiduciary duty and fraud (especially as mentioned in the Complaint) related to alleged injuries to the partnership and not to the individual plaintiffs. More specifically, some of these indirect claims that should have been brought as a derivative action include (1) the claims relating to SHALP I entering into a twenty-year lease with Kusko to rent the second floor of the medical office building, (2) the Management Committee's decision to pay Kusko six percent of the 2–ross revenue of SHALP 1, (3) Kusko's creation and operation of SHALP II, (4) the sharing of employees between SHALP I and SHALP II, (5) SHALP I's loan to Sacred Heart, (6) SHALP I entering into the March 13, 2006 cooperative agreement with SHALP II, and (7) Kusko's running of the SHALP I Management Committee meetings. On the other hand, Weston's claim concerning the termination of his management contract would be an injury distinct from those of the other partners, as would Strecansky's claim that he was promised an ownership interest in the medical office building in exchange for a reduced rate for the construction of the building.[89] Therefore, we determined that it appeared that almost all of the plaintiffs' claims were indirect claims asserting damages suffered by the partnership itself at the hands of the appellees and the plaintiffs would not have standing to bring those claims.

[88] Contrary to a direct action, the right of a limited partner to bring such claims derivatively

is clear. More specifically, section 8951 of the Revised Uniform Limited Partnership Act states as follows:

> A limited partner may bring an action in the right of a limited partnership to recover a judgment in its favor if general partners with authority to do so have refused to bring the action or if an effort to cause those general partners to bring the action is not likely to succeed. The derivative action may not be maintained if it appears that the plaintiff cannot fairly and adequately represent the interests of the limited partners in enforcing the rights of the partnership.

15 Pa.C.S. § 8951.

[89] Arguably, Weston's claim that Kusko told him that all of the partners of SHALP I would receive an ownership interest in the medical office building would not be an injury distinct from those of the other partners as by Weston's own words, all of the partners were supposed to get an interest in the building. Pa.R.A.P. 1925(a) Opinion at 76–78.

In faulting Judge Smith for his reliance on *Kenworthy*, Weston points out that "[o]ther states courts have ruled differently and allowed limited partners to commence suit in their name for claims that may be considered of the individual partner." *Id.* at 73. The mere existence of cases from other states, however, fails to render Judge Smith's reliance on *Kenworthy* reversible error.[15] *Skiff, supra.*

■ Weston's second appellate issue asks us to determine:

15. We note that *Kenworthy* has been cited favorably by other courts, such as the Court of Appeals of Georgia, which, lacking binding authority addressing what rights a limited partner may assert in a claim against the partnership, indicated that it would "look to the law of other jurisdictions considering the same question under the ULPA, so as 'to effect its general purpose to make uniform the law of those states which enact it.' " *Hendry v. Wells*, 286 Ga.App. 774, 650 S.E.2d 338, 346–47 (2007). *Kenworthy* has also been relied upon by the Federal District Court for the Western District of Pennsylvania, which explained:

> To determine whether a complaint states a direct or derivative cause of action, courts look to the "nature of the wrongs alleged in the body of the complaint, not the plaintiff's designation or stated intention." *Strasenburgh v. Straubmuller*, 146 N.J. 527, 683 A.2d 818, 830 (N.J.1996). Generally, the distinction between direct and derivative actions depends upon whether the harm alleged by the plaintiff is independent of the harm suffered by the corporation or partnership. *HB Gen. Corp. v. Manchester Partners, L.P.*, 95 F.3d 1185, 1194 (3d Cir.1996). When a plaintiff alleges harm which she has suffered indirectly, through the partnership, such as a the diminution of the value of her investment, malfeasance by the general partners, waste, or breach of fiduciary, the claim must be brought derivatively on behalf of the partnership. See *Strasenburgh*, 683 A.2d at 829–30 (finding diminution in value, waste, and breach of fiduciary

to be classically derivative); *Kenworthy v. Hargrove*, 855 F.Supp. 101, 106 (E.D.Pa. 1994) (noting that malfeasance is the type of derivative action contemplated by Pennsylvania's version of § 1001 of the ULPA). On the other hand, if the plaintiff establishes an injury "separate and distinct" from that suffered by other limited partners, she may proceed against the partnership directly. *Strasenburgh*, 683 A.2d at 830 (quoting *Moran v. Household Int'l, Inc.*, 490 A.2d 1059, 1070 (Del.1985) [ (Del.Ch. 1985) ] ). A classic example of independent harm which should be brought individually is interference with the contractual rights of an investor. *Id.*

*U.S. Small Bus. Admin. v. Propper*, CIV.A. 03–5982, 2004 WL 2624759 (E.D.Pa. Nov. 17, 2004). Citations to Kenworthy also appear in Standard Pennsylvania Practice 2d § 112:19. ("Under Pennsylvania law as predicted by the federal district court, when a limited partner alleges wrongs to the limited partnership that indirectly damaged the limited partner by rendering his or her contribution or interest in the limited partnership valueless, the limited partner is required to bring a claim derivatively on behalf of the partnership."), and Summary of Pa. Jurisprudence.2d Business Relationships § 18:92 (2d ed.) ("When a limited partner alleges wrongs to a limited partnership that indirectly damaged the limited partner by rendering his or her contribution or interest in the limited partnership valueless, the limited partner is required to bring the claim derivatively on behalf of the partnership.").

2. Whether the lower court erred as a matter of law by entering verdict in favor of the Defendants on the basis that Plaintiffs lacked standing to bring their claims against Defendants for breach of fiduciary duty and fraud, despite evidence that Defendants, as the general partners, breached their duty not to use their power in such a way to exclude, Plaintiffs, as limited partners, from their proper share of the benefits accruing from the general partnership Northampton Personal Care Associates, L.P.

Appellant's brief at 7, 84. Judge Smith's Rule 1925(a) Opinion has exhaustively and correctly addressed Weston's allegations, and, following our review of the record and the applicable case and statutory law, we rely thereon in finding that Weston has failed to show that Judge Smith's determination is either unsupported by the record or legal error. Rule 1925(a) Opinion filed 3/19/12 at 78–92 (finding that "even if the plaintiffs had standing, we determined that they did not sustain their burdens of proof on either of their causes of action for breach of fiduciary duty or fraud," and discussing those issues in complete detail).

 Weston's third issue asks us to determine:

3. Whether the lower court erred as a matter of law by entering verdict in favor of the Defendants on Plaintiffs' cause of action for fraud despite clear and convincing evidence that Defendants committed the acts complained of and defrauded Plaintiffs from their proper share of the benefits accruing from the general partnership.

Appellant's brief at 7, 93.

The elements of fraudulent misrepresentation are as follows:

(1) A representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and, (6) the resulting injury was proximately caused by the reliance.

*Heritage Surveyors & Eng'rs, Inc. v. Nat'l Penn Bank,* 801 A.2d 1248, 1250–51 (Pa.Super.2002). Scienter, or the maker's knowledge of the untrue character of his representation, is a key element in finding fraudulent misrepresentation. See Restatement (Second) of Torts § 526, Comment a.

*Ira G. Steffy & Son, Inc. v. Citizens Bank of Pennsylvania,* 7 A.3d 278, 290 (Pa.Super.2010), appeal denied, 611 Pa. 675, 27 A.3d 1015 (2011). Fraud must be proven by clear and convincing evidence. *Hart, supra; Goldstein v. Phillip Morris, Inc.,* 854 A.2d 585, 590 (Pa.Super.2004).

Turning to the matter before us, Judge Smith's Rule 1925(a) Opinion has again thoroughly dealt with Weston's allegation. Therein, the judge has set forth the elements of fraud expressed above, addressed each of the actions alleged by Weston to constitute fraud, and explained why Weston failed to meet his burden of proving fraud by clear and convincing evidence. Following our review of the record, and the law applicable to this allegation, we find Judge Smith's determination fully supported by the record and free of legal error. Therefore, we decline to grant Weston appellate relief on this issue, and rely on Judge Smith's Rule 1925(a) Opinion. Rule 1925(a) Opinion filed 3/19/12 at 92–97.

Weston's final issue for our review asks us to determine "[w]hether the lower court erred as a matter of law by disregarding the outrageous, self serving and fraudulent acts of Defendants as set forth at trial and above in determining that Plaintiffs are

not entitled to punitive damages." Appellant's brief at 7, 94.

■■■■■ "A request for punitive damages does not constitute a cause of action in and of itself. Rather, a request for punitive damages is merely incidental to a cause of action. [A] cause of action for misrepresentation can support a claim for punitive damages." *McClellan v. Health Maint. Org. of Pennsylvania*, 413 Pa.Super. 128, 604 A.2d 1053, 1061 (1992) (citation omitted). However:

> Punitive damages will lie only in cases of outrageous behavior, where defendant's egregious conduct shows either an evil motive or reckless indifference to the rights of others. Punitive damages are appropriate when an individual's actions are of such an outrageous nature as to demonstrate intentional, willful, wanton, or reckless conduct.

*J.J. DeLuca Co., Inc. v. Toll Naval Associates*, —— Pa.Super. ——, 56 A.3d 402 (2012) (citation omitted).

> Outrageous conduct is an "act done with a bad motive or with a reckless indifference to the interests of others." "Reckless indifference to the interests of others", or as it is sometimes referred to, "wanton misconduct", means that "the actor has intentionally done an act of an unreasonable character, in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow."

*Smith v. Brown*, 283 Pa.Super. 116, 423 A.2d 743, 745 (1980) (citations omitted).

> [I]n Pennsylvania, a punitive damages claim must be supported by evidence sufficient to establish that (1) a defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed and that (2) he acted, or failed to act, as the case may be, in conscious disregard of that risk.

*Snead v. Soc'y for Prevention of Cruelty to Animals of Pennsylvania*, 929 A.2d 1169, 1184–85 (Pa.Super.2007), aff'd, 604 Pa. 166, 985 A.2d 909 (2009) (*citing Hutchison ex rel. Hutchison v. Luddy*, 896 A.2d 1260, 1266 (Pa.Super.2006)).

■■■■ The determination of whether a person's actions arise to outrageous conduct lies within the sound discretion of the fact-finder and will not be disturbed by an appellate court so long as that discretion has not been abused. *J.J. DeLuca Co., supra*. Here, Judge Smith found:

> [T]he appellant failed to prove by a preponderance of the evidence that the appellees breached their fiduciary duty to him. The appellant also failed to prove by clear and convincing, evidence that the appellees committed fraud. We respectfully submit that since the appellees failed to sustain their burdens of proof on their underlying causes of action and since the evidence in the case did not show that the appellees' conduct was so outrageous as to demonstrate willful, wanton or reckless conduct, we did not err in failing to award punitive damages to the appellant in this action.

Rule 1925(a) Opinion filed 3/19/12 at 99. We find that this determination is wholly supported by the record, and that Weston has failed to show that it constitutes an abuse of discretion requiring reversal.

For the foregoing reasons, we affirm the August 12, 2011 entry of judgment in favor of Appellees.

Entry of Judgment Affirmed; Appellees' Application for Relief Denied.

Attachment

IN THE SUPERIOR COURT EASTERN DISTRICT OF PENNSYLVANIA

Superior Court Docket No. 2473 EDA 2011

Randall Weston and James Strecansky,

 Appellants

 vs.

Northampton Personal Care, Inc. and
James Kusko, Individually

 Appellees

LOWER COURT'S MEMORANDUM OPINION PURSUANT
TO PENNSYLVANIA RULE OF APPELLATE PROCEDURE 1925(a) TO BE ATTACHED TO
APPELLANTS' BRIEF

Appeal from the Order of the Court of Common Pleas of Northampton County, Pennsylvania
dated November 9, 2010
Trial Court Docket No. C-48-CV-2005-5306

Douglas M. Marinos, Esquire
Attorney For Appellant
DOUGLAS M. MARINOS & ASSOCIATES. P.C.
101 North Cedar Crest Boulevard
Allentown, PA 18104

Charles E. Shoemaker, Jr., Esquire
Attorney For Appellees
Law Offices Of Charles E. Shoemaker. Jr.
727-729 North 19th Street
Allentown, PA 18104

Jill Kelly McCumsey, Esquire
Philip Hof, Esquire
Seidel Cohen Hof & Reid LLC
CrownPointe Corporate Center
3101 Emrick Boulevard, Suite 205
Bethlehem, PA 18020

---

IN THE COURT OF COMMON PLEAS OF NORTHAMPTON COUNTY, PENNSYLVANIA CIVIL DIVISION

RANDALL WESTON and JAMES STRECANSKY, Appellant,

v.

NORTHAMPTON PERSONAL CARE, INC., and JAMES KUSKO, Individually, Appellees.

No. C–48–CV–2005–5306

Superior Court No. 2473 EDA:2011

### *MEMORANDUM OPINION*

The appellant, Randall Weston ("Weston" or "the appellant"), appeals from "the order entered in this matter on the 9th day of November, 2010 denying Plaintiffs' action for breach of fiduciary duty and fraud."[1] This memorandum opinion is

1. As discussed later herein, we have identified Randall Weston as the sole appellant in this matter as it does not appear that a notice of appeal was filed on behalf of the other plaintiff, James Strecansky.

filed pursuant to Pennsylvania Rule of Appellate Procedure ("Pa.R.A.P.") 1925(a).

## I. *Procedural History*

On August 5, 2005, the appellant and his co-plaintiff, James Strecansky ("Strecansky"), filed a Complaint against the defendants/appellees, Northampton Personal Care, Inc. and James Kusko, individually. In the Complaint, the plaintiffs alleged that "on or about November 14, 1997, the Plaintiffs entered into a Limited Partnership known as Northampton Personal Care Associates, LP, wherein the Plaintiffs are two of five limited partners and Defendant is the general partner." [Complaint, at 5.] This limited partnership was to become the general partner with Sacred Heart Assisted Living Partnership, "in the creation and operation of a personal care/assisted living facility[.]" [*Id.* at ¶ 6.]

The plaintiffs also alleged that since the formation of the partnership, the general partner, by and through its president, the appellee, James Kusko, "breached the fiduciary relationship to the Partnership by engaging in self-dealing which further[ed] the interests of the general partner and its shareholders to the detriment of the Limited Partner[s]." [*Id.* at 8.] The plaintiffs identified the following acts in which the appellees breached their fiduciary duty:

a) Causing the Sacred Heart Assisted Living Partnership [to] enter into a lease for a professional building at terms commercially unreasonable to the partnership which benefits the personal interests of James Kusko.

b) Failing to secure the independent auditors required by Paragraph 9 of the "SHALP" Agreement attached as Exhibit B.

c) Increasing expenses of the partnership to further the interests of the Defendants to [the] detriment of the Limited Partners.

d) Starting a competing entity under the substantially similar name of "Sacred Heart Assisted Living at Saucon Creek."

e) Failing to conduct meetings when requested by partners.

f) Failing to properly account for capital funds.

g) Misrepresentation as to ownership of the medical office building, budget and management decisions.

h) Diverting opportunities available to the partnership in marketing, advertising and otherwise to other entities owned and controlled by James Kusko.

i) Failing to provide true and full information regarding the state of the business and financial condition of the limited partnership as required by 15 Pa.C.S.A. [§] 8525(a).

[*Id.* at 119.]

Based on these allegations, the plaintiffs brought causes of action for breach of fiduciary duty and fraud, and they sought compensatory and punitive damages. The plaintiffs also sought an accounting of the limited partnership. The appellees filed an Answer to the Complaint and New Matter on September 9, 2005. The plaintiffs filed a Reply to New Matter on November 7, 2005.

On December 4, 2008, the appellees filed a Motion for Summary Judgment and supporting brief. The plaintiffs filed a Response to the Motion for Summary Judgment and supporting brief on January 30, 2009. On March 5, 2009, the Honorable Stephen G. Baratta entered an order with statement of reasons denying the appellees' motion.

This matter was assigned to the undersigned for trial from the March 2010 Non–

Jury Trial List, and the trial proceeded from March 15, 2010 until March 23, 2010.[2] At the conclusion of the trial, we took the matter under advisement and requested that the parties submit proposed findings of fact and conclusions of law, The appellees filed their proposed findings of fact and conclusions of law (with a supporting brief) on May 28, 2010, and the plaintiffs filed their proposed findings of fact, conclusions of law, and discussion on June 1, 2010.

On November 9, 2010, we entered a verdict in this matter in favor of the appellees on each of the plaintiffs' causes of action. In our verdict, we noted that, *inter alia*, even if the plaintiffs could somehow show that they have standing to bring this direct action against the appellees, they did not prove by a preponderance of the evidence that the appellees (in particular, Kusko), breached any fiduciary duty to the plaintiffs. In addition, the plaintiffs did not prove by clear and convincing evidence that the appellees committed fraud or that they were otherwise entitled to punitive damages.

On November 24, 2010, the plaintiffs filed a Motion for Judgment Notwithstanding the Verdict or, in the Alternative, for a New Trial and to Accept this Motion Nunc Pro Tune. Although the plaintiffs filed their post-verdict motion well beyond the ten-day period provided in our November 9, 2010 decision and Pennsylvania Rule of

Civil Procedure 227.1(0(2)), the plaintiffs timely filed this motion within ten days of the date of mailing by our Prothonotary's Office, *i.e.* November 15, 2010. [*See* Plaintiffs' Motion for Judgment Notwithstanding the Verdict or, in the Alternative, for a New Trial and to Accept This Motion Nitric Pro Tune, at Exhibit A.][3] On December 3, 2010, the appellees filed an answer to the post-trial motions. We denied the plaintiffs' post-trial motions on June 30, 2011.

The appellees filed a Praecipe to Enter Judgment on Verdict on August 12, 2011. The appellant filed a timely Notice of Appeal on September 8, 2011.[4] Upon receiving notice of the Notice of Appeal, we ordered the appellant to file a concise statement of the matters complained of on appeal in accordance with Pa.R.A.P. 1925(b) on September 15, 2011. Unfortunately, due to a clerical error in our Prothonotary's Office, our order was not sent to the appellant until September 30, 2011. Therefore, on October 6, 2011, we granted the appellant's request for an extension of time to file the Pa.R.A.P. 1925(b) concise statement.

On October 21, 2011, the appellant filed his concise statement of the matters complained of appeal in which he states as follows:

The Court abused its discretion, rendered a decision after a non-jury trial which lacked supporting evidence, or clearly entered as a matter of law:

---

**2.** During the trial, the plaintiffs withdrew their claim for an accounting. [See Notes of Trial—Day Two, 3–16–10, at 205; Notes of Trial—Day Seven, 3–23–10, at 86.]

**3.** Rule 227.1(c)(2) of the Pennsylvania Rules of Civil Procedure provides that a party must file post-trial motions within ten days of the date of the decision in the ease of a trial without a jury. Pa.R.C.P. No. 227.1(c)(2). The Superior Court has concluded that the

ten-day period proscribed in Rule 227.1(c)(2) starts to run on the date that copies of the trial court's order are sent to counsel, *Carr v. Downing*, 388 Pa.Super. 195, 565 A.2d 181, 182 (1989), *allocator denied*, 527 Pa. 628, 592 A.2d 1296 (1990).

**4.** The appeal lies from the date of entry of the judgment, not from the date of the denial of the post-trial motions. *Kaufman v. Campos*, 827 A.2d 1209, 1210 n. 1 (Pa.Super.2003).

1. By entering verdict in favor of the Defendants on the basis that **"almost all** of the particular breaches or harms complained of [by Plaintiffs] were not suffered directly" and, therefore, Plaintiffs lacked standing to bring their claims against Defendants for breach of fiduciary duty and fraud. (Emphasis added).

2. By failing to consider all of the breaches or harms complained of by Plaintiffs when determining whether Plaintiffs lacked standing to bring their claims against Defendants for breach of fiduciary duty and fraud.

3. By entering verdict in favor of the Defendants on the basis that Plaintiffs lacked standing to bring their claims against Appellees/Defendants for breach of fiduciary duty and fraud, despite evidence that Defendants, as the general partners, breached their duty not to use their power in such a way to exclude, Plaintiffs, as limited partners, from their proper share of the benefits accruing from the general partnership[,] Northampton Personal Care Associates, L.P.

4. By erroneously classifying the breaches or harms complained of by Plaintiffs as harms suffered indirectly by Plaintiffs and essentially as claims of Sacred Heart Assisted Living Partnership ("SHALP I") not direct and unique to Plaintiffs.

5. By erroneously relying on federal case law, *Kentworthy* [*Kenworthy* ] *v. Hargrove*, 855 F.Supp. 101 (E.D.Pa. 1994), without any supporting Pennsylvania [c]ase law, and holding that because almost all of Plaintiffs' claims were not direct or unique, Plaintiffs, as limited partners, lacked standing to pursue their claims for breach of fiduciary duty and fraud.

6. By entering verdict in favor of the Defendants on Plaintiffs' cause of action

for breach [of] fiduciary duty despite a preponderance of evidence that Defendants breached their fiduciary duty to Plaintiffs and acted improperly, abused their positions of trust or used various resources to enrich themselves to the detriment of Plaintiffs by: 1) removing Northampton Village, the management company of Plaintiff: Randy Weston (hereinafter "Weston") from managing SHALP I, 2) replacing Northampton Village and Weston as manager of SHALP with Defendant, James Kusko, (hereinafter "Kusko"), 3) paying Kusko a higher fee for his managing services th[a]n paid to Weston or Northampton Village, and 4) having SHALP I pay for employees that Weston previously provided (and paid for) out of his own pocket.

7. By entering verdict in favor of the Defendants on Plaintiffs' cause of action for breach of fiduciary duty despite a preponderance of evidence that Defendants breached their fiduciary duty to Plaintiffs and acted improperly, abused their positions of trust or used various resources to enrich themselves to the detriment of Plaintiffs by having SHALP I enter into a disadvantageous twenty year lease for the second floor of a medical office building owned and operated by Kusko.

8. By entering verdict in favor of the Defendants on Plaintiffs' cause of action for breach [of] fiduciary duty despite a preponderance of evidence that Defendants breached their fiduciary duty to Plaintiffs and acted improperly, abused their positions of trust or used various resources to enrich themselves to the detriment of Plaintiffs by using partnership assets for Kusko's benefit by having SHALP I provide a loan in the amount of $664,385.00 to Sacred Heart Health-

care System (hereinafter "SHHS") to allow SHHS to submit the $800,000.00 capital contribution required by Kusko for interest in Sacred Heart Living Partnership II (hereinafter "SHALP II"), a competing assisted living facility at the intersection in the Stabler Center, Saucon Valley, Pennsylvania created by Kusko and SHHS.

9. By entering verdict in favor of the Defendants on Plaintiffs' cause of action for breach [of] fiduciary duty despite a preponderance of evidence that Defendants breached their fiduciary duty to Plaintiffs and acted improperly, abused their positions of trust or used various resources to enrich themselves to the detriment of Plaintiffs by using SHALP I employees trained by Plaintiffs and possessing intellectual property of Plaintiffs to staff and operate SHALP II.

10. By entering verdict in favor of the Defendants on Plaintiffs' cause of action for breach [of] fiduciary duty despite a preponderance of evidence that Defendants breached their fiduciary duty to Plaintiffs and acted improperly, abused their positions of trust or used various resources to enrich themselves to the detriment of Plaintiffs by improperly running, operating and/or chairing the management committee meetings for SHALP I.

11. By entering verdict in favor of the Defendants on Plaintiffs' cause of action for fraud despite clear and convincing evidence that Defendants committed the acts complained of in paragraphs 6 through 10 above and defrauded Plaintiffs from their proper share of the benefits accruing from the general partnership.

12. By disregarding the outrageous, self[-]serving and fraudulent acts of Defendants as set forth at trial and above in determining that Plaintiffs are not entitled to punitive damages.

[Appellant's Concise Statement of Matters Complained of on Appeal Pursuant to Pa. R.A.P. 1925(b).]

## II. *Factual Findings from Non–Jury Trial*

During the seven-day trial, we carefully considered the evidence presented at trial and, after assigning such weight to the evidence as we deemed proper and after disregarding the testimony that we found to lack credibility, we found the following facts:

### A. James Kusko

James Kusko ("Kusko") received his Bachelor of Science degree in accounting from Lehigh University in 1976. [Notes of Trial—Day One, 3–15–10 ("Day One Tr."), at 11; Notes of Trial—Day Six, 3–22–10 ("Day Six Tr."), at 40.] After graduating from Lehigh University, Kusko first worked as a cost accountant. [Day Six Tr., at 40.][5] Approximately twelve to

---

5. Kusko explained that

[c]ost accounting is a method of accounting where you look at budgets and performance and you try to maximize your performance when you're dealing with certain companies.

You have to analyze how those companies are performing, and then you calculate different departments and try to make them efficient.

In other words, if you segment your cost in different areas depending on the compa-

ny that you're dealing with when you segment those costs, you want to make sure that they're the most efficient cost that you can have for each department.

So that specific company, whatever it is, operates very efficiently. That was my background. it's very important to be able to keep your cost under control or you won't make money.

[Day Six Tr., at 41.]

eighteen months later, Kusko became engaged in the real estate business. [*Id.* at 42.]

Although initially Kusko sold real estate, he eventually started acquiring rental real estate, including commercial properties, to take advantage of the depreciation deduction on his tax return. [*Id* at 43.] During this time, Kusko acted as a general contractor in the construction of single family dwellings and apartment buildings, and he also renovated commercial properties. [*Id.* at 43–45.]

While Kusko was operating in the real estate business, he partnered with a collegiate friend in an advertising business called Total Marketing Resources ("TMR"). [*Id.* at 45–46.] Kusko's involvement in the advertising business led him to form Target Select (now known as ViaMedia) (hereinafter referred to as "ViaMedia"), an advertising business specializing in the sale and placement of television advertisements on cable television channels. [*Id.* at 4–6, 46–48.] [6] These cable channels include all of those received in the Lehigh Valley, with the exception of the three major networks and Channel 69, provided through cable providers, Service Electric Cable Television, RCN, and Blue Ridge Cable Company. [*Id.* at 4, 5, 47–48.]

By the time of trial, Kusko indicated that he was associated with a number of different businesses other than ViaMedia, including, among, others: (1) Sacred Heart Senior Living; (2) Teledrill Incorporated, an oil research and development company; and (3) various commercial and residential real estate holdings. [Day One Tr., at 2.]

### B. The Creation of Sacred Heart Assisting Living Facility

On or about June 29, 1989, Kusko bought approximately seven-and-a-half acres of property (the "Property") in the Borough of Northampton from Super Rite Foods. [Day Six Tr., at 48; Defendants' Exhibit 53.] At the time, this property was zoned for commercial business. [Day Six Tr., at 49.] Kusko sought to subdivide the property into two parcels, one of which he initially planned to use for a multi-family dwelling or apartment building. [*Id.* at 49.] Local residents opposed the use of part of the property for multi-family dwellings, so Kusko decided to seek approval to use the property for assisted senior living. [*Id.* at 49–50.] Kusko was able to get part of the property approved for assisted living via a variance and, on February 22, 1996, he subdivided the property into two parcels: Lot #1, consisting of 4.8759 acres designed for an assisted living facility, and Lot #2, consisting of 2.6344 acres and remaining zoned for commercial use. [*Id.* at 49–53, 54; Defendants' Exhibits 54, 56, 57.] [7] As of this time in February 1996, Kusko intended to use Lot #1 for the construction of an assisted living facility, and Lot #2 for a commercial building or medical office. [Day Six Tr., at 54.]

Since Kusko intended to use Lot #1 to construct an assisted living facility, he realized that he needed to learn how to operate such a facility. [*Id.* at 54–55; Day One Tr., at 12, 122–23.] In May 1996, Kusko combined with a group of investors to purchase the personal care/assisted lining facility known as Trexler Park Manor and located in South Whitehall Township, Pennsylvania. [Day One Tr., at 12, 122–

**6.** Kusko is the majority owner of ViaMedia. [Day Six Tr., at 5.]

**7.** Kusko was unable to recall how much of the property required a variance for assisted living. [Notes of Trial—Day Seven, 3–23–10, at 5–7.]

23; Day Six Tr., at 55; Day Seven Tr., at 7.] At the time, Trexler Park Manor was an old nursing home, and they gutted the inside of the premises and turned it into about a forty-five to fifty bed facility. [Day One Tr., at 123; Day Six Tr., at 55.] Kusko hired an individual by the name of Dean Pulzinsky to manage Trexler Park Manor, and the business started operating in late 1996. [Day One Tr., at 124; Day Six Tr., at 55.] [8]

As he was learning about how to operate an assisted living facility out of Trexler Park Manor, Kusko began to engage in discussions for the construction and operation of an assisted living facility on Lot # 1 of the Property. [Day Six Tr., at 56–57.] [9] After engaging in discussions with businesses from New Jersey and Wilkes Bane, Pennsylvania, Kusko eventually began preliminary discussions with another member of Saucon Valley Country Club, James Strecansky ("Strecansky"). [*Id.*] Strecansky was experienced in the commercial construction business. [*Id.* at 57.]

Based on Kusko and Strecansky's discussions about Kusko's desire to build an assisted living facility, Strecansky suggested to Kusko that he consider partnering with Sacred Heart Hospital in such a business. [*Id.*] Kusko recognized that Sacred Heart Hospital's name recognition and reputation was exceptional, and there were no other Catholic-based facilities in the area. [*Id.* at 57–58.] In addition, partnering with Sacred Heart Hospital would provide instant name recognition for the new business, provide a potential source of referrals to the new enterprise, and assist Sacred Heart Hospital in fulfilling its not-for-profit mission both through the financial success and through the level of care and the costs therefor that would be provided at the new personal care/assisted living facility. [*Id.* at 57–59; Notes of Trial—Day Five ("Day Five Tr."), 3–19–10, at 132–33.]

Strecansky then introduced Kusko to Joseph Cimerola ("Cimerola"), President and CEO of Sacred Heart Hospital and Sacred Heart Healthcare System, Inc. (hereinafter "Sacred Heart"). [Notes of Trial—Day Two, 3–16–10 ("Day Two Tr."), at 132, 196; Day Six Tr., at 57–58.] Thereafter, Kusko prepared a *pro forma* budget for the construction and operation of what was to become Sacred Heart Assisted Living Facility ("SHALF"), with the initial plan being to construct a three-story building, completing the first two floors immediately and finishing the third floor at some later date. [Day Two Tr., at 197; Day Six Tr., at 58–59, 63–64; Defendants' Exhibit 43.] Based on their discussions, Sacred Heart appeared to be interested in the project. [Day Six Tr., at 59–60.] [10]

Kusko researched the banking and financial side of the project, while Strecansky was assessing the costs for the building and arranging for the drawing of architectural plans. [*Id.* at 60.] As part of his work, Kusko started to look for investors and for someone to manage the day-to-day operations of the assisted living facility. [*Id.* at 60–61.] Through

---

**8.** Pertinent to our later discussion, Kusko did not pay Mr. Pulzinsky a percentage of the gross revenues as his salary. [Day One Tr., at 124.] Instead, he was a partner, and he "was set up just like [Weston] was." [*Id.*]

**9.** Kusko eventually left the operation at Trexler Park once the business had an issue with the death of one of the residents, [Day One Tr., at 124.]

**10.** Gombert recalled that she made a presentation to Sacred Heart's Board of Directors. [Day Two Tr., at 200, 201, 202.] The presentation included the *pro forma* budget. [*Id.* at 203.]

another acquaintance from Saucon Valley Country Club, Jack Pavis, who was also the owner of a pharmacy in Northampton and would later become one of the limited partners in Northampton Personal Care Associates, L.P., Kusko was introduced to the plaintiff, Randall Weston ("Weston"). [*Id.* at 61.] [11]

After Kusko and Weston met, they discussed the potential project and Kusko asked Weston whether he would be interested in managing the day-to-day operations of the assisted living facility, subject to the requirement that Weston purchase an equity interest in the business. [Day Six Tr., at 62.] Weston indicated that he was interested in becoming the manager of the day-to-day operations of the personal care/assisted living facility to be constructed by Sacred Heart and Kusko. [*Id.* at 62.] Additionally, at some point during or after their discussions, Kusko toured Weston's facility at Northampton Village As-

sisted Living, and noted that it was very similar to Kusko's facility at Trexler Park Manor. [*Id.* at 63, 65.]

In October 1997, Sacred Heart publicly announced its plans to construct a personal care/assisted living facility in Northampton Borough, and the Morning Call newspaper also published the announcement. [*Id.* at 71–72; Defendants' Exhibit 39.] During that same month, counsel for Sacred Heart, Attorney Joseph Budny, sent a draft of the proposed partnership agreement to Kusko. [Day Six Tr., at 65; Defendants' Exhibit 38.] In the proposed partnership agreement, Sacred Heart would be a 50% general partner and an entity to be formed by Kusko, which would include a group of investors, would constitute the other 50% partner. [Day Six Tr., at 66, 67; Defendant's Exhibit 38.]

As the parties were negotiating the terms of the agreement, Kusko created the limited partnership known as Northamp-

---

11. We recognize that Weston testified that he had been the one to contact Kusko, *see* Transcript of Proceedings PM Session, 3–18–10, at 7–9, but we found Kusko's testimony on this issue to be more credible. Regardless, the facts relating to how the parties met has little relevance to the ultimate issues in this proceeding.

Weston has a Bachelor of Science degree in occupational therapy from Eastern Michigan University. [Transcript of Proceedings PM Session, 3–18–10, at 4.] Weston initially trained at Moss Rehabilitation Service in Philadelphia before eventually moving to the Lehigh Valley to work at Good Shepherd Rehabilitation Hospital. [*Id.* at 4.] After working at a couple of other entities, including Sacred Heart, Weston started the Weston Group physical therapy company in 1992.[*Id.*] The Weston Group provided on-site rehabilitation services for assisted living communities. [*Id.*] It currently provides occupational, physical, and speech therapy to over two hundred communities and eighteen states. [*Id.*]

In 1994, Weston started Northampton Village, Incorporated, which designs, develops,

and operates assisted living communities. [*Id.* at 5.] Weston also purchased his first assisted living building named Northampton Village Assisted Living, and he hired Carol Blazo to assist him at the facility. [*Id.* at 6.] Although originally Northampton Village Assisted Living had only thirteen beds, by approximately early 1996, the facility had approximately forty-eight beds. [*Id.* at 6, 7]

Since 1994, Weston has owned (in whole or in part) several personal care/assisted living facilities other than Northampton Village. Included in these other facilities are: (1) in 1999, he owned Sullivan Trail in Easton; (2) in 2003, Emmaus Village in Emmaus; (3) in 2003, Willow Lane in Macungie; and (4) in 2006, Palmerton Hospital's Assisted Living in Palmerton. [*Id.* at 6, 44–47.] Weston did not offer to Kusko, Sacred Heart, or any of the other limited partners of Northampton Personal Care Associates, L.P., the opportunity to participate or otherwise share in the ownership of any of these facilities. [Notes of Trial—Day Three, 3–17–10, at 36, 37; Transcript of Proceedings PM Session, 3–18–10, at 48, 49.]

ton Personal Care Associates, L.P. ("NPCA") via written agreement (the "NPCA Agreement") on November 14, 1997. [Day One Tr., at 13; Day Six Tr., at 67; Plaintiffs' Exhibit 1.][12] The general partner of NPCA is the appellee, Northampton Personal Care, Inc., of which Kusko is the president. [Day One Tr., at 15; Day Six Tr., at 69.] The limited partners of NPCA included Weston, Strecansky, Kusko, the partnership of Granson, Balshie and Fisher, Jack Pavis, David Kusko, Barry Follweiler, and Charles Shoemaker. [Plaintiffs' Exhibit 1.]

The purpose of the NPCA Agreement was to

hav[e] such entity become a general partner with Sacred Heart Healthcare System, Inc. in the partnership to be known as Sacred Heart Assisted Living Partnership, in the construction, ownership, and operation of a personal care/assisted living facility to be located in Northampton, Pennsylvania, and known as Sacred Heart Assisted Living Facility.

[Plaintiffs' Exhibit 1; see Day One Tr., at 14; Notes of Trial—Day Three, 3–17–10 ("Day Three Tr."), at 34.] The NPCA Agreement also stated that

[t]he purpose for which the Partnership is organized is to render services in the nature of personal care/assisted living, to own and operate the associated facilities, equipment and real estate to render such services to the public at large, and to deal in direct interests, partnership interests, shareholder interests, and joint venture interests which represent shares in such enterprises and property,

and to build or contract for the building of buildings and other structures on such property for such uses, including, but not limited to, becoming a general partner with Sacred Heart Healthcare. System, Inc., in the partnership to be known as Sacred Heart Assisted Living Partnership, in the construction, ownership, and operation of a personal care/assisted living facility to be located in Northampton, Pennsylvania, and known as Sacred Heart Assisted Living Facility.

[Plaintiffs' Exhibit 1, at 3.]

The parties' respective capital contributions to the partnership were as follows: Northampton Personal Care, Inc. contributed its 6.66% ownership interest in Lot # 1 (real estate valued at $225,000) and $15,000; Kusko contributed his 93.34% interest in Lot # 1; Weston contributed $180.000; Strecansky contributed "$84,000 contractors profit assigned to SHALP[;]" the partnership of Granson, Balshie and Fisher contributed $60,000; and the partnership of Pavis, Kusko, Follweiler, and Shoemaker contributed $36,000. [Id. at Schedule A.][13] Based on these contributions, each partner's respective percentage share of profits and capital was: Northampton Personal Care, Inc. (5%); Kusko (35%); Weston (30%); Strecansky (14%); the partnership of Granson, Balshie and Fisher (10%); and the partnership of Pavis, Kusko, Follweiler, and Shoemaker (6%). [Id. at 6; see also Day One Tr., at 14–16; Day Three Tr., at 5–6; Transcript of Proceedings PM Session, 3–18–10 ("Day Four Tr."), at 10; Day Five Tr., at 128.]

On December 11, 1997, Sacred Heart and NPCA entered into a partnership

**12.** The NPCA Agreement was also admitted as Defendants' Exhibit 3.

**13.** For his contribution, Strecansky essentially agreed to forgo his contractor's profit un-

der the construction contract by which he agreed to build the assisted living facility. [Day Six Tr., at 72–75.]

agreement (the "SHALP I Partnership Agreement"). [Day Two Tr., at 111–12; Day Six Tr., at 68; Defendants' Exhibit 4][14] This partnership would be known as Sacred Heart Assisted Living Partnership ("SHALP I") with the purpose of constructing and operating an assisted living facility in Northampton, Pennsylvania known as the Sacred Heart Assisted Living Facility ("SHALF"). [Defendants' Exhibit 4, at 1–2, 3.][15] Sacred Heart and NPCA each received 50% of SHALP I's partnership interests. [Day Two Tr., at 112; Defendants' Exhibit 4, at 7, ¶ 7.]

On December 12, 1997, SHALP I and Strecansky's construction company entered into a construction contract entitled "Abbreviated Form of Agreement Between Owner and Contractor for Construction Projects of Limited Scope where the basis of payment is the Cost of the Work Plus Fee with or without a Guaranteed Maximum Price" for the construction of the building for SHALF, with the cost of such construction to be "Cost of the Work plus a Fee," representing Strecansky's actual costs of construction plus 5%, not to exceed a stated maximum. [Day Three Tr., at 22–23; Day Six Tr., at 72–74; Defendants' Exhibit 40.] The overall contract price was 53,066.475. [Day Three Tr., at 25; Day Six Tr., at 72; Defendants' Exhibit 40.]

On March 3, 1998, Kusko (and his wife) deeded Lot # 1 to SHALP I and obtained construction financing. [Day One Tr., at 17; Day Six Tr., at 77–78; Defendants'

Exhibit 55.] In this regard, SHALP I obtained a mortgage from First Union National Bank on or about May 11, 1998 in the amount of $3,372.000. [Day One Tr., at 73, 74; Plaintiffs' Exhibit 18.] Thereafter, construction of die SHALF building began in May 1998, and the first two floors of the business were completed in October 1998. [Day Six Tr., at 78.]

SHALP I was successful soon after it began its operations. [Day One Tr., at 18, 19.] After SHALP's business began to succeed (and had sufficient occupancy), the SHALP I Management Committee decided to finish the third floor of the SHALF building to increase the potential occupancy. [Day Six Tr., at 89, 90.] Kusko negotiated with Strecansky about the construction of the third floor. [*Id.* at 90.] SHALP I and Strecansky entered into an agreement by which Strecansky would construct the third floor and receive the actual costs of construction plus 5%. [*Id.* at 91; Defendants' Exhibit 51.] Construction of the third floor began in Spring 2000 and was completed in August 2000. [Day Three Tr., at 30, 31; Day Six Tr., at 90, 105, 106.] Strecansky invoiced SHALE' I 5541,679.80 for the construction. [Day Three Tr., at 30, 31.]

### C. SHALP I's Management Committee

As set forth in paragraph 15(a) of the SHALP I Partnership Agreement, authority with respect to all decisions concerning the management and control of SHALP I's business (including determining whether

14. The plaintiffs also admitted this document as Plaintiffs' Exhibit 2. Both the October 1997 draft and page 4 of the SHALP I Partnership Agreement reference "Northampton Village II" as the other party to the agreement. [Defendants' Exhibits 4, 38.] Kusko was unaware why this entity was included, and believes it was a typo on the final partnership agreement. [Day Six Tr., at 69–70.] Kusko

signed the actual agreement as the president of the general partner of NPCA. [Day Six Tr., at 69.]

15. Prior to entering into this partnership agreement, Sacred Heart relied upon a feasibility study. [Day Two Tr., at 112; Defendants' Exhibit 4, at 1.]

or not distributions beyond the tax distributions should be made) is vested in a Management Committee consisting of five members. [Defendants' Exhibit 4.] Of these five members, two are selected by Sacred Heart and two are selected by NPCA. [Id.] Regarding the fifth member, this individual is

> selected or removed only by the unanimous vote of Sacred Heart and NPCA who will be an individual not affiliated with either of Partners, any partners of NPCA or Weston Group, Inc. but, in the considered opinion of Sacred Heart and NPCA, is a representative of the communities served by Sacred Heart and the Partnership and who is familiar with the goals and underlying mission of the Partnership ("Community Representative").

[Id.]

From the formation of SHALP I on December 11, 1997, until March 2001, the five member SHALP I Management Committee was composed of the following members: (1) selected by Sacred Heart: (a) Cimerola and (b) Laurie Gombert ("Gombert"), C.P.A., M.B.A., Treasurer and CFO of Sacred Heart; (2) selected by NPCA: (a) Kusko and (b) Strecansky; and (3) Community Representative: Jahn V. Cooney ("Cooney"), CEO of Penn State University and CEO of Good Shepherd. [Day Two Tr., at 66, 92, 112, 132, 144–45, 224; Day Three Tr., at 6, 7; Defendants' Exhibit 42.] [16] After March 2001, the following changes to the membership of the Management Committee occurred: (1)

during the period of time from March 2001 until June 2001, the new CEO and President of Sacred Heart, James Seitzinger ("Seitzinger"), replaced Cimerola on the Management Committee; (2) from the period of June 2001 until July 2006, Dr. Marc Granson ("Granson"), Chief of Surgery at St. Luke's Hospital replaced Strecansky on the Management Committee; (3) from the period of July 2006 until August 2008, Frank Sparandero, the new President and CEO of Sacred Heart, replaced Seitzinger on the Management Committee; and (4) after August 2008. Stephen Lanshe, Esquire ("Lanshe"), general counsel for Sacred Heart, replaced Sparandero on the Management Committee. [Day Two Tr., at 139, 225–26; Day Five Tr., at 84, 90–91, 137; Defendants' Exhibit 42.] [17]

The Management Committee would meet two to four times per year. [Day Two Tr., at 113] Kusko ran the meetings. [Id.] If meeting minutes were taken, it is unclear whether those meeting minutes were shared with other members of the Management Committee. [Id. at 114–20] Gombert prepared the meeting minutes, and gave the minutes to Kusko. [Id. at 114–20; Plaintiffs' Exhibits 9, 31–37.] After receiving the minutes, Kusko never asked her to change or modify them. [Day Two Tr., at 120.] Although the minutes were summaries, Gombert always tried to be as accurate and complete as possible. [Id. at 120–21.] It appears that almost all of the minutes produced during the trial were created for Management Committee meetings that occurred after the plaintiffs commenced this litigation.

---

**16.** Cooney indicated that Strecansky had approached him about serving on the Management Committee. [Day Two Tr., at 67.] At that time, he did not know Kusko or the limited partners in NPCA. [Id.] Cooney did not know the names of all of the limited partners of NPCA until his deposition in December 2009. [Id.]

**17.** In or around the beginning of 2005, Lanshe began attending meetings of the Management Committee even though he was not a member of the committee, [Day Five Tr., at 138.]

[*Id.* at 114–120; Plaintiffs' Exhibits 31–37; Defendants' Exhibit 23.] It also appears that minutes of prior meetings were not approved in subsequent meetings. [Day Two Tr., at 74.]

Votes from the Management Committee were almost always unanimous. [Day Two Tr., at 102, 121.] Also, as shown above, Kusko was a member of the SHALP I Management Committee since its inception, and there were no Management Committee meetings held without him in attendance. [Day One Tr., at 33.] Kusko recalled having a couple of Management Committee meetings every year, during which he "basically would run the meetings." [*Id.* at 34.] For most of the Management Committee meetings, especially those prior to the onset of this litigation, no written meeting minutes were taken. [*Id.* at 34.] [18]

### D. Management of SHALF

#### 1. *Management Under Northampton Village, Inc.*

In February 1998, SHALP I entered into a five-year Agreement for Management Services (the "Management Agreement") with Weston, through his company, Northampton Village, Inc., whereby Weston would provide day-to-day management services for the operation of SHALT in return for a guaranteed minimum monthly payment and a share of the net profit resulting from the operations of SHALE [Day One Tr., at 79; Day Four Tr., at 13; Day Six Tr., at. 75; Plaintiffs' Exhibit 20; Defendants' Exhibit 25.] More specifical-

ly, the Management Agreement provided that Northampton Village, Inc. would receive 10% of the net profit, subject to a guaranteed minimum annual payment of $36,000 ($3,000 per month). [Day One Tr. at 90–91; Day Six. Tr., at 76–77; Defendants' Exhibit 25, at 7.] [19]

Regarding the percentage of net profit, Kusko wanted that to be part of Weston's Management Agreement because

> I wanted to make sure that [Weston] was going to work and the net profit would be . . . the way I would tie his fee into this whole thing.
>
> So I structured this thing, this contract, so that as we got different levels of occupancy, [Weston] could make more money based on the net income of the property.

[Day Six Tr., at 76; *see also* Day One Tr., at 91.] In addition, Kusko indicated that "I didn't want [Weston] to get a percentage of the gross [revenue], that was not typical." [Day One Tr., at 90.] Further, Kusko knew that the business was going to initially lose money, so the Management Agreement provided that Weston was guaranteed a minimum of $36,000. [*Id.*]

Pursuant to its managerial responsibilities under the Management Agreement, Northampton Village, Inc. provided Weston, a licensed personal care home administrator, Carol Blazo ("Blazo"), also a licensed personal care home administrator, and Sue May ("May"), a marketer, as part of the SHALP I management team. [Day One Tr., at 81–84.] [20] Following the execu-

---

**18.** It appears that although Kusko was unsure whether prior meeting minutes were taken during Management Committee meetings, the first minutes produced during discovery were minutes of the meeting on November 18, 2003. [Day One Tr., at 39, 40; Plaintiffs' Exhibit 9.]

**19.** SHALP I's Management Committee approved Weston's salary. [Day One Tr., at 91.] Weston's salary increased to $4,500 per month once SHALP I added the independent living apartments (as discussed *infra*). [Day Six Tr., at 117.]

**20.** Carol Blazo has been an employee of Northampton Village, Inc. and Weston for the

tion of the Management Agreement and the opening of SHALF in 1998, Weston and his employees helped prepare SHALF for operation. [Day Four Tr., at 13–17.] Thereafter, Weston and his employees managed the day-to-day operations of SHALF. [Day Six Tr., at 88.] Weston indicated that with his support, May's marketing ability, and Blazo's operational knowledge, they "filled the building up really rapidly." [Day Four Tr., at 16.]

Although he was only one member on the Management Committee of SHALP I, Kusko supervised the services provided by Weston's employees and provided general management for the overall operations of SHALP I's business, including overseeing staffing, managing marketing, preparing budgets, monitoring cost controls and reporting the results of operations to the Management Committee, [Day Two Tr., at 105; Day Five Tr., at 126, 127; Day Six Tr., at 79–89.] Weston always reported to Kusko and never directly reported to the Management Committee, and Weston always received instructions from Kusko and never from the Management Committee. [Day Four Tr., at 66–67; Day Six Tr., at 139–40.]

On behalf of the SHALP I Management Committee, Kusko handled the responsibility of the general management of SHALP I's business, including the responsibility to prepare budgets for future operating revenues, expenses, and to report the results of operations. as compared to budgets, to the Management Committee, and to control expenses and marketing. [Day Six Tr., at 79–89.] SHALP I did not pay Kusko for these services; instead, Kusko undertook this responsibility because of (1) his financial interest in SHALF's success, and (2) his concern for the financial interests of

Sacred Heart and the limited partners of NPCA, the majority of whom were his personal friends. [*Id* at 60, 121, 122.] Kusko has been the driving force behind the success of SHALP I. [Day One Tr., at 91, 93; Day Five Tr., at 131, 156.]

Within the first year of the Management Agreement, Kusko believed SHALP I would not renew the Management Agreement with Weston. [Notes of Trial—Day Seven, 3–23–10 (Day Seven Tr., at 26.)] Kusko remained in charge of the general management of the overall operations of the business of SHALP I, including SHALP I's independent living apartments. [Day Six Tr., at 120–22.]

Starting in late 2000 until the end of 2001, Kusko noted that he did not communicate with Weston very much concerning the operation at SHALF. [*Id.* at 116.] Instead, he would communicate with Blaze and Gayle Yastrop ("Yastrop"), an administrator at SHALT, a few times each week to ensure the business was running smoothly. [*Id.*] Additionally, Kusko noted that Weston would bill SHALP I for various services and expenses, and SHALP I intended that Weston would get paid and reimbursed for those services. [*Id.* at 119, 120; Defendants' Exhibit 52.]

Blazo was in charge of operations for SHALF. [Day One Tr., at 130.] She also participated in training and hiring of personnel at both of SHALP I's buildings. [*Id.*] At the onset of the business, she was also responsible for getting the various departments up and running. [*Id.* at 134.]

Between late 2001 and July 1, 2003, Kusko continued to supervise the management of SHALF including reviewing, the costs and budget. [Day Four Tr., at 111; Day Six Tr., at 120, 121.] Kusko was

past fifteen years. [Day One Tr., at 129.] Blazo is a nurse and although she originally served as an administrator, she has been the

vice-president of development for Northampton Village, Inc. since approximately 2000.[*Id.*]

particularly concerned with the profitability of the business and the effectiveness of the advertising campaign. [Day Six Tr., at 121.] Kusko was still not receiving compensation for his work for the business, but he continued to work to ensure the success of the business. [*id.* at 121, 122.] Kusko was also regularly present on SHALF's premises and was recognized by Weston's and SHALF's employees as the manager of SHALF's operations. [Day Two Tr., at 13, 14; Day Six Tr., at 120–22.] The SHALF personnel also understood that all directions came through Kusko. [Day One Tr., at 221, 222, 224.] Moreover, Weston acknowledged that he always reported to Kusko and Kusko reported to the Management Committee. [Day Six Tr., at 139, 140.]

Thus, from approximately 1998 until July 1, 2003, Northampton Village, Inc.'s performance of the day-to-day operations of SHALF were primarily performed by Blazo, May, and other employees of Northampton Village, Inc., who devoted a portion of their time to SHALF and the remainder of their time to six other personal care and assisted living facilities owned by Weston and/or others. [Day One Tr., at 135–39, 166; Day Six Tr., at 83, 114, 116.]

### 2. *Termination of the Management Agreement and Kusko's Ascension as Manager of SHALF*

Regarding Northampton Village, Inc.'s management of SHALF, Kusko and the SHALF I Management Committee discussed issues with Weston's performance under the Management Agreement even though SHALF was performing successfully. [Day One Tr., at 18, 19; Day Five Tr., at 92, 93; Day Six Tr., at 124.][21] Because the Management Agreement would expire on June 30, 2003. the SHALF I Management Committee determined that there was no need to renew the contract as Kusko had been and was continuing to provide the overall general management of SHALF's operations, and the day-to-day operations could be managed by SHALF's existing staff with part-time assistance from Blazo. [Day Five Tr., at 92, 93; Day Six Tr., at 122–25; Day Seven Tr., at 27.][22] Thus, on or about February 26, 2003, Kusko informed Weston that SHALP I was not renewing his management contract as of July 1, 2003. [Day Four Tr., at 37–38; Day Six Tr., at 122. 123; Plaintiffs' Exhibit 19.][23]

When SHALP I terminated the Management Agreement on February 26.2003, SHALP I (via Kusko) and Northampton Village, Inc. (via Weston) entered into a new agreement by which, *inter alia,* SHALP I would pay Weston a consulting fee for the use of Blazo for approximately eighteen months, *i.e.* from July 1, 2003 through December 31, 2004. [Day One Tr., at 78, 132; Day Four Tr., at 38, 76–77; Day Six Tr., at 122; Plaintiffs' Exhibit

**21.** Kusko had indicated that as the assisted living business changed, he believed that Blazo and Weston did not have the training to adjust to those changes. [Day Six Tr., at 81–82.] Kusko taught Blaze what to do, and she gained an understanding of what to do after approximately one year. [*id.* at 82.] Kusko was very concerned that they needed to constantly monitor the business. [*id.* at 87.]

**22.** There was no Management Committee meeting minutes relating to the termination of Weston's management contract that were introduced during the trial [Day Seven Tr., at 27.]

**23.** This agreement was also admitted as Defendants' Exhibit 26. Kusko did not believe that Weston's management company was ineffective; rather, they did not know how to budget and keep costs in line. [Day Seven Tr., at 12.]

19.][24] This agreement provided that Northampton Village, he. would provide SHALP I with access to Blazo's services for thirty hours per month at a fee of $100 per hour (thus, $3,000 per month). [Day One Tr., at 78, 79; Day Seven Tr., at 26–27; Plaintiffs' Exhibit 19.] Either party could terminate this agreement by providing one-hundred-and-twenty-days written notice. [Day One Tr., at 79; Plaintiffs' Exhibit 19.] Moreover, by entering into this agreement the February 1998 Management Agreement was rendered "null and void." [Plaintiffs' Exhibit 19.]

Pursuant to the February 26, 2003 agreement, Weston provided the part-time services of Blazo from July 1, 2003 through January 1, 2005. [Day One Tr., at 132; Day Six Tr., at 125.] During that time, all other management services were provided by Kusko at no charge to SHALP I. [Day One Tr., at 80; Day Six Tr., at 125, 126.] As with his previous management services, Kusko was not paid a management fee from July 2003 to January 1, 2005. [Day One Tr., at 81; Day Six Tr., at 127.]

By letter dated October 1, 2004, Kusko (on behalf of SHALP I) informed Weston that SHALP I was terminating the consulting agreement as of January 1, 2005. [Day One Tr., at 79, 80; Plaintiffs' Exhibit 21.][25] Even though he was already acting as manager of SHALF for approximately eighteen months while Blazo worked under the consulting agreement, as of January I, 2005, Kusko served as the manager of SHALF. [Day One Tr., at 80.] While Blazo worked for SHALF during this period, she reported to Kusko. [Day One Tr., at 81, 82.] On January 1, 2005, the consulting agreement ended and the Management Committee agreed to pay Kusko a fee of approximately $116,000 to manage SHALF and continue his success in marketing and managing the business. [Day One Tr., at 81; Day Two Tr., at 145, 157–59, 173.][26]

Blazo was distraught upon learning that SHALP I was terminating the consulting agreement. [Day Seven Tr., at 28.] Thus, Kusko continued to pay and somewhat employ Blazo for $1,000 per month out of his own pocket for the potential use of her services, which lasted up until approximately one year prior to the trial in this matter. [Day One Tr., at 93, 94, 134; Day Seven Tr., at 28.] Kusko paid the money out of his own company, Cornerstone Property Management, Inc., and neither Weston nor Northampton Village, Inc. was aware of this arrangement at the time. [Day One Tr., at 94, 96; Day Four Tr., at 40, 41; Plaintiffs' Exhibit 22.][27] Although Kusko did consult with Blazo pursuant to this arrangement, he called upon her services much less frequently than in the past. [Day One Tr., at 133.]

To effectuate this consulting arrangement, Kusko provided Blazo with a fax

24. There are no minutes of a SHALP I Management Committee meeting approving of this agreement.

25. This document was also admitted as Defendants' Exhibit 27. There was no Management Committee meeting minutes relating to this termination that were introduced during the trial. [Day Seven Tr., at 28.]

26. At no point were Weston's yearly compensation packages (including flat fee and bonus, if any), equal to Kusko's compensation once he started receiving compensation for managing SHALF. [Day Seven Tr., at 25, 26,] In addition, Kusko's $116,000 fee was comprised of an $80,000 marketing fee and a $36,000 property management fee. [Day Two Tr., at 157–58; Plaintiffs' Exhibit 31.]

27. Apparently, Weston suspected something after finding Blazo's cellphone in a parking lot, but he apparently did not inquire thereafter. [Day Four Tr., at 40–41.]

machine and a cellular telephone. [Day One Tr., at 96, 132, 133.] Blazo wanted a fax machine so she could check messages at night if necessary and not have her work for Kusko interfere with her work for Weston. [Day One Tr., at 97. 133.]

### 3. Kusko's Management Fee and Proposed Succession Plan

After concerns were initially raised by Seitzinger, then-President and CEO of Sacred Heart and member of the SHALP I Management Committee, as to a succession plan for Kusko's management, the SHALP I Management Committee met and discussed SHALP I's need to have ongoing management for SHALF and what would happen if Kusko was unable or unwilling to provide management services for SHALF. [Day Two Tr., at 80, 165, 166, 167; Day Five Tr., at 100, 101, 156; Day Six Tr., at 127; Plaintiffs' Exhibit 33.] In response to these concerns, Kusko agreed to create and lead a management company, with employees trained to provide the services required for ongoing management of the business of SHALP I should he be unable or unwilling to personally continue doing so in return for an annual management fee of 6% of the gross revenue of SHALF. [Day Two Tr., at 165–66; Day Five Tr., at 100; Day Six Tr., at 129–31; Plaintiffs' Exhibit 33.] Gombert, on behalf of Sacred Heart and the SHALP I Management Committee, researched the management fee and determined that the 6% management fee was fair and reasonable based upon the fees paid to managers of other such companies. [Day Two Tr., at 79, 158–160, 165–67; see also Day One Tr., at 88; Day Five Tr., at 155.] Since March 13, 2006, Kusko has

been the formal manager of SHALF, and he has been responsible for the general management and most aspects of the day-to-day operations of SHALF [Day Six Tr., at 127, 129–39.] There is no written document setting forth the terms of the management services that Kusko was to provide in exchange for the management fee. [Day One Tr., at 80; Day Five Tr., at 26.]

Regarding Kusko's six percent management fee, Scott E. Townsley ("Townsley") was admitted as an expert in strategic planning, marketing analysis, operational evaluations, and project development for senior living facilities, and testified, inter alia, as follows: (1) typical management fees range between four percent of gross revenue on the low end to eight percent of gross revenue on the high end; (2) six percent of gross revenue is widely recognized to be an acceptable or "safe harbor" management fee for lenders, financiers, or appraisers when examining an assisted living business operation; (3) a six percent of gross revenue management fee is reasonable and is not excessive, regardless of the size of the personal care/assisted living facility or the increases in gross revenue; and (4) a six percent of gross revenue management fee is reasonable and not excessive for a managing person or entity because that person or entity must, among other things, (a) maintain a seamless operation that will continue without interruption, (b) report to the board of directors, managing committee, or owners, and (c) financially manage the community of personal care/assisted living facility. [Day Five Tr., at 14–17, 27, 28, 33.][28] Townsley also indicated that some assisted living facilities hire individuals to manage the business at a lower fee and others do not,

---

**28.** Townsley is employed as the managing principal by Third Age, a division of Larson Allen. [Day Five Tr., at 3–4.] Townsley's employer is a consulting firm that works ex-clusively with assisted living providers, skilled nursing providers, continuing care retirement communities, and community service providers for seniors. [Id. at 3–4.]

and it was "not unusual for the management company after opening not to be renewed and sometimes there's a new management company that comes in." [Day Five Tr., at 36–37.]

In addition to Townsley's testimony, Lisa Foreback ("Foreback"), a Pennsylvania certified general appraiser, testified that in 2004, management expenses for personal care/assisted living facilities in the Lehigh Valley typically ranged between three percent and six percent of gross income. [Day Five Tr., at 69; Defendants' Exhibit 34.][29] Further. Foreback testified that in 2010, management expenses for personal care/assisted living facilities in the Lehigh Valley were typically six percent to eight percent of revenue, and sometimes as much as ten percent of gross income. [Day Five Tr., at 69; Defendants' Exhibit 34.][30]

SHALP I's management expenses beginning in 2006 exceeded its expenses for 2005 and prior years, including those under Northampton Village Inc.'s stewardship. [Defendants' Exhibit 19.] For example, in 2005, Kusko received $116,000 for his management services at SHALF, and he received $289,000 in 2006. [Day One Tr., at 81.] Kusko admitted that he may have received approximately $1,464,847 in management fees from 2005 through 2009. [Day Seven Tr., at 70–71.] However, those fees are not excessive. [Day Five Tr., at 14–17, 69.] There is no

indication that SHALP I has not continued to be highly profitable under Kusko's stewardship or that Kusko has otherwise not earned his management fees.

Although there is no actual written succession plan (and there is no requirement for such a written plan), Kusko, through his management company, Cornerstone Property Management, Inc., proceeded to hire personnel for his management company. [Day Six Tr., at 130–31.] Among those employees were, Ralph Feldman as Kusko's second-in-command who can provide the same services that Kusko provides to SHALF and two facility maintenance personnel. [Day One Tr., at 101; Day Six Tr., at 130, 131, 136, 137, 138.][31] Currently, if Yastrop, the administrator of SHALF, has issues, she will initially report to Feldman. [Id. at 140: Day Six Tr., at 138.] However, Kusko is still responsible for the overall performance of SHALF and he reports directly to the Management Committee. [Day Six Tr., at 139.]

### E. The Medical Office Building

#### 1. Construction of the Medical Office Building and Execution of Leases for the First and Second Floors

In 1997, at the time Kusko first spoke to Joseph Cimerola concerning Sacred Heart's potential interest in what eventually became SHALF, Kusko inquired about Sacred Heart's interest in leasing office space for medical offices from Kusko in the

**29.** The Frederick Group employs Foreback as a general appraiser, and she has worked there since July 1997. [Day Five Tr., at 44.]

**30.** Weston had previously charged a management fee of six percent of gross sales for his services at the Villages of Willow Lane, a personal care/assisted living business he owns with Cimerola. [Day Four Tr., at 75.]

**31.** Neither Kusko, his management company, Cornerstone Property Management, nor its

two employees, or Feldman (who Kusko actually treats as an independent contractor), has an assisted living administration license. [Day Seven Tr., at 33–34.] Instead, SHALP I or SHALP II pays the individuals who are licensed administrators. [Id. at 34.] Kusko indicated that one did not need to be a licensed administrator to run the business as he had licensed administrators working at each facility. [Id. at 33, 34.]

commercial building Kusko intended to construct on Lot # 2. [Day One Tr., at 19, 20; Day Six Tr., at 91.] At the time, Sacred Heart had leased other office space for its medical offices in Northampton, and was not interested in new office space until the expiration of its existing leases. [Day One Tr., at 20.] Additionally, in or around the same time, Kusko and Weston actually discussed Kusko's desire to construct a medical office building in the area. [Day Four Tr., at 19–21.]

While Kusko had deeded Lot # 1 to SHALP on March 3, 1998, he retained Lot # 2 for his future use. [Day Six Tr., at 51–54.] Kusko ultimately transferred Lot # 2 to an entity of which he was and is the owner. [Defendants' Exhibit 57.] By approximately 1999, Kusko developed plans to construct a two-story building on Lot # 2, using the first floor for medical offices and the second floor for independent living for senior citizens who did not require the level of assistance of SHALF, but who may be in need of such care in the future. [Day Six Tr., at 92, 93.] Regarding the second floor, Kusko believed that because people "age in place," an independent living facility would provide a source of referrals to SHALF insofar as independent living residents would age and potentially need the increased level of care available through SHALF. [Day One Tr., at 21.]

Once Kusko determined that Sacred Heart was ready and interested in leasing these proposed medical offices, Kusko prepared a *pro forma*/projected budget and plans for use of the second floor of the medical office building for independent living. [Day One Tr., at 93–95; Defendants' Exhibit 31.] Kusko presented this information and the proposed budget to SHALP I's Management Committee, which included Strecansky at the time, at Saucon Valley Country Club. [Day Six Tr., at 95, 96; Day Two Tr., at 187, 210, 211.] During this meeting, the Management Committee reviewed and discussed the rent Kusko proposed to charge to SHALP, the 20–year term of the lease, and the projected profit for SHALP I. [Day Six Tr., at 93–98; Day Seven Tr., at 13.] The Management Committee desired to proceed in accordance with Kusko's suggestion, and Kusko had a lease prepared for the second floor of the medical office building after the Management Committee approved the lease proposal. [Day Six Tr., at 100; Day Seven Tr., at 13.][32]

In addition, Kusko also discussed with each limited partner of SHALP I the proposed lease, including the rent and term of the lease, the plans for independent living, and his desire to use Strecansky's construction company to Construct the medical office building. [Day One Tr., at 23, 24, 124, 125; Day Five Tr., at 96, 97; Day Six Tr., at 98, 99; Day Seven Tr., at 13.] Kusko also provided them with a copy of the projections and the rent [Day One Tr., at 24, 125.] After these discussions, none of the limited partners, including Weston and Strecansky, objected to the proposed expansion of SHALP's business by renting the second floor of Kusko's medical office building, to the lease terms proposed by

---

**32.** There is no SHALP I Management Committee meeting minutes documenting this action or the approval of the leases. [Day Two Tr., at 249–50; Day Seven Tr., at 14.] In addition, while we recognize that Strecansky provided opposing testimony regarding the dissemination of the proposed lease and the lack of any discussion about it during a Management Committee meeting and Cooney, as the community representative on the Management Committee, stated that he did not recall any discussions concerning the lease of the second floor of the medical office building, we found the evidence provided to the contrary to he more persuasive and credible. [*See* Day Three Tr., at 11–12, 44.]

Kusko, or to Strecansky performing the construction. [Day Six Tr., at 98.]

Kusko prepared drafts of the leases for the first and second floors of the medical office building and provided copies to Cimerola and Gombert, then-Treasurer and CFO of Sacred Heart, for their review on behalf of Sacred Heart as tenant and for review as members of the Management Committee. [*Id.* at 100.] Gombert, who also served as Treasurer of Sacred Heart Realty Corp., the for-profit subsidiary owned by Sacred Heart, acting on behalf of Sacred Heart and as a member of the Management Committee, investigated the reasonableness of the rents and lease terms as provided by Kusko. [Day Two Tr., at 192, 193.][33] Gombert believed her responsibility was to determine that Sacred Heart and SHALP I paid no more than the fair market value for any leased space. [*Id.* at 190.] In addition. Gombert also understood that part of her responsibility was to determine that the non-profit Sacred Heart, directly, concerning the first floor lease, and indirectly, regarding the second floor lease, did not inappropriately benefit the other party to such a transaction and that the costs in any transaction were reasonable. [*Id.* at 210, 211.]

To carry out her responsibility, Gombert spoke to realtors and banks, looked at real estate comparables, and examined Sacred Heart's other existing leases to investigate the reasonableness of the rents and lease terms as proposed by Kusko and, after this investigation, she determined that such terms were commercially reasonable for both the first floor lease to Sacred Heart and for the second floor lease to SHALP I. [*id.* at 190–94.] Thereafter. Cimerola and Gombert referred Kusko's proposed leases to Lanshe, general counsel for Sacred Heart, for his review. [Day Five Tr., at 146–49.]

Lanshe reviewed the leases and proposed several changes that he determined were in the best interests of Sacred Heart and SHALP, [*Id.* at 146–49; Day Six Tr., at 100; Defendants' Exhibit 60.][34] Upon receiving the proposed changes from Lanshe, Kusko made the requested changes. [Day Five Tr., at 146–49; Day Six Tr., at 100.]

Sacred Heart executed the lease for the first floor of the medical office building on October 15.1999. [Day One Tr., at 22; Day Two Tr., at 28, 188; Plaintiffs' Exhibit 3.][35] Cimerola signed the lease on behalf of Sacred Heart. [Day One Tr., at 25; Day Two Tr., at 227; Plaintiffs' Exhibit 3.][36] The initial term of this lease was for ten years, lasting from October 1, 2000 until September 30, 2010, unless continued or otherwise terminated as provided by the agreement. [Day One Tr., at 23; Day Two Tr., at 188; Plaintiffs' Exhibit 3, at 1.][37] Additionally, pursuant to the lease,

---

33. Gombert noted that it was her responsibility to investigate the terms of the lease because, as a nonprofit entity, it could not expend funds on anything inappropriate or something that would benefit someone inappropriately. [Day Two Tr., at 211.]

34. Lanshe did not opine about the reasonableness of the rent, as his firm was not requested to perform an independent evaluation of that item. [Day Five Tr., at 147–48; Defendants' Exhibit 60.]

35. This document was also admitted as Defendants' Exhibit 28.

36. Cimerola had the authority to sign the lease on behalf of Sacred Heart without seeking approval from the Board of Sacred Heart. [Day Two Tr., at 132, 227–28.]

37. The lease contained a term allowing for postponement of the commencement date for construction delays. [Plaintiff's Exhibit 3, at 1.] In December 2005, the lease was extended for a total term of twenty years. [Day Two Tr., at 188–90; Day Five Tr., at 150; Day Six Tr., at 101; Defendants' Exhibit 61.]

Sacred Heart paid annual rent of 8349,596 payable in monthly installments of $29,133. [Day Two Tr., at 191; Defendants' Exhibit 61.][38] On each fifth anniversary of the lease, the rent goes up by ten percent. [Day Two Tr., at 191; Defendants' Exhibit 61.][39]

On the same date as the execution of the lease for the first floor of the medical office building, SHALP I executed another lease agreement for the second floor. [Day One Tr., at 22; Day Two Tr., at 192–93; Plaintiffs' Exhibit 4; Defendants' Exhibit 29.][40] Per the terms of the lease for the second floor, SHALP I paid annual rent of $296,800 payable in monthly installments of $24,733, which was approximately $5,000 less than Sacred Heart paid for the rent of the first floor. [Day Two Tr., at 194; Plaintiffs' Exhibit 4.][41] The rent would increase by ten percent on every fifth anniversary (a 2% increase each year), which was determined to be reasonable. [Day Two Tr., at 194.] The initial term of this lease was for twenty years, lasting from October 1, 2000 and ending on September 30, 2020, unless continued or otherwise terminated as provided by the agreement. [Day Two Tr., at 193; Plaintiffs' Exhibit 4, at 1.][42] Considering the escalation of 10% on each fifth anniversary, the lease created an obligation to SHALP I of more than $7,000,000 over its twenty-year term. [Day Three Tr., at 155; Plaintiffs' Exhibit 39.] The present value of that twenty-year obligation in October 1999 was approximately $3,800,000 without any rights or benefits of ownership to SHALP I or the limited partners of NPCA. [Day Three Tr., at 155; Plaintiffs' Exhibit 39.][43]

Regarding the twenty-year lease term, Kusko was concerned that the term of the lease was lengthy enough to protect the interests of SHALP I because if the real estate of the medical office building was sold, voluntarily or involuntarily, SHALP I would he able to continue to use arid profit from the second floor. [Day Six. Tr., at 97.] In addition, Gombert had noted that there were some substantial improvements fees on the second floor that were included into the lease phase. [Day Two Tr., at 193.] Moreover. since they had the assist-

38. Gombert researched the value of the lease on behalf of Sacred Heart and determined that the rental amount was within the market range for the community. [Day Two Tr., at 190–91.] Also, as the square footage of the leased premises was 17,800 square feet and the rental rate was $19.64 per square foot. [Plaintiffs' Exhibit 3.]

39. Gombert researched and determined that the rental increase was reasonable. [Day Two Tr., at 192.]

40. Joseph Cimerola, as a member of the Management Committee, executed this lease on behalf of SHALP I. [Plaintiffs' Exhibit 4.] As with the first floor lease, Kusko signed on behalf of the lessor, Cornerstone Real Estate. [Plaintiffs' Exhibits 3, 4.]

41. Weston was aware of the amount of the monthly rent SHALP I paid to Kusko since Weston signed rent checks on behalf of SHALP I, starting in January 2001, when he began making payments of $25,759.18 per month. [Day Six Tr., at 108; Defendants' Exhibits 24, 48.] Weston inadvertently overpaid the amount of rent due in January, February, and March of 2001, sending the full amount of rent rather than half payments due for those months. [Day Six Tr., at 106, 107; Defendants' Exhibits 24, 32, 48.]

42. Similar to the first floor lease, the commencement date could be extended if construction was delayed, [Plaintiffs' Exhibit 4.]

43. Cimerola, as a member of the SHALP I Management Committee, executed this lease on behalf of SHALP I. [Plaintiffs' Exhibit 4.] As with the first floor lease, Kusko signed on behalf of the lessor, Cornerstone Real Estate. [Plaintiffs' Exhibits 3, 4.]

ed living next door, the length of the lease allowed SHALP I to protect its interest and not allow competition to relocate there. [Day Two Tr., at 194.]

On the same date of the execution of the second floor lease, Kusko executed an addendum to the lease for the second floor of the medical office building whereby the rental payments were abated for October. November, and December of 2000, and the rent payments were reduced in half for the months of January, February, and March of 2001. [Day Two Tr., at 195, 196; Day Six Tr., at 102, 103; Defendants' Exhibit 32.] [44] Kusko determined the rent to be charged to SHALP I for the lease of the second floor of the medical office building by projecting revenues and expenses to SHALP I from its operations on the second floor of the medical office building and then calculating the rent which SHALP I could afford and still derive a net profit of approximately $100,000 from such operations. [Day One Tr., at 24, 25; Day Six Tr., at 98; Defendants' Exhibit 31.]

Kusko charged less rent for the second floor of the medical office building than he otherwise could have charged despite the added cost to him for independent living fit outs with kitchens and bathrooms. [Day One Tr., at 24, 25, 74.] Nonetheless, Kusko charged this reduced rent to ensure the financial success of SHALP I from its independent living operation on the second floor, so that the SHALP I partners would be certain to make money. [*Id.* at 24, 25, 74.] Thus, Kusko provided a six-month rent concession to SHALP I for the second floor of the medical office building, since

he was concerned that income generated from such space by SHALP I during the time that SHALP I need to procure tenants for the independent living apartments. [Day Six Tr., at 102, 103.] Thus, although no rent was charged to SHALP I for the lease of the second floor for the months of October, November, and December, SHALP I paid half rent for the months of January, February, and March. [Day Six Tr., at 106.]

On November 17, 1999, Kusko entered into a construction contract with Strecansky entitled "Standard From of Agreement Between Owner and Contractor where the basis of payment is the Cost of the Work Plus Fee with or without a Guaranteed Maximum Price." [Day Three Tr., at 8, 9, 26–27; Day Six Tr., at 103, 104; Day Seven Tr., at 78; Defendants' Exhibit 30.] [45] This construction contract was similar to the contracts for the construction of the SHALF building in 1997 and the third floor expansion in 2000 insofar as it provided Strecansky with payment for his actual costs plus a contractor's fee of 5%. [Day Six Tr., at 104, 105; Day Seven Tr., at 78; Defendants' Exhibits 30, 40, and 51.] Strecansky did not give Kusko any price reduction in the construction of Kusko's medical office building. [Day Six Tr., at 104.] The total contract price was $3,134,838. [Day Three Tr., at 9, 27.] [46]

After obtaining a signed lease from Sacred Heart for the first floor of the medical office building, Kusko was able to secure financing for the construction of the medical office building as the execution of the first floor lease was important to the

---

44. There was no testimony indicating that a similar rent concession was made for the benefit of Sacred Heart and its lease of the first floor of the medical office building.

45. This agreement appears to be an abbreviated version of the A/A's standard form contract that was used by the parties for the construc-

tion of the SHALF building. [Defendants' Exhibits 30, 40.]

46. Approximately $70,000 of the contract price was returned to Kusko upon completion of the construction, [Day Three Tr., at 28.]

bank lender. [Day Six Tr., at 105; Day Seven Tr., at 15, 16.] [47] Nonetheless, Kusko's construction financing did not require and was not contingent upon the execution of the lease for the second floor of the medical office building by SHALP I. [Day Six Tr., at 104–05; Day Seven Tr., at 16.] Construction of the medical office building proceeded and SHALP I was able to open the second floor for renting independent living, apartments in October 2000. [Day Six Tr., at 105, 106.] [48]

Kusko subsequently determined that it was in SHALP I's best interest to convert the SHALP I independent living apartments to additional space for personal care/assisted living as an expansion of SHALP's existing business located across the parking lot separating the medical office building from the SHALP I building. [Day Six Tr., at 109.]

The lease of the second floor of the medical office building has been profitable to SHALP I. [Day Six Tr., at 110.] More specifically. SHALP I has received added net profits from its operation at the second floor of the medical office building in the amounts of:

- 2002—$203,352
- 2003—$213,415
- 2004—$317,452
- 2005—$398,679
- 2006—$343,210
- 2007—$368,600
- 2008—$234,277
- 2009—$197,674

[Day Five Tr., at 183–85, 202–04; Day Six Tr., at 110; Defendants' Exhibit 21.] [49] Thus, the lease of the second floor of the medical office building resulted in over $2,000,000 in net profits to SHALP I. [Day Five Tr., at 183–85, 202–04; Day Six Tr., at 110; Defendants' Exhibit 21.] As shown above, the profits significantly exceeded Kusko's estimated profits of approximately $100,000 per year. [Day Six Tr., at 110.] Contrary to Weston and Strecansky's beliefs about the prudence of the twenty-year lease, the evidence indicates that the second floor lease was in the best interests of SHALP I.

Regarding the reasonableness of the lease terms for the second floor of the medical office building Foreback noted that the lease represented rent of $14.54 per square foot ($296,800 annual rent for 20,000 square feet of finished space). [Day Five Tr., at 61; Defendants' Exhibit 29.] [50] The fair market rental value of the

47. We recognize that the plaintiffs point to a sentence in an October 8, 1999 letter in which Lanshe, acting on behalf of Sacred Heart, intimated to Cimerola that "we have been asked to review these leases [*i.e.* the leases for the first and second floors of the medical office building] as Mr. Kusko must have them signed and in place as part of his financing for construction of the building." [Defendants' Exhibit 60.] Despite this document, we found Kusko's explanation that Lanshe's recollection was incorrect and he only needing a signed first floor lease to be credible. [Day Seven Tr., at 15, 16.]

48. The independent living rooms had kitchens, baths, and closets, but did not have patios or balconies. [Day One Tr., at 74–77.]

49. During the first year, 2001, SHALP I received a net loss of $266,975. [Defendants' Exhibit 21.]

50. Foreback indicated that, *inter alia*, she had performed approximately six hundred appraisals of commercial real estate in twelve years, which had included some assisted living and independent living facilities. [Day Five Tr., at 46–47.] Foreback was admitted without objection as an expert in the valuation of real estate, particularly with regard to the fair market rental value of the second floor of the medical office building and her background in advertising and management fees that she has observed during the course of her various appraisals. [*Id.* at 48–49.]

second floor of the medical office building, as of October 15, 1999, was $19.50 per square foot. [Day Five Tr., at 50, 51, 60; Defendants' Exhibit 35.][51] Thus, SHALP I paid a reduced rate per square foot in rent.

Foreback also pointed out that Kusko had paid for the cost of the fit out of the twenty-nine independent living units, each with a bathroom and a kitchen. [Day Five Tr., at 51–60; Defendants' Exhibit 35; *see also* Day Two Tr., at 193, 250.] Kusko's payments for the fit outs added to the fair market rental value of the second floor of the medical office building. [Day Five Tr., at 53–54; Defendant's Exhibit 35.] In addition, if the lessee of the independent living space on the second floor of the medical office building had an adjoining property at which it operated a personal care/assisted living facility (like SHALP I does), the value might be greater to such a tenant as compared to other potential tenants. [Day Five Tr., at 78–79.] Foreback further explained that the twenty-year lease, with the 10% rent increases every fifth year, was commercially reasonable. [Defendants' Exhibit 35.]

### 2. *Weston and Strecansky's Inquiries Regarding the Second Floor Lease*

In addition to the foregoing, Weston objected to the terms of the lease in 2001 and spoke to Strecansky concerning his objections. [Day Four Tr., at 23.] On March 12, 2001, Kusko met with Weston, shared with him "the information regarding the [medical office building] and how it interplays with the profit and loss [Kusko would] personally receive, and discussed with Weston the "financial responsibilities for the second floor" of the medical office building being leased by SHALP I. [Defendants' Exhibit 5.]

On December 4, 2001, approximately eighteen months of the second floor of the medical office building was completed and used, Strecansky sent a letter to Kusko requesting copies of various documents including, *inter alia*, a signed lease for the second floor of the medical office building. [Day One Tr., at 29; Day Three Tr., at 12, 14, 15, 43; Plaintiffs' Exhibit 6.] In response to this letter, Kusko sent a letter to Strecansky dated December 6, 2001, in which he enclosed copies of the SHALF quarterly financial statements, a signed lease, and all expense information, and he informed Strecansky that he could come to Kusko's office to research any item. [Day One Tr., at 30; Day Three Tr., at 15–16, 65–66; Plaintiffs' Exhibit 7.]

On the same date Kusko sent the aforementioned letter, he sent Strecansky another letter in which he stated as follows:

> I'd like to thank you for your cooperation while serving on the Board of Sacred Heart Assisted Living during the past three years. To further the education of present shareholders in the assisted living business, I am rotating another shareholder in your board position for the next three years.

---

**51.** Foreback mentioned that she attempted to find comparable leases that were similar to the property, but assisted living facility leases wore difficult to find comparables insofar as assisted living facility leases were usually arm's length transactions. [Day Five Tr., at 52–53.]

We also note that Sacred Heart pays $19.64 per square foot for the unfinished space it leases from Kusko on the first floor of the medical office building. [Defendants' Exhibit 28.] Weston is a subtenant of Sacred Heart, and he leases space from Sacred Heart on the first floor of the medical office building for approximately $28.80 per square foot. [Day Four Tr., at 56, 115.]

Thanks again for your past commitment while serving on the SHALF board.
[Plaintiffs' Exhibit 8; *see* Day One Tr., at 31; Day Three Tr., at 18–19.] [52]

Strecansky replied to Kusko's letters by a letter dated January 7, 2002. [Day Three Tr., at 71; Defendants' Exhibit 8.] In this letter, Strecansky, among other things. (1) does not object to being replaced on the Management Committee, (2) inquires about the expense allocation paid by SHALF to the medical office building, and (3) requests that they have a board meeting "as required in our by-laws." [Day Three Tr., at 71–75; Defendants' Exhibit 8.] After this letter, Strecansky did not follow-up on the request for the back-up expenses. [Day Three Tr., at 73.]

Via a letter dated January 9, 2002, Kusko responded to Strecansky's letter and informed him that a SHALP I Management Committee meeting had recently occurred and advised him about the dispute resolution procedure contained in the Northampton Personal Care Associates, L.P. Partnership Agreement. [Day Three Tr., at 79–80; Defendants' Exhibit 9.]

### F. Strecansky's Offer to Purchase an Interest in the Medical Office Building

From the outset of the construction of the medical office building, Strecansky expressed to Kusko an interest in acquiring an ownership interest in the medical office building, although the extent of or price for such an interest was never specifically discussed. [Day Three Tr., at 63; Day Six Tr., at 110.] Although Kusko never explicitly rebuffed Strecansky's interest, Kusko never committed to offer such an ownership interest to Strecansky. [Day Six Tr., at 111.] In particular, Kusko wanted to avoid the appearance of favoring one limited partner over the others by offering Strecansky an investment opportunity which was related, albeit indirectly, to SHALP I, but which was not offered to all of the limited partners. [*Id.*] Kusko never made any misrepresentations to Strecansky (or Weston) concerning the ownership or interests in the medical office building.

On March 12, 2001, Kusko met with Weston and informed him of Strecansky's desire to buy an interest in the medical office building. [Day Four Tr., at 87; Day Six Tr., at 111; Defendants' Exhibit 5.] Later that day, Weston sent Kusko a letter in which Weston, *inter alia,* suggested to Kusko that Kusko provide an explanation to the other limited partners and obtain their written approval before offering an interest in the medical office building to Strecansky. [Day Four Tr., at 87; Day Six Tr., at 112; Defendants' Exhibit 5.] [53]

Subsequent to this meeting, Kusko sent a letter to all of the limited partners informing them that he was considering letting Strecansky obtain an interest in the medical office building and inquiring whether they objected to this purchase. [Day Six Tr., at 112; Day Seven Tr., at 23.] Weston was the only limited partner that negatively responded to Kusko's letter. [Day Six Tr., at 112; Day Seven Tr.,

---

**52.** To replace Strecansky, Kusko "rotated" another limited partner, Granson, from the partnership Granson, Balshie, and Fisher, as a member of the Management Committee. [Day One Tr., at 32.] Although he indicated in his letter that he was going to rotate this new member, he has not removed Granson from the Management Committee since 2001. [*Id.*]

**53.** Weston informed Strecansky that he (Weston) thought that it was unfair to the partnership if Strecansky could get an interest in the medical office building. [Day Three Tr., at 62.]

at 23.] More specifically, Weston sent a letter dated April 17, 2001 in which he objected to Strecansky acquiring an interest in the medical office building and stated that "unless others are provided with the same opportunity as Jim Strecansky, I must disagree with this offering." [Day Three Tr., at 56, 57; Day Four Tr., at 95, 96, 98–99; Day Six Tr., at 112, 113; Defendants' Exhibit 63.][51]

Kusko did not want to offer to sell an ownership interest in his medical office building to any limited partner, let alone each of the limited partners of NPCA. [Day Six Tr., at 111.] In response to Weston's letter, Kusko sent Weston a letter dated April 26, 2001 in which he stated, *inter alia,* that

> as I informed all of the partners when I advised them of Jim Strecansky's desire to participate in the Medical Office/Independent Living Building, if anyone objected I would abide by that decision and reject Jim's offer. Since, as you say, you "disagree with this offering", I will give Jim notice of your decision. Although he will be disappointed, your decision is your decision.

[Day Four Tr., at 99–100; Day Six Tr., at 113; Plaintiffs' Exhibit 7.] At some point thereafter, Kusko informed Strecansky of Weston's decision and Kusko's decision not to offer him an ownership interest in the medical office building. [Day Six Tr., at 114.]

### G. SHALP II & SHALP I Loan to Sacred Heart

#### 1. *Creation of SHALP II and Sacred Heart—Saucon*

After the business at SHALP I became financially successful, Kusko and Sacred Heart discussed opening a second assisted living facility after Seitzinger encouraged Kusko to initiate another project. [Day Two Tr., at 132, 133; Day Six Tr., at 143.] Thereafter, Kusko examined possible alternatives outside of Northampton including possibly expanding Trexler Park Manor and creating a new personal care/assisted living facility site in Trexlertown. [Day One Tr., at 41, 42; Day Six Tr., at 143, 144.] Kusko was unable to place an assisted living site near Trexler Park Manor due to issues with getting a variance. [Day Six Tr., at 143.]

In April 2004, Kusko purchased land in Saucon Valley to, *inter alia,* build an assisted living facility and a medical office building. [Day Six Tr., at 144.] Although he did not have to, Kusko wanted to offer an opportunity to Sacred Heart to participate in his new personal care/assisted living business so that Sacred Heart could generate additional income for its nonprofit efforts. [Day Six Tr., at 143.] Nonetheless, even if Sacred Heart did not want to be involved in the Saucon Valley facility, he would have continued with the project. [Day Six Tr., at 144–45.]

Sacred Heart determined that it was interested in partnering with Kusko in another assisted living business endeavor because SHALP I was doing so well. [Day Two Tr., at 132–33; Day Six Tr., at 145.] Kusko then prepared a *pro forma* budget for the construction and operation of what would eventually become SHALP II. [Day Two Tr., at 134; Day Six Tr., at 145.]

The SHALP I Management Committee discussed Kusko's proposal to create another assisted living facility. [Day One Tr., at 42.] Kusko indicated that

---

**54.** In this letter, Weston also indicated, although after-the-fact, concerns about the terms of the SHALP I lease of the second floor of the medical office building, including the length of the lease. [Day Seven Tr., at 21; Defendants' Exhibit 63.]

[t]he management committee thought it was a good idea because we were able to share expenses, advertising, we're going to be able to have economies of scale. For that reason, they thought that it was more of a benefit to the management of SHALP I which is Northampton that it was beneficial and they wanted to go ahead with it for that reason, and they approved the hospital being able to get involved with me in that project.

[Day One Tr., at 42–43.] Kusko brought the proposal before SHALP I's Management Committee because he wanted to disclose everything to the committee and ensure that there were no conflicts and permit the sharing of advertising and possibly employees. [Day One Tr., at 43.] The Management Committee understood that Sacred Heart would be a half owner in this other enterprise and the other half would be owned by a new partnership that included Kusko as a large percentage owner. [Day One Tr., at 44.] [55]

After reviewing Kusko's *pro forma* budget, Sacred Heart did not believe it needed a feasibility study and agreed to become a partner with Kusko in his Saucon Valley personal care/assisted living project. [Day Two Tr., at 132–35; Day Six Tr., at 145.] Thus, on September 14, 2004, Sacred Heart entered into a partnership agreement with Saucon Creek Assisted Living, L.P. to own and operate a

> personal care/assisted living facility to be located on the west side of Rt. 378 (Three Seventy Eight) at the intersection of Saucon Creek Road in the Stabler Center Saucon Valley. PA ("Site") which will provide the following services through the operating entity *SACRED HEART ASSISTED LIVING BY SAUCON CREEK, LIMITED LIABILITY COMPANY* (SHALSC, LLC) (the Company), to its residents.

[Day Two Tr., at 134; Plaintiffs' Exhibit 10.] [56] This partnership was known as "Sacred Heart Limited Partnership II" ("SHALP II"). [Plaintiffs' Exhibit 10, at ¶ 2.] [57] It does not appear that the plaintiffs were aware of the proposed facility, and they were not offered an opportunity to invest in it. [Day Three Tr., at 22; Day Four Tr., at 29–30.] [58]

---

**55.** There was no evidence that Kusko offered an opportunity to invest in SHALP II to any limited partner of NPCA. Also there was no evidence that the appellees diverted any opportunities available to any of the limited partners of NPCA.

**56.** Apparently, NPCA, of which Kusko is the president, was also the general partner of Saucon Creek Assisted Living, L.P. [Day One Tr., at 65; Plaintiffs Exhibits 2, 10.]

In addition to executing the SHALP II partnership agreement, Sacred Heart and Saucon Creek Assisted Living LP entered into an operating agreement to permit the entity known as Sacred Heart Assisted Living by Saucon Creek LLC to conduct the business operations of the Sacred Heart Assisted Living by Saucon Creek facility. [Day One Tr., at 54; Plaintiffs' Exhibit 11.] The parties also entered into a similar agreement for SHALF, which is operated by the entity known as Sacred Heart Assisted Living LLC. [Day One

Tr., at 54, 57.] After Kusko's attorney suggested the creation of an independent operating entity to limit potential liability for the partnership, the management committees of SHALP I and SHALP II approved the creation of these operating entities. [*Id.* at 54.]

**57.** Hereinafter, we will refer to SHALP II's assisted facility endeavor in Saucon Valley as "Sacred Heart—Saucon".

**58.** Additionally, it appears that some members of Sacred Heart never knew the identity of all of the partners in NPCA, and it appears that it may not have known all of the partners of Sacred Heart Assisted Living, L.P. [Day Two Tr., at 134; Day Five Tr., at 165.] Further, Cooney, the community representative of both SHALP I and SHALP II did not know the identities of all of the partners in the limited partnerships comprising part of the partnerships of SHALP I and SHALP II. [Day Two Tr., at 103.]

Per the agreement, the limited partnership owned 57.5% of SHALP II and Sacred Heart owned the other 42.5%. [Day One Tr., at 51; Day Two Tr., at 134–35; Day Seven Tr., at 52; Plaintiffs' Exhibit 10.] Kusko had offered Sacred Heart 7.5% less than a 50% ownership interest in SHALP I so that by him also devoting 7.5% of his ownership interest, they had an available pool of 15% interest to permit key employees of SHALP II to acquire ownership interests in a business that they would help to succeed. [Day Two Tr., at 239; Day Seven Tr., at 66, 67.] Kusko had previously adopted this policy by permitting Weston to have an ownership interest in SHALP I by which his management company was employed. [Day One Tr., at 90; Day Seven Tr., at 38.]

The SHALP II partnership agreement also provided that (1) neither SHALP I nor SHALP II (or the operating entities of those partnerships) would not operate a pharmacy business at the SHALF or Sacred Heart—Saucon locations; instead, Sacred Heart could provide pharmacy services to those locations; and (2) the operating entity of SHALF would partner with a new physical therapy entity (selected by Kusko) to service it, and neither SHALP II nor the operating entity for Saucon Valley would enter the physical therapy business at Sacred Heart—Saucon. [Day One Tr., at 51–52; Plaintiffs' Exhibit 10.] [59] Kusko also received an initial "Consulting fee" of $36,000, which would increase to $86.000 once the income of the Saucon operating entity and SHALP II exceeded $200,000. [Day One Tr., at 53; Day Seven Tr., at 51; Plaintiffs' Exhibit 10.] This $86,000 fee would continue until the expiration of five years after which it could be adjusted by the SHALP II management committee. [Day Seven Tr., at 51; Plaintiffs' Exhibit 10.] At some point thereafter, Kusko received a management fee of 6% of the gross revenues of Sacred Heart—Saucon. [Day One Tr., at 88–89.]

Saucon Creek Assisted Living L.P. and SHALP II entered into a ninety-nine-year lease on September 1, 2004 for a one time rental payment of $625,000. [Day One Tr., at 62–63; Day Seven Tr., at 48; Plaintiffs' Exhibit 12.] This lease is for the pad as Kusko continues to own the land. [Day Seven Tr., at 48.]

Kusko (on behalf of SHALP II) obtained financing for the construction of Sacred Heart—Saucon, which was obtained from Lafayette Ambassador Bank. [Day One Tr., at 65; Plaintiffs' Exhibit 14.] The total amount of the loan was up to $5,400,000.00. [Plaintiffs' Exhibit 14.] Kusko signed the loan commitment as president of Northampton Personal Care, Inc., which was also the general partner of Saucon Creek Assisted Living L.P. [Day One Tr., at 65; Plaintiffs' Exhibit 14.] In addition, the commitment contained language indicated that Kusko was "contemplating a cash out refinance of existing debt for the Northampton personal care facility and Northampton medical office building." [Plaintiffs' Exhibit 14; Day One Tr., at 66.] Kusko contemplated refinancing because the mortgage was coming due. [Day One Tr., at 67.]

As part of the refinancing. Kusko also secured an appraisal of the proposed Saucon Valley facility at the request of Lafayette Ambassador Bank. [Day One Tr., at 67; Plaintiffs' Exhibit 15.] Joseph J. Genay and Frederick Lesavoy prepared the appraisals on September 9, 2004. [Plain-

---

59. Per the agreement, the operating entity of Northampton was Sacred Heart Assisted Living LLC, and the operating entity of Saucon Valley was Sacred Heart Assisted Living by Saucon Creek LLC. [Plaintiffs' Exhibit 10.]

tiffs' Exhibit 15.] The appraisal for the real estate with the proposed facility was $8,000,000, and the appraisal for the real estate itself was $7,100,000. [Day One Tr., at 68; Plaintiffs' Exhibit 15.]

At approximately this same point in time, Sacred Heart informed Kusko that the hospital was interested in purchasing the partnership's interests in SHALP I. [Day One Tr., at 63.] In this regard, then-president of Sacred Heart, Seitzinger, asked Kusko to send a letter to the limited partners to inquire as to whether they would sell their interest for a certain dollar amount. [*Id.* at 13.] Via a letter dated September 17, 2004, Kusko sent the limited partners a letter detailing an offer by Sacred Heart to purchase each partnership share for $25,000, with settlement prior to December 1, 2004. [Plaintiffs' Exhibit 13.] If all of the partners sold their shares, the entire deal was worth $2,500,000. [Day One Tr., at 64; Plaintiffs' Exhibit 13.]

Kusko also sought an appraisal of SHALF. [Day One Tr., at 69.] Kusko received a letter dated December 9, 2004 from Frederick Lesavoy of the Frederick Group, which indicated that as of April 1, 205, the prospective "growing concern" market value of SHALF will be $16,000,000 (including use of the second floor of the medical office building), and the market value of the real estate owned by SHALP I was $8,290,000. [*Id.* at 69–70; Plaintiffs' Exhibit 16.]

### 2. *SHALP I Loan to Sacred Heart*

Sacred Heart needed to and eventually contributed $800,000 to the SHALP II partnership. [Day One Tr., at 49; Day Two Tr., at 137; Day Six Tr., at 145; Plaintiffs' Exhibit 10; Defendants' Exhibit 59.] To fund this required investment, Sacred Heart needed $664,385 in addition to the cash assets it had on hand. [Day Two Tr., at 137, 213.] Sacred Heart had commercial financing available to obtain the additional $664,385. [Day Two Tr., at 217.] In addition, although Sacred Heart's potential commercial lending sources would demand an interest rate less than LIBOR, they would require collateral that would involve Sacred Heart encumbering its ownership interest in SHALP I to an outside lender. [Day Two Tr., at 217.]

Despite the availability of other commercial lenders, Sacred Heart knew that SHALP I had cash in the bank that the Management Committee had chosen not to distribute, but to save, since 2003, as a reserve for the payoff of the SHALP I mortgage, which was scheduled to balloon and come due at the end of 2005. [Day Two Tr., at 121–23, 152, 217; Day Five Tr., at 98, 99.] As of December 31, 2003, SHALP I had cash, cash equivalents, and marketable securities in the amount of $2,245,275. [Defendants' Exhibit 37.]

After considering the amount of SHALP I's reserve funds in 2004 and the anticipated profits from SHALF between then and the due date of the mortgage, Sacred Heart proposed to SHALP I's Management Committee that it lend Sacred Heart the amount it needed, up to $800,000. [Day Five Tr., at 104–07; Day Six Tr., at 145, 146.] More specifically, Sacred Heart proposed to the Management Committee that: (1) a loan to Sacred Heart would provide SHALP I with greater interest than it was otherwise earning on the cash held in reserve; (2) Sacred Heart would repay SHALP I by SHALP I retaining any distributions that would go to Sacred Heart; (3) based on the profitability of SHALF, Sacred Heart would quickly repay the loan; (4) the loan would not interfere with the Management Committee's decision to pay off the existing mortgage rather than pursue refinancing; (5) the

collateral for the loan was Sacred Heart's ownership in SHALP I and would include, at Kusko's request, a confession of judgment provision to protect SHALP I if Sacred Heart defaulted on the loan; and (6) Sacred Heart's loan was similar to an individual borrowing from his or her 401(k) plan as it would have been entitled to the amount as a distribution if the Management Committee had not decided to hold the money for paying off the mortgage. [Day Two Tr., at 214, 217, 218, 221; Day Five Tr., at 150–53; Day Six Tr., at 145, 146, 147.] Additionally, Sacred Heart offered to pay a LIBOR rate of interest, which was not a rate favorable to Sacred Heart. [Day Two Tr., at 217.] Further, Sacred Heart felt that the loan was beneficial to avoid having to make a distribution. [Day Two Tr., at 252.]

The Management Committee discussed and approved the loan to Sacred Heart, ultimately in the amount of $664.385, which was memorialized by Sacred Heart's judgment note prepared by its counsel, Lanshe. [Day One Tr., at 50; Day Two Tr., at 212–14, 229–30; Day Five Tr., at 104–07, 150–52; Day Six Tr., at 147; Defendants' Exhibit 59.][60] The loan proceeds, rather than being paid to Sacred Heart, were transferred directly from SHALP I to SHALP II. [Plaintiffs' Exhibit 39.][61] This loan, the interest paid on the loan, and the loan's repayment were disclosed on the financial statements of SHALP I, on its tax returns, and on its audited financial statements. [Day Three Tr., at 170, 171; Day Five Tr., at 190, 191; Day Six Tr., at 147, 148; Defendants' Exhibit 37.]

SHALP I's cash position was still strong even after the loan to Sacred Heart as 2004 operations resulted in SHALP I having cash and cash equivalents on hand in the amount of $2,738,528. [Defendants' Exhibit 37.] With this cash amount, SHALP I's mortgage was repaid in December 2005 from the reserve funds designated for this purpose by the Management Committee and the loan to Sacred Heart did not interfere with SHALP I's ability to pay off the mortgage prior to the balloon payment. [Day One Tr., at 74; Day Two Tr., at 160, 161, 218; Plaintiffs' Exhibit 32.] Prior to paying off the loan, the SHALP I Management Committee had researched various options such as extending the loan or refinancing the loan, but it eventually determined that it was in SHALP I's best interest to pay off the loan to avoid future interest costs to the organization. [Day Two Tr., at 121, 122, 152, 161–62; Day Five Tr. at 98.][62] Even after the payoff of the mortgage, 2005 operations resulted in SHALP I having cash and cash equivalents on hand in the amount of $962,234. [Defendants' Exhibit 37.]

Although the loan to Sacred Heart was memorialized by a judgment note with a term of ten years, Sacred Heart repaid the overwhelming majority of the loan on or

60. There was no meeting minutes of SHALP I's Management Committee related to the loan to Sacred Heart. [See, e.g., Day Two Tr., at 230.] Cooney, as the community representative, did not recall discussing the terms of the loan from SHALP I to Sacred Heart. [Day Two Tr., at 89–90.] Further, Granson admitted that the Management Committee should have kept written meeting minutes or otherwise documented the loan. [Day Five Tr., at 121.]

61. After the Management Committee approved the loan, Kusko transferred the funds to Sacred Heart, [Day Two Tr., at 213.]

62. The Management Committee was concerned about the interest rate fluctuating to an unfavorable rate when the mortgage ballooned. [Day Two Tr., at 152.]

about April 11, 2006, approximately eighteen months after the date of the loan, using distributions which would have otherwise been made from SHALP I to Sacred Heart. [Day Two Tr., at 217, 220–21, 229; Day Five Tr., at 190.][63] Until Sacred Heart repaid the loan, it paid a variable interest rate based on LIBOR, which was greater than the average interest rates on SHALP I's investments during the same period. [Day Two Tr., at 218; Day Five Tr., at 190, 191.] More specifically, from the date of the loan in 2004, the interest rate progressed from a low of 2.28% in 2004 to a high of approximately 4% in the first quarter of 2006. [Day Five Tr., at 190–91.] As for SHALP I's cash reserves, SHALP I was earning 1.07% interest on its cash reserves during 2004. [Day Five Tr., at 191.] Therefore, SHALP I earned more interest income from funds loaned to Sacred Heart than it earned and otherwise would have earned on its other investments. [Day Five Tr., at 191.] Even Weston acknowledges that SHALP I did not lose interest income by loaning the money to Sacred Heart. [Day Four Tr., at 62.][64]

### H. SHALP I's Financial Success

As shown by the evidence presented in this case, SHALP I has been a financial success for its partners and, thus, it has also been successful for the limited partners of Northampton Personal Care Associates, L.P. More specifically, the net income of SHALP I, from 1998 through 2003, when it owned the real estate and operated the business of SHALF, was as follows:

- 1998—($140,194)
- 1999—($265,292)
- 2000—$367,422
- 2001—$620,454
- 2002—$892,318
- 2003—$1,051,949

[Day Five Tr., at 171–76; Plaintiffs' Exhibit 39 with attachment #4; Defendants' Exhibit 19.]

On January 1, 2004, SHALP I formed Sacred Heart Assisted Living, LLC, with membership identical to SHALP I, to own and operate SHALF's business, thereby separating ownership of the real estate (which remained with SHALP I) from the potential liability associated with the operation of the business. [Day One Tr., at 54; Day Six Tr., at 140.] Thus, to determine the income resulting from SHALF for a year after 2004. one would have to consolidate the income statements for the partnership owning the real estate and collecting rent from the LLC with the income of the LLC. [Day Five Tr., at 176–83; Day Six Tr., at 141.] The consolidated net income of SHALF and Sacred Heart Assisted Living, LLC, from 2004 through 2007, was as follows:

- 2004—$1,323,813
- 2005—$1,282,529
- 2006—$1,287,196
- 2007—$1,317,547

[Day Five Tr., at 176–83; Plaintiffs' Exhibit 39 with attachments 4 and 6.]

### I. SHALP I's Financial Statements & Auditors

As previously indicated, from the inception of SHALP I, the Management Com-

---

**63.** By April 11, 2006, it appears that Sacred Heart had paid off the entire loan except for a balance of $3,900, which it repaid by June 30, 2006. [Day Five Tr., at 190.]

**64.** In response to paragraph 9f of the Complaint in this matter, we note that there was no other evidence potentially relating to the claim that the appellees failed to properly account for capital funds.

mittee meetings of SHALP I (and after 2004, for Sacred Heart Assisted Living, LLC) were not held on a set schedule; instead, the meetings were held at least a couple of times every year to review (1) the budget for the coming year, (2) quarterly financial statements showing actual performance, and (3) the financial performance of SHALF for the preceding year. [Day Two Tr., at 154, 155; Day Five Tr., at 91, 126, 127, 138; Day Six Tr., at 142.] Even though Weston's management company ran the day-to-day operations from 1998 until 2003, Kusko always prepared the annual budgets for the Management Committee. [Day Six Tr., at 88, 142.] These budgets were (and are) thoroughly reviewed by Sacred Heart. [Day Two Tr., at 155; Day Five Tr., at 154.] Kusko would also always review the budget on a monthly basis with Blazo. [Day Six Tr., at 88.]

Audra Wallis, SHALP I's bookkeeper since its inception and now its corporate financial officer, (1) handles SHALP I's accounts payable, accounts receivable, and payroll, (2) maintains the financial records of SHALP I using Quickbooks, and (3) provides such financial information to John Savchak, SHALP I's accountant. [Day One Tr., at 107; Day Two Tr., at 4, 14, 16, 38, and 59, 148; Day Five Tr., at 171.] Savchak provides Wallis with guidance as to how to maintain SHALP I financial records and instructs her to make changes or corrections when necessary. [Day Two Tr., at 16, 17, 38, 59.]

Using the Quickbooks information Wallis provides to him along with SHALP I's banking records, Savchak prepares SHALP I's quarterly financial statements (or compilations) in a form compliant with AICPA rules for Generally Accepted Accounting Principles ("GAAP"). [Id. at 148, 234–35; Day Five Tr., at 199–202; Day Six Tr., at 88.] Savchak provides these quarterly financial reports to Kusko, who presents them to the Management Committee and thereafter are thoroughly reviewed by Sacred Heart. [Day Two Tr., at 148, 154, 234; Day Five Tr., at 154–55; Day Six Tr., at 88.] Kusko has always been the individual who presents these financial reports to the Management Committee. [Day Seven Tr., at 142.] If Sacred Heart (acting through Gombert) had questions about the financial statements, Gombert would ask Kusko or Savchak. [Day Two Tr., at 148–49.] Gombert always received satisfactory answers to her questions. [Id. at 149.] [65]

SHALP I has employed independent auditors to perform audits during each year of its operation, with Buckno Lisicky & Company performing most of the initial audits and Regan, Scarles & Company performing the most recent audits. [Day Two Tr., at 145, 235; Day Five Tr., at 154, 187, 189; Defendants' Exhibit 37.] [66] The independent auditors examine Savchak and Wallis's work product, and they meet with Wallis each year and whenever they have questions. [Day Two Tr., at 17, 61.] Savchak noted that the independent auditors have only performed two adjustments to his work throughout the time he worked as the accountant for SHALP I. [Day Five Tr., at 189.] [67]

---

**65.** This was also the case regarding Sacred Heart—Saucon's financial statements. [Day Two Tr., at 149.]

**66.** Gombert recommended Regan, Searles & Company. [Day Two Tr., at 236.] By 2003, Weston was aware that SHALP I employed independent auditors to perform annual audits. [Day Four Tr., at 60, 61.]

**67.** Neither of these two adjustments appears to be pertinent to the issues raised in this case. [See Day Two Tr., at 189.]

Sacred Heart thoroughly reviews the audited financial statements, and those statements are presented to its financial committee and board of directors and are eventually included in Sacred Heart's own independently audited financial statements. [Day Two Tr., at 145, 146; Day Five Tr., at 154–55.] Sacred Heart's own independent auditors have never raised any issue, discrepancy, or objection concerning SHALP I's financial statements in the audited results of Sacred Heart's operations. [Day Two Tr., at 147.]

### J. SHALP I Advertising

As indicated above, Kusko has a majority interest in the advertising sales company, ViaMedia. [Day Six Tr., at 5.] ViaMedia has the capability of selling all of its allotted commercials except for twenty percent of them, which are used by the applicable cable operator. [*Id.* at 7.] Although ViaMedia has a large inventory of commercial spots available to its customers, it does not sell all of the spots. [*Id.*] The unsold spots are given to advertisers who are already advertising with ViaMedia or a non-profit entity. [*Id.*]

Because he realized that the Sacred Heart name was highly promotable for marketing purposes, Kusko started cable advertising (including a commercial) prior to the opening of SHALF. [*Id.* at 154.] Thus, starting in 1998, although he had no legal obligation to do so, Kusko used his ownership interest in ViaMedia to obtain free or low cost advertising to benefit SHALF. [Day Two Tr., at 156, 157; Day Four Tr., at 73; Day Five Tr., at 102; Day Six Tr., at 9–16, 154–56; Defendants' Exhibits 46, 50.] ViaMedia did not have a written agreement (or any other legal obligation) with SHALP I for these commercials. [Day Two Tr., at 157; Day Five Tr., at 103; Day Six Tr., at 32.] Ninety-eight percent of SHALF's residents for the first couple of years of the business resulted from television advertising. [Day Six Tr., at 156; Day Seven Tr., at 44, 45.]

Even if a personal care/assisted living facility is at or near capacity in terms of the number of residents, advertising dollars continue to be spent to maintain the level of occupancy. [Day One Tr., at 176, 189; Day Two Tr., at 158, 172; Day Five Tr., at 34, 35.] In addition, maintaining occupancy permits the personal care/assisted living facility to remain profitable. [Day Two Tr., at 158, 172; Day Four Tr., at 17, 18, 74, 75.]

From 1998 until the end of 2004, SHALP I spent an average of $2,000 per month for cable television advertising. [Day Six Tr., at 9–18, 155–56.] During that period of time, while other customers of Target Select/ViaMedia received free "bonus" sports in number ranging between 20% and 50% of those paid for, SHALP I received fifty to seventy free "bonus" spots for each advertisement for which it paid. [*Id.* at 14, 15, 29, 38.] SHALP I had a large number of commercials placed on the available cable channels. [Day Two Tr., at 156; Defendants' Exhibit 43.] Therefore, because of Kusko's ability to give "bonus" television advertising spots to SHALP I, SHALP I spent $24,000 per year from 1998 to 2005 for television advertising, and it has received the equivalent of approximately $750,000 to $800,000, in television advertising. [Day Five Tr., at 102; Day Six Tr., at 26, 27, 30; Defendants' Exhibits 46, 50.][68] This was significantly more preferential than any other ViaMedia client. [Day Six Tr., at 38.]

---

68. The rates for the commercials depended on the location of the cable company in the region. [Day Six Tr., at 31.]

During the period from 1998 until the end of 2004, the budgets proposed by Kusko and approved by the SHALP I Management Committee included an advertising allocation. [*Id.* at 164.][69] These advertising allocations were significantly higher than the amount SHALP I actually spent each year. [*Id.* at 164.] SHALP I's budgeted amount for advertising exceeded its actual expenditures to account for the contingency if Kusko would no longer be willing or able to provide the free or low cost television advertisements to SHALP I. [*Id.* at 164.]

Kusko continued to provide this free or low cost television advertising exclusively for the benefit of SHALP I until 2005 when he began to use the free or low cost television advertising available to him to benefit SHALP II. [Day Six Tr., at 157, 158; Defendants' Exhibit 46.] Commencing on or about November 15, 2005. the television spots being run changed to an advertisement devoted primarily to the promotion of SHALP II. [Defendants' Exhibit 46.] Nonetheless, even after November 15, 2005, the new television advertisements continued to include the name of SHALP I. but would not necessary include the telephone number of SHALP I. [Day Six Tr., at 18, 19, 158; Defendants' Exhibit 46.]

In anticipation of the loss of the advantageous advertising, Kusko reported to the SHALP I Management Committee in 2004 that such advertisements would be ending and that SHALP I would need to find another medium for advertising. [Day Five Tr., at 103; Day Six Tr., at 157–59, 164.][70] Kusko also recommended that SHALP I increase its advertising budget for 2005 so it could cover the costs for advertising that Kusko (through Target Select/ViaMedia) provided to SHALP I for little or no charge. [Day Two Tr., at 155–57; Day Six Tr., at 163.] The Management Committee agreed with Kusko that it should increase the 2005 advertising budget. [Day Two Tr., at 157; Day Six Tr., at 163.]

Kusko recommended that the Management Committee use billboard advertising from Go Board Advertising to protect SHALF from the lack of commercials. [Day Six Tr., at 159; Day Seven Tr., at 41.][71] In light of Kusko's recommendation. SHALP I's Management Committee approved the use of billboard advertising. [Day Five Tr., at 103, 104; Day Six Tr., at 159, 160, 163.][72] Thus, starting in November 2005 and continuing until September 2006, SHALP I used billboard advertising to solicit new business. [Day Five Tr., at 103, 104; Day Six Tr., at 161–62; Defendants' Exhibits 44, 45.] Approximately seventeen to twenty billboards located throughout the greater Lehigh Valley exclusively advertised SHALF. [Day Six Tr., at 161–63; Defendants' Exhibit 44.]

**69.** Sacred Heart thoroughly reviewed all budgets proposed by Kusko. [Day Five Tr., at 154.]

**70.** Granson admitted that as a limited partner in NPCA and as a member of the SHALP I Management Committee, he was not "overwhelmed with" the proposition that Kusko was going to stop using cable television to advertise SHALF because it could possibly affect his partnership's investment. [Day Five Tr., at 103.]

**71.** In 1998, when he was managing SHALF, Weston had actually recommended billboard advertising, but Kusko believed that television was a better medium. [Day Four Tr., at 32.]

**72.** Billboard advertising is a typical medium for advertising by personal care/assisted living businesses in the Lehigh Valley. [Day One Tr., at 165; Day Four Tr., at 74.] Also, there was no Management Committee meeting minutes approving the use of the billboard advertisements. [Day Seven Tr., at 46.]

SHALP I's costs for billboard advertising ranged from $13,340 per month to $14,945 per month, which was significantly higher than SHALP I's previous monthly expense of $2,000 for television advertising. [Day Five Tr., at 103, 104; Defendants' Exhibits 44, 45.] Thus, SHALP I's billboard advertising increased SHALP I's advertising expenses for 2005 and 2006 more than it would spend in 2004 or 2007. [Defendants' Exhibit 19.] [73]

At approximately the beginning of 2007, Kusko began including both Sacred Heart—Saucon and SHALF's phone numbers on the cable advertisements, and also actually referencing SHALF during the commercial. [Day Six Tr., at 160.]

Regarding the advertising expenses sustained by SHALP I, Foreback testified (and otherwise indicated in her expert report) that as to advertising expenses for personal care/assisted living facilities: (1) the Lehigh Valley is an advertising intensive market for personal care/assisted living facilities; (2) the use of billboard advertising is expensive; (3) the use of television advertising is usually cost-prohibitive; and (4) personal care/assisted living facilities in the Lehigh Valley spend a minimum of three percent of gross income on advertising, and typically spend between six and seven percent of gross income. [Day Five Tr., at 63; Defendants' Exhibit 34.] Additionally, SHALP I spent as little as 1.03% up to a maximum of 2.12% of its gross income on advertising during the years of 2004 through 2007. [Day Five Tr., at 67–68; Defendants' Exhibit 34.] Furthermore, the fact that SHALP I received free or low-cost television advertising should not be considered in an appraiser's analysis since Kusko provides it and its continua-

tion cannot be relied upon if Kusko should become unable or unwilling to provide this form of advertising. [Day Five Tr., at 65–66; Defendants' Exhibit 34.]

Townsley also testified (and provided an expert report) concerning advertising expenses for personal care/assisted living facilities as follows: (1) the general personal care/assisted living facilities' rule of thumb used in developing initial financial forecasts for planned assisted living facilities is that advertising and direct marketing expenses will approximate 3.5% percent of an assisted living facility's overall operating expenses in any given year; (2) SHALP I's advertising/direct marketing expenditures for the years of 2005 through 2008 did not exceed the industry rule of thumb and were (a) in 2005—2.82% of operating expenses, (b) in 2006—3.24% of operating expenses, (c) in 2007—1.59% of operating expenses, and (d) in 2008—1.88% of operating expenses. [Day Five Tr., at 14, 17–20; Defendants' Exhibit 36.] Also, the use of billboard advertising by personal care/assisted living facilities in the Lehigh Valley is typical. [Day Five Tr., at 21.] Further, SHALP I's advertising and direct marketing expenditures for the years 2005 through 2008 were reasonable in amount. [Defendants' Exhibit 36.]

## K. Business Model

The business model of SHALP I is a personal care/assisted living facility similar to other facilities, including those owned by Weston, with the exception of the availability of the use of "Sacred Heart" in its name, resulting solely from the affiliation of Sacred Heart with both SHALP I and SHALP II. [Day Six Tr., at 149, 150.] When Kusko started Sacred Heart—Saucon, he did not use the business model from SHALF, and he did not use the

---

**73.** It appears that SHALP I's advertising expenses increased from $46,184 in 2004 to $90,859 in 2005 and then to $105,266 in 2006. [Plaintiffs' Exhibit 39.]

financial information from SHALF (such as the financial results, income, costs and expenses, or rates) to plan the financial aspects for Sacred Heart—Saucon. [*Id.* at 148–49, 152.] There are significant differences between Sacred Heart—Saucon and SHALF, including, *inter alia*, their locations, setting, design, amenities, and potential clientele. [Day One Tr., at 163, 164; Day Six Tr., at 149.] For example, Sacred Heart—Saucon is located next to Saucon Valley Country Club and has other amenities unavailable at SHALF including, *inter alia*, multiple meal choices and a private dining room. [Day Six Tr., at 149, 150, 151.] Furthermore, since the rates for occupancy were higher in Sacred Heart—Saucon, it was harder to fill. [*Id.* at 150.]

There was no evidence suggesting that the term "Assisted Living" or "Sacred Heart Assisted Living" is a trademark, service mark, or trade name owned by SHALP I or NPCA. Regarding the use of the term "Sacred Heart" in the title of the business, neither party offered evidence to suggest that "Sacred Heart" is a trademark, service mark, or trade name owned by SHALP I or NPCA; instead, the name "Sacred Heart" is owned by Sacred Heart Hospital and pursuant to the partnership agreements creating SHALP I and SHALP II, must be removed from the business names of SHALP I and SHALP II if Sacred Heart ever ceases to be a co-owner of the businesses. [Day Two Tr., at 221–23; Day Three Tr., at 219, 220; Defendants' Exhibit 4; Plaintiffs' Exhibit 10.] Sacred Heart permits numerous entities in which it has a financial interest to include "Sacred Heart" in a business name. [Day Two Tr., at 177.][74] Moreover, Weston has used the name "Sacred Heart" his physical therapy joint venture with Sacred Heart

located on the first floor of the medical office building, which is called Sacred Heart Physical Therapy and Rehab. [Day Four Tr., at 55.]

SHALP I and SHALP II use the same budget system, but Kusko (a partner in both enterprises) developed the system. [Day Six Tr., at 79–88.] SHALP I and SHALP II also use the same management, but Kusko essentially provides the management (except to the extent it is delegated). SHALP I's financial statements, rates charged by SHALF, and the expenses paid by SHALF are available to and known by all of the limited partners of NPCA. [Day Six Tr., at 153.] Also, there was no evidence presented linking SHALP II's profitability with the profitability of SHALP I.

Townsley indicated that with regard to the start-up forecasts, operating budgets, financial statements, marketing materials, websites, policy and procedure manuals, and other information relating to SHALF, there is nothing to suggest that the operation and development of SHALF is unique or proprietary. [Day Five Tr., at 14, 21, 22; Defendants' Exhibit 36.] Additionally, the development and operation of SHALF is similar to general industry practices and benchmarks. [Day Five Tr., at 14, 21, 22; Defendants' Exhibit 36.]

### L. Termination of Lease for Weston's Physical Therapy Business

Regarding the physical therapy provided to residents of SHALF, there was only one change in the provider occurring in 2008. [Day Six Tr., at 132.] One of Weston's entities provided physical therapy to SHALF residents until 2008. [Day Two Tr., at 128; Day Six Tr., at 132.] Residents were complaining about the physical therapy provided by Weston's company,

---

74. Strecansky does not object to SHALP II's use of "Sacred Heart" and acknowledges that such use is not part of his claim in this matter. [Day Three Tr., at 37.]

and some of the complaints included issues with time restraints placed on the therapists. [Day Two Tr., at 130; Day Six Tr., at 133.]

Via a letter dated May 5, 2008, Kusko, on behalf of the SHALP I Management Committee, informed Weston that the Management Committee was terminating his lease for space in SHALF effective June 1, 2008. [Day One Tr., at 113: Day Two Tr., at 127; Plaintiffs' Exhibit 24.] There were no meeting minutes of the Management Committee produced for this decision to terminate. [Day One Tr., at 113, 114; Day Two Tr., at 130.] Because Good Shepherd received good feedback from residents for its work at Sacred Heart—Saucon, the Management Committee selected it to replace Weston's business. [Day Seven Tr., at 29.]

When the Management Committee decided to terminate the relationship with Weston, it also hurt Sacred Heart because Sacred Heart was affiliated with Weston's physical therapy business that was operating on the first floor of the medical office building. [Day Two Tr., at 256.] Nonetheless, Gombert noted that she voted for the termination because it was in the best interests of SHALP I and the facility. [*Id.* at 256.]

### M. Cooperative Agreement and Shared Employees

#### 1. *The Cooperative Agreement*

In 2005, recognizing that the economies of scale were available to SHALP I and SHALP II, Kusko suggested to the SHALP I Management Committee that the joint use of anything that could be purchased in bulk, such as certain marketing methods, advertising media, food, and other resources, would benefit both SHALP I and SHALP II. [*Id.* at 139, 163, 175, 176, 177; Day Five Tr., at 109, 110; Day Six Tr., at 165–67.] SHALP I's Management Committee agreed with Kusko and recognized that the economies of scale could also be achievement by sharing the services and costs of certain employees for such things as marketing, promotions, billings, collections, payments, and bookkeeping. [Day Two Tr., at 78, 139, 163, 175, 176, 179; Day Five Tr., at 109, 110, 111; Plaintiffs' Exhibit 25.]

Scott E. Townsley, admitted as an expert in strategic planning, marketing analysis, operational evaluations, and project development for senior living facilities, indicated that it is a common business practice for personal care/assisted living facilities that are not in direct competition with one another to cooperate and take advantage of economies of scale and share expenses, such as those for marketing, insurance, and tangible assets. [Day Five Tr., at 42–43.] In addition, it is common in the healthcare industry (and at Sacred Heart) to seek and take advantage of economies of scale by sharing expenses, including those for staffing. [Day Two Tr., at 176, 177.]

SHALP I's Management Committee agreed and commencing in or about May 2005: (1) SHALP I and SHALP II agreed to and began sharing certain names (such as "Senior Living" and "By the Creek"), employees and expenses, (2) SHALP I agreed and included reference to SHALP II in all of its print advertising, (3) SHALP II agreed to and included reference to SHALP I in all of its print advertising, and (4) SHALP II agreed to and included reference to SHALP I in all of SHALP II's television advertisements. [Day Two Tr., at 139, 163, 175–79; Day Five Tr., at 109, 110, 157, 158; Defendants' Exhibit 33.] This understanding was ultimately memorialized on March 13, 2006, when the operating entities of SHALP I and

SHALP II, Sacred Heart Assisted Living, LLC, and Sacred Heart Assisted Living by Saucon Creek, LLC, entered into an cooperative agreement (the "Cooperative Agreement") by which, *inter alia*, they agreed to (1) share the servicemark "Sacred Heart Senior Living By The Creek" and cooperate in advertising programs, and (2) "share their knowledge and information as well as the marketing, management and other resources each has developed, including, but not limited to, images, logos, tradenames, trademarks, servicemarks, personnel and internet websites[.]" [Day One Tr., at 115; Day Six Tr., at 165; Plaintiffs' Exhibit 25; Defendants' Exhibit 33.] The Management Committee of SHALP I agreed to the Cooperative Agreement. [Day Six Tr., at 165.][75] In this regard, Gombert, as a member of both management committees, believed that the Cooperative Agreement was in the best interest of SHALP I and SHALP II. [Day Two Tr., at 182.] In addition, Lanshe had reviewed the draft agreement on behalf of and as attorney for Sacred Heart as well as for the benefit of SHALP I and SHALP II. [Day Five Tr., at 157, 158.]

Prior to entering into the Cooperative Agreement, a brochure was produced that advertises both SHALF and Sacred Heart—Saucon. [Day One Tr., at 116; Plaintiffs' Exhibit 26.] Kusko indicated that both entities were included on one brochure to share and save the costs. [Day One Tr., at 116.] In addition, since the execution of the cooperative agreement, Sacred Heart Northampton has been included by reference to its name or location in every television advertisement that was run concerning Sacred Heart Saucon, without any cost to SHALP I. [Day Two Tr., at 180; Day Six Tr., at 166;

Day Seven Tr., at 9–21, 37, Defendants' Exhibit 46.]

The Cooperative Agreement provides for reciprocal obligations on the parts of SHALP I and SHALP II, with the exception of SHALP II's obligation to include SHALP I, at no cost to SHALP I, in every television advertisement run by SHALP II. [Day Two Tr., at 180; Defendants' Exhibit 33.] Thus, pursuant to the agreement, if Sacred Heart—Saucon ran a television advertisement, it had to include either the name or location of SHALF. [Day Two Tr., at 180.] This obligation to provide no cost television advertising would apply regardless of whether Kusko provides the television advertising at little or no cost or if SHALP II obtains the advertising through other entities. [*Id.* at 179–82; Defendants' Exhibit 33.] Additionally, Sacred Heart—Saucon would have to refer any telephone call (at no charge to SHALF) if a person called Sacred Heart—Saucon and the person either could not afford Sacred Heart—Saucon or preferred SHALF. [Day Two Tr., at 180.] Further, if the advertisement contained the telephone number, Sacred Heart—Saucon and SHALF would equally share the cost provided that each party approved the advertisement in advance. [*Id.* at 181.]

Pursuant to the Cooperative Agreement, SHALP I and SHALP II have determined an allocation of their shared employees, tangible assets, and certain other expenses, such as Yellow Pages advertising and the cost of promotional materials. [Day One Tr., at 105–07; Day Two Tr., at 28–38; Day Seven Tr., at 167–68; Defendants' Exhibit 22.] Kusko supervises this allocation and directs Wallis regarding the specific allocations (particularly when it comes to the employees), and Savchak and

---

**75.** Interestingly, Seitzinger signed this agreement on behalf of both SHALP I and SHALP II. [Plaintiffs' Exhibit 25; Defendants' Exhibit 33.]

the independent auditors review Wallis's work as to SHALP I and SHALP II. [Day Two Tr., at 7–8, 18, 19; Day Six Tr., at 167, 168.]

In accordance with the Cooperative Agreement, SHALP I and SHALP II have reimbursed each other for their shared employees and shared expenses. [Day Two Tr., at 7, 18, 19, 28–50; Day Six Tr., at 168–72; Defendants' Exhibit 22, 64, 68, 69.] Wallis maintains the ongoing records of reimbursements due from SHALP I and SHALP II and *vice versa*. [Day Two Tr., at 28–50; Day Six Tr., at 168–72; Defendants' Exhibits 22, 64, 68, 69.] Wallis prepares and pays the invoices to and from SHALP I and SHALP II. [Day Two Tr., at 7–8, 18, 19, 28–50; Day Six Tr., at 168–172; Defendants' Exhibits 22, 64, 68, 69.]

Wallis will provide all of her records to Savchak, accountant for SHALP I and SHALP II and, when requested, the independent auditors of SHALP I and SHALP II, with whom she meets with every year. [Day Two Tr., at 38, 47, 59, 61.] Savchak and the independent auditors review Wallis's work and notify her if she needs to correct or change anything. [*Id.* at 45–46, 62; Defendants' Exhibit 64, at 21.]

### 2. *Shared Employees*

May was one of the employees that provided services to both SHALP I and SHALP II. Initially, while Northampton Village, Inc. managed SHALF, Weston paid for and provided May to market SHALF. [Day One Tr., at 82, 83, 155.] At the time, May was Weston's vice president of marketing and development. [*Id.* at 155–56.] As part of the management team of SHALF, May handled marketing and training individuals how to market, such as how to conduct a tour, customer service, etc. [*Id.* at 156–57.] May had started working at SHALF prior to the completion of the building, and she would have hard hat tours mostly for individuals working at entities that were likely to refer customers to SHALF. [*Id.* at 157.]

Once Kusko took over as manager of SHALF, he hired May to act as marketer, and SHALP I paid May for her services. [*Id.* at 82, 83, 84.] May had quit her job with Northampton Village, Inc., to start working for Kusko after she had a disagreement with Weston over her financial compensation for her work at one of his other facilities. [*Id.* at 158, 185.] None of May's salary was paid from Kusko's management fee he received from SHALP I. [*Id.* at 87.]

Regarding the allocation of May's time as marketer for both facilities, May had only initially worked for SHALF because SHALP II had hired Haglund as an administrator of Sacred Heart—Saucon. [*Id.* at 159.][76] May spent her entire time working for SHALP I until December 2006. [*Id.* at 102; Plaintiffs' Exhibit 23.] SHALP II eventually started using May in or around January 2007, so SHALP II began reimbursing SHALP I for May's services. [Day One Tr., at 97, 99, 170.][77]

During the period of January 2007 through February 2007, May spent 75% of her time at SHALP I and 25% of her time at SHALP II. [*Id.* at 103; Plaintiffs' Exhibit 23.] From March 2007 through November 2007, May spent 66% of her time at SHALP I and 33% of her time at SHALP II. [Day One Tr., at 103; Plain-

---

76. May was once the vice president of marketing, but she is now the director of community relations. [Day One Tr., at 155.]

77. The operating entities at each facility are her actual employer(s). [Day One Tr., at 101.] Also, we note that May did not document her hours. [Day One Tr., at 184.]

tiffs' Exhibit 23.][78] Finally, from December 2007 until the present, May evenly split her time between both businesses. [Day One Tr., at 103; Day Seven Tr., at 35–36; Plaintiffs' Exhibit 23.] May also had a company vehicle, which was owned by SHALP I, but SHALP II reimbursed SHALP I for May's use of the vehicle. [Day One Tr., at 103–04, 161.]

With regard to the aforementioned allocations, Kusko determined how May allocated her services to SHALP I and SHALP II. [*Id.* at 171.][79] When determining the allocation, Kusko and May would talk about the censuses at both facilities and whether May needed to advertise more. [*Id.*] They would also discuss how competing assisted living facilities were performing. [*Id.*]

Rosalind Haglund ("Haglund") was hired as the administrator for Sacred Heart—Saucon. [*Id.* at 104, 141, 192.][80] From June 2005 through November 2005, Haglund spent 75% of her time at Sacred Heart—Saucon and 25% of her time at SHALF, and Sacred Heart—Saucon reimbursed SHALF for 75% of the payments to her. [*Id.* at 104; Plaintiffs' Exhibit 23.] Since November 2005, Sacred Heart—Saucon rendered any and all payments to Haglund. [Plaintiffs' Exhibit 23.]

When Haglund first started in May 2005, she was physically located at SHALF. [Day One Tr., at 192, 199.] She stayed in a storage room type area, which she converted into a workspace for herself.

[*Id.* at 199.] No one had to move out of the space for her to move into it. [*Id.* at 199–200.] She stayed there for approximately two months before moving to a farmhouse near the Sacred Heart—Saucon location. [*Id.* at 193.] After relocating to the farmhouse, she would help out at SHALF if its administrator, Yastrop, was on vacation, if SHALF possibly needed weekend coverage, and she helped Yastrop once with covering an inspection. [*Id.* at 193, 200, 206.][81] Haglund also provided some tours of the SHALF facility. [*Id.* at 200.]

While she was at SHALF, she had access to things such as contracts, admission documents, and employee documents. [*Id.* at 194.] Concerning the contracts, Haglund would review the contract forms to examine the content of the forms. [*Id.* at 200.] Haglund modified some of the contract forms to satisfy the applicable regulations, and those changes were incorporated into SHALF's forms. [*Id.* at 201.] Additionally, Haglund did review and use some of the contracts and other documents for use at Sacred Heart—Saucon. [*Id.* at 194.]

Haglund also noted that SHALF was lacking many policies in conjunction with new regulations, so she drafted a lot of new policies and procedures. [*Id.* at 194, 201.] For example, the state regulations required SHALF to create policies and procedures for, *inter alia,* the destruction of medication, storage of records, and hospice policy. [*Id.* at 201.] SHALF had not

---

**78.** Plaintiffs' Exhibit 23 states that the commencement date for this period is "3/06", but based upon the testimony, this appeared to be a typographical error.

**79.** In general, it appears that the allocation of salaries of the shared employees between SHALP I and SHALP II was handled by Kusko. [Day One Tr., at 97–98; Day Three Tr., at 173.]

**80.** Haglund previously worked for Weston at Northampton Village, Inc., as the administrator of the Village at Sullivan Trail. [Day One Tr., at 141, 192.]

**81.** She did not get paid for this additional coverage. [Day One Tr., at 206–07.]

yet developed those policies and procedures by the time Haglund started working. [*Id.*] SHALF kept the policies Haglund drafted, and used them for their inspections. [*Id.* at 201–02.] Sacred Heart—Saucon also ended up using those policies and procedures. [*Id.* at 202.]

Haglund also created an inspection book, *i.e.* an arrangement of documents prepared for a state inspector upon the inspector's walk-in of the facility. [*Id.* at 202–03.] The documents are kept in the order of the state regulations. [*Id.* at 203.] Haglund created SHALF's in-depth inspection book. [*Id.* at 203, 204.] Haglund also created an inspection book as applicable to Sacred Heart—Saucon. [*Id.* at 204.]

Haglund has shared her information regarding policies and procedures with administrators other than Yastrop as it is "common practice" to share. [*Id.* at 204–05.] She has even shared her work product with Blazo for use at Weston's facilities. [*Id.* at 205.] After she started in May 2005, she never saw Blazo providing on-site management services at SHALF while she was there. [*Id.* at 206.] After she moved near Sacred Heart—Saucon (and eventually after Sacred Heart—Saucon opened), she never saw Blazo providing on-site operational service management. [*Id.* at 206.]

Haglund also noted that on a few occasions, Yastrop would serve in her absence as the administrator of Sacred Heart—Saucon. [*Id.* at 196.] Also, although Haglund originally had a business card that displayed both facilities, shortly after Sacred Heart—Saucon opened, they revised the cards. [*Id.* at 197.][82] Haglund does not believe that the two facilities appeared on the same card. [*Id.* at 198.]

In addition to the foregoing, SHALF erroneously purchased a vehicle for Haglund's use in June 2005. [Day Two Tr., at 50–54; Day Six Tr., at 168–72; Plaintiffs' Exhibit 23; Defendants' Exhibits 65–68.][83] Wallis inadvertently made the payment mistake in June 2005, and she corrected it immediately upon discovering her error in August 2005. [Day Two Tr., at 53–54; Day Six Tr., at 168–72.] Thus, the entire costs of the car, car insurance, and related operating expenses were reimbursed by Sacred Heart—Saucon to Sacred Heart—Northampton or were paid directly by Sacred Heart—Saucon. [Day One Tr., at 104, 105; Day Two Tr., at 8; Day Seven Tr., at 53, 54; Plaintiffs' Exhibit 23.] It appears that the reimbursement occurred in August 2005, which was after this litigation commenced, [Day Seven Tr., at 54.]

Along with May, Wallis, the corporate financial officer for SHALF, spent some time working for Sacred Heart—Saucon. [Day One Tr., at 108; Day Seven Tr., at 58; Plaintiffs' Exhibit 23.][84] More specifically, in 2006, Wallis spent 85% of her time at SHALF and 15% at Sacred Heart—Saucon; in 2007, Wallis spent 72% of her time at SHALF and 28% at Sacred Heart—Saucon; and, in 2008, Wallis spent 68% of her time at SHALF and 32% at Sacred Heart—Saucon. [Day One Tr., at

---

82. May appears to have also had such a card. [Day One Tr., at 116, 117.] Obviously, these cards were printed prior to the Cooperative Agreement. [Day One Tr., at 117, 118.]

83. The price of the vehicle was $11,301. [Day Six Tr., at 169–70; Defendants' Exhibits 67, 68.]

84. Wallis did not document her hours. [Day Two Tr., at 6.] Instead, Wallis would estimate her time. [*Id.* at 8–9.]

108; Day Seven Tr., at 58; Plaintiffs' Exhibit 23.] In those years, Sacred Heart—Saucon reimbursed SHALF for the allocations, and Wallis calculated the amounts for reimbursement. [Day One Tr., at 108, 109; Day Seven Tr., at 58; Plaintiffs' Exhibit 23.]

The reimbursement procedure set up between Sacred Heart—Saucon and Sacred Heart—Northampton was similar to that set forth in Weston's Agreement for Management Services, which Weston used when he shared the services of some of his employees, including nurses and cooks, with SHALP I. [Day Two Tr., at 22–27; Day Four Tr., at 35; Defendants' Exhibits 25, 52.] Sacred Heart thoroughly reviews the reimbursements between SHALP I and SHALP II. [Day Two Tr., at 148, 149.] If Sacred Heart has questions, it has contacted Savchak directly to ask those questions. [Day Two Tr., at 148, 149.] Similar to the financial records of SHALP I, the audited financial statements prepared by SHALP II's independent auditors are thoroughly reviewed by Sacred Heart, are submitted to Sacred Heart's financial committee and board of directors, and are ultimately included in Sacred Heart's own independently audited financial statements. [Day Two Tr., at 145, 146; Day Five Tr., at 154, 155.] Sacred Heart's own independent auditors have never raised any issue, discrepancy or objection concerning SHALP II's financial statements in the audited results of Sacred Heart's operations. [Day Two Tr., at 147.]

During the years, Blazo shared information with both Haglund and Yastrop as to what information needs to be in the inspection books for when stale regulators. [Day One Tr., at 143–44.] She even exchanges information with that on a regular basis in recent years even though she no longer works for SHALP I. [Day One Tr., at 144.]

Blazo acknowledged that the individuals running the assisted living facilities are a "close-knit group" that "help each other out." [Day One Tr., at 145.] In addition, Weston's assisted living facility in Northampton has received referrals (even after June 2008) from Sacred Heart Northampton as Weston's facility cares for individuals requiring a higher level of care. [Day One Tr., at 145–46.] Referrals also occur between the different facilities based on the desired location of the customer/client and the responsible party. [Day One Tr., at 148–52.] Since Yastrop and Haglund did not get along, Kusko asked her (during the period of time that he individually compensated her) to mediate disputes between Sacred Heart Northampton and Saucon. [Day One Tr., at 151.]

### 3. Operation of SHALP I and SHALP II/Whether the Entities are Competitive

In general, although certain prospective customers are, on occasion, referred by SHALP I to SHALP II, the same occurs with regard to referrals from SHALP II to SHALP I, and from both SHALP I and SHALP II to other personal care/assisted living facilities, including those owned by Weston. [Day Two Tr., at 145–50, 173, 208, 209, 219, 220.] The determining factors in a customer's choice of a personal care/assisted living facility, in order of importance, are (1) the facility's location (relative to where the customer and the customer's family lives), (2) whether the customer knows someone already living at the facility, and (3) the amenities, cost and availability of space in the facility. [Day One Tr., at 150, 171–73, 220.]

The SHALP I partners acknowledged, in paragraph 18 of the SHALP I partnership agreement that a distance of eight miles was reasonable for a non-competition

provision. [Defendants' Exhibit 4.] Paragraph 18 states that:

Notwithstanding any provisions of this Paragraph 18 to the contrary, except for Trexler [Park] Manor and Northampton Village, none of the Partners, any partners of [Northampton Personal Care Associates, L.P.], Weston Group, Randy Weston, nor any subsidiaries or affiliates of any of them shall directly or indirectly develop, operate, manage, or own an assisted living facility similar to or in competition with Sacred Heart Assisted Living Facility within an eight mile distance from the Site as measured by customarily traveled roads or highways.

[Id.] The driving distance between SHALP I and SHALP II is just over fourteen miles. [Day Five Tr., at 26; Defendants' Exhibit 36.]

The partnership agreement also specifically provides that partners may participate in competing business ventures. [Defendants' Exhibit 3 at 15, § 8.4] More specifically, the agreement states that

[p]artners may engage in or possess interests in other business ventures of every kind and description for their own accounts, including, but not limited to, competing business ventures. Neither the Partnership nor any of the Partners shall have any rights by virtue of this Agreement in such independent business ventures or to the income or profits derived therefrom.

[Id.]

The opening of SHALP II did not have an adverse effect on the market draw for SHALP I. [Day Five Tr., at 14, 23–26; Defendants' Exhibit 36.] Instead, the opening of SHALP II had a positive effect on SHALP I in terms of advertising/direct marketing expenditures and potentially other operating expenses which can be shared between SHALP I and SHALP II. [Day Five Tr., at 42, 43; Defendants' Exhibit 36.] Also, contrary to typical competing assisted living facilities, Sacred Heart—Saucon and SHALF, during the years of 2008 and 2009, did not draw customers from the same locations. [Day Five Tr., at 23–25; Defendants' Exhibit 36.] There is no evidence that SHALP II competes with SHALP I.

At the time of trial, occupancy at SHALP I was 100%, since it had 141 residents for its 141 beds. [Day One Tr., at 161, 224, 226.] The occupancy at SHALP II was 69%, since it had 96 residents for its 140 beds. [Id. at 207.]

### N. Distributions

Paragraph 7 of the SHALP I Partnership Agreement requires that SHALP I make minimum distributions to the partners to reimburse the limited partners of NPCA for the income taxes they will pay because of the income reported each year by SHALP I. [Defendants' Exhibit 4.] In addition, pursuant to paragraph 7, all distributions of SHALP I's net profits, other than the mandatory minimum distribution for reimbursement of income taxes, are left to the discretion of the Management Committee. [Id.]

Weston sent Kusko a letter dated September 22, 2003, in which he inquired as to why SHALP I has failed to make "meaningful distributions" of the "significant cash available to make such distributions." [Day Four Tr., at 85; Day Six Tr., at 172; Defendants' Exhibit 13.] Weston requested that Kusko arrange for a meeting of the partners of NPCA. [Defendants' Exhibit 13.] Kusko believes that he responded to Weston by informing him that he would address his concerns with the Management Committee. [Day Six Tr., at 173.]

Despite Kusko's belief, Ronnie F. Hess, counsel for Weston, drafted a letter dated

November 4, 2003 to Kusko in which Attorney Hess indicated that Kusko told Weston that he would not call a meeting of the limited partners in accordance with Weston's request. [Day Six Tr., at 173; Defendants' Exhibit 14.] Attorney Hess stated that Weston was invoking section 9.17 of the NPCA Agreement to require a meeting between Kusko. Weston and their respective legal counsel. [Defendants' Exhibit 14.]

In response to the November 4, 2003 letter, Kusko drafted a letter dated November 10.2003 to Attorney Hess. [Day Six Tr., at 173–74; Defendants' Exhibit 15.] In this letter, Kusko indicated that he had met with Weston to discuss the dispute over the distributions, and he advised Attorney Hess that the Management Committee (in particular the members representing Sacred Heart and the community member) were opposed to the current distribution of the reserve funds of SHALP I. [Day Six Tr., at 174; Defendants' Exhibit 15.]

On November 18, 2003, Kusko raised Weston's concerns about the lack of significant distributions by SHALP I to the SHALP I Management Committee during a Management Committee meeting. [Day Five Tr., at 99; Day Six Tr., at 175.] Kusko ensured that written minutes were kept of the meeting so he could substantiate that he discussed Weston's request with the Management Committee as he told Attorney Hess he would do. [Day Six Tr., at 177; Defendants' Exhibit 16.] During the meeting, the Management Committee, in the exercise of its reasonable business judgment, decided to forego immediate discretionary distributions so it could plan for the payoff of the mortgage and for expanding SHALP I's existing facilities, which included, *inter alia,* converting every two "L" shaped rooms into three efficiency rooms. [Day One Tr., at 34, 11, 112; Day Two Tr., at 121–23, 150, 151; Day Five Tr., at 98, 99; Defendants' Exhibit 23.][85] Thus, the Management Committee made a business decision not to initially make distributions of net income beyond what was necessary to pay taxes until there was a sufficient reserve. [Day Two Tr., at 126.]

Kusko then sent Attorney Hess a letter dated December 5, 2003, in which he attached a copy of the meeting minutes from the Management Committee meeting. [Day Six Tr., at 175–76; Defendants' Exhibit 16.] Relating to the issue about the disbursement of funds, these meeting minutes indicated as follows:

4) *Disbursement of Funds*

Ms. Gombert indicated that Mr. Kusko had informed her a limited partner had requested distributions be made in excess of the minimum amount allowed to pay taxes. That partner asked the Committee to address our cash surplus situation.

Ms. Gombert noted, that we had held excess cash reserves for expansion plans but regardless of expansion plans, our mortgage will balloon in two years and to avoid the interest rate risk she suggested holding excess cash in the company so we have the option to pay the

---

85. The "expansion plans" mentioned in the meeting minutes referred to (1) SHALP I needed to adjust the compliment of rooms, whether they were going to be single or double rooms because more individuals wanted singles than doubles and they needed to convert double rooms to single rooms before they could lease them out, and (2) the residents had requested more places for gatherings and card games. [Day Two Tr., at 150–51.] The expansion plans were solely related to the property owned in Northampton. [*Id.* at 151.]

mortgage down to avoid excess interest costs at that time. Mr. Seitzinger and Mr. Cooney agreed. Mr. Kusko stated he had a fiduciary responsibility to raise the question regarding disbursement of funds to our partners. He noted that if he and Mr. Granson voted it would not change the outcome given the opinions expressed by the other members of the committee and, therefore, suggested tabling the idea until after the close of the second quarter of 2004 to get a better picture of where interest rates are headed. The Board agreed to table the issue as suggested.

[Defendants' Exhibit 16.] After Kusko sent this letter, Weston no longer requested information regarding distributions. [Day Six Tr., at 176.]

On December 9, 2004, the Management Committee, in the exercise of its reasonable business judgment, at the suggestion of Sacred Heart, decided to forego immediate discretionary distributions to plan for the payoff of the mortgage, which had an interest rate of 7.25%. [Day Two Tr., at 121–23, 160, 161; Day Five Tr., at 98, 99; Defendants' Exhibit 23.] Although it is unclear of the exact date, the Management Committee determined that it was in SHALP I's best interest to maintain a cash reserve of six months of operating expenses (or net income) in the event of unforeseen operating expenses or bad months. [Day Two Tr., at 123, 170; Day Five Tr., at 99–100, 145.] This reasonable business decision, based in large part on the suggestion of Sacred Heart, was reflected in the October 22, 2007 and January 8, 2009 meeting minutes of the Management Committee. [Day Two Tr., at 121–23, 126, 169, 170; Day Five Tr., at 99, 100, 145; Defendants' Exhibit 23.] This six-month reserve continues to be maintained. [Day Five Tr., at 99, 100; Defendants' Exhibit 23.]

### O. Disclosure of Information

Weston sent Kusko a letter dated December 3, 2004, in which he requested that he receive a copy of SHALP I's and NPCA's federal tax returns, including all K–1's for 2003, year-end audited financial records for 2002 and 2003, a detailed general ledger, and all board meeting minutes. [Day Six Tr., at 179–80; Defendants' Exhibit 17.] Although Weston sent this letter, Kusko had (and has) provided the limited partners of NPCA with at least annual mailings that always included the limited partner's minimum distribution, Internal Revenue Service Form K–1, and, for every year except two, SHALP I's financial statements or a copy of SHALP I's Federal Income Tax Return, Form 1065. [Day Five Tr., at 85–91; Day Six Tr., at 179; Defendants' Exhibits 6, 10, 58.]

In response to Weston's request, Kusko sent him a letter dated December 13, 2004, in which he tells Weston that all of the requested information can be reviewed at Kusko's office at Weston's convenience. [Day Six Tr., at 180–81; Defendants' Exhibits 17, 18.] This letter was in accordance with Kusko's practice to allow any limited partner, including Weston or Strecansky, to review the records of SHALP I or NPCA. [Day Six Tr., at 181; Defendants' Exhibit 18.] Kusko has never denied any partner access to those records. [Day Six Tr., at 181.]

In this regard, the financial and other records of SHALP I and NPCA were an "open book" as far as Weston and all of the other limited partners were concerned. [Day One Tr., at 29; Day Four Tr., at 64; Day Six Tr., at 180, 181.] Neither Weston nor Strecansky were ever refused an opportunity to inspect the financial records

of SHALP I and NPCA. [Day Three Tr., at 65: Day Six Tr., at 380, 181.] There is also no evidence that the defendants failed to provide available information to the plaintiffs.

Weston did not avail himself of the opportunity to inspect the financial records of SHALP I and NPCA until after he and Strecansky had commenced this litigation. [Day Six Tr., at 180, 181.] Weston never requested financial or other information from members of the SHALP I Management Committee other than Kusko. [Day Four Tr., at 66.]

Strecansky never requested financial or other information from members of the Management Committee other than Kusko, even though Strecansky (1) was replaced by his personal friend, Granson, as member of the Management Committee, (2) knew that Cooney was the community representative on the Management Committee, since Strecansky first approached Cooney to serve in such capacity, and (3) knew that the CEO and CFO of Sacred Heart were members of the Management Committee. [Day Two Tr., at 66, 91; Day Five Tr., at 124, 125.] In addition, Strecansky never requested financial or other information from Savchak, although he knew that Savchak was SHALP I's accountant and NPCA and had been invited to do so by Kusko. [Day Three Tr., at 66.]

### P. Success for the Limited Partners

The totality of the evidence shows that Kusko was at all times acting in good faith concerning the interests of SHALP I and NPCA along with its limited partners. [Day Six Tr., at 181, 182.]

Although Weston's initial investment in NPCA in 1997 was $180,000 (for a 30% partnership interest), Weston has received distributions totaling $955,281. [Day Four Tr., at 69; Day Five Tr., at 186; Defen-

dants' Exhibit 20.] Additionally, while Strecansky's total investment in NPCA in 1997 was $84,000 (for a 14% partnership interest), Strecansky has received distributions totaling $445,797.80. [Day Three Tr., at 35; Day Five Tr., at 186; Defendants' Exhibit 20.]

### Q. Standing

The plaintiffs have acknowledged that they are not making claims on behalf of NPCA or the limited partners of that limited partnership. [Day One Tr., at 48.] None of the other limited partners of NPCA have an ownership interest or a reasonable expectation of having an ownership interest in the medical office building or SHALP II. [See, e.g., Day Five Tr., at 107, 108.] It does not appear that either of the plaintiffs contacted any of the other limited partners of NPCA for purposes of requesting information from them or soliciting them to join in the present litigation. [See, e.g., Day Five Tr., at 112, 124–26.]

The plaintiffs allege that all of their claims against the defendants are unique to them, as distinguished from the limited partners of NPCA as to the fiduciary duty allegedly breached, the alleged misrepresentations or lack of disclosures, and the damages allegedly suffered. [Day One Tr., at 48.] Almost all of the plaintiffs' claims are not unique to them as opposed to the interests of NPCA or the limited partners of NPCA. Thus, almost all of the alleged harm suffered by the plaintiffs is based on harm caused to SHALP I, and thereby to NPCA and thereby to them.

### R. Damages

The plaintiffs failed to present sufficient evidence to justify an award of damages for any of the allegations of wrongdoing encompassed by paragraph 9 of the Complaint. The plaintiffs failed to present evidence that would justify an award of punitive damages.

## S. Management Committees of SHALP I and SHALP II

Once Sacred Heart—Saucon was built, there were some joint meetings of the SHALP I and SHALP II Management Committees. [Day Two Tr., at 81, 82, 117, 138.] The Management Committees of SHALP I and SHALP II comprised of the same individuals. [Day Two Tr., at 81, 82, 138.]

John V. Cooney, the SHALP I and SHALP II Management Committee community representative, seeks to serve the interests of the Catholic community and the elderly that may need a personal care/assisted living facility. [Day Two Tr., at 94, 95.] Cooney indicated that no preference is given to SHALP I or SHALP II at the expense of the other. [Day Two Tr., at 102, 105.][86]

In addition to Cooney, Granson, Northampton Personal Care Associates, L.P.'s other representative on the Management Committee of SHALP I and a representative on the Management Committee of SHALP II (even though he has no ownership interest in SHALP II), seeks to ensure the profitability of SHALP I since he is, with his partners, a limited partner in Northampton Personal Care Associates, L.P. [Day Five Tr., at 111, 131.] Granson exercises his right to vote as a member of the SHALP II Management Committee to ensure that SHALP II does not take advantage of SHALP I. [Day Five Tr., at 111, 131.] If he acted otherwise, Granson would not be acting in his best interests or in the best interests of the other limited partners of Northampton Personal Care Associates, L.P. [Day Five Tr., at 111, 131.]

## III. *Discussion*

As evidenced by the appellant's Rule 1925(b) concise statement, he has raised multiple issues in this appeal. More specifically, the appellant asserts that we erred in determining that he lacked standing to bring most of his claims for breach of fiduciary duty and fraud. The appellant also contends that we erred in failing to find that he satisfied his burden of proof to show that the appellees violated their fiduciary duty to him in a variety of different matters. Moreover, the appellant claims that he introduced clear and convincing evidence to show how the defendants defrauded him concerning various aspects of the business operation. Finally, the appellant asserts that the appellees' conduct was so extreme and outrageous he was entitled to an award of punitive damages. As discussed in more detail below, none of these claims have merit.

## A. Preliminary Matter—Whether Strecansky is a Party to This Appeal

Before addressing the appellant's claims in this appeal, we note that we are unaware of any filed documents indicating that the other plaintiff in this matter, Strecansky, is part of the appeal filed in this case. In this regard, the Notice of Appeal states as follows:

> Notice is hereby given that *Randall Weston,* Plaintiff in the above-referenced matter, hereby appeals to the Superior Court of Pennsylvania from the order entered in this matter on the 9th day of November, 2010 denying Plaintiffs' action for breach of fiduciary duty and fraud. The appeal period was tolled by Plaintiff, *Randall Watson's* [sic], post-trial motion for judgment not with-

---

**86.** Cooney stated that the target community for SHALP I is located in northern Lehigh and Northampton counties, and the target community for SHALP II is located south of Allentown in the Saucon Valley area. [Day Two Tr., at 94–96.]

standing [sic] the verdict, denied on June 30, 2011, and reduced to final judgment on verdict on August 12, 2011.

Attorney Douglas Marinos, Esquire, counsel for Weston, indicates that he is the "Attorney for Plaintiff[.]" on the signature line for the Notice of Appeal [*Id.*] Furthermore, when Attorney Marinos entered his appearance in this matter on that same date, he did so only on behalf of Weston and not on behalf of Mr. Strecansky. [*See* 9–8–11 Entry of Appearance.]

Nonetheless, despite the clear indication that he was acting only on behalf of Weston, when Attorney Marinos filed his Rule 1925(b) statement in this matter, he indicated that "Appellants/Plaintiffs, Randall Weston and James Strecansky. file the following ..." [*See* 10–21–11 Concise Statement of Matters Complained of on Appeal Pursuant to Pa.R.A.P. 1925(b), at 1.] Moreover, unlike the signature line on the Notice of Appeal, on the signature line for the Pa.R.A.P. 1925(b) concise statement, Attorney Marinos states that he is the "Attorney for Plaintiffs." [*Id.* at 4 (emphasis added).]

We respectfully submit that Weston is the only proper appellant in this appeal. Pa.R.A.P. 512 provides that

> [p]arties interested jointly, severally or otherwise in any order in the same matter or in joint matters or in matters consolidated for the purposes of trial or argument, may join as appellants or be joined as appellees in a single appeal where the grounds for appeal are similar, *or any one or more of them may appeal separately* or any two or more may join in an appeal.

*Id.* (emphasis added). Thus, pursuant to Rule 512. Weston's appeal did not have to include Strecansky even though they were both plaintiffs in this matter. Based on our review of the record and the docket sheets in this matter, Attorney Marinos has not formally entered his appearance on Strecansky's behalf and Strecansky has not filed a notice of appeal.[87]

### B. Standing

The appellant's first five matters complained of on appeal relate to his interpretation of the language in our verdict concerning the appellees' argument that the plaintiffs, as limited partners of NPCA, lacked standing in this matter to bring a direct action against the general partner, Northampton Personal Care, Inc. and its principal, Kusko. More particularly, the appellant asserts that we erred by (1) finding that almost all of the particular breaches or harms complained of by the plaintiffs were not suffered directly, (2) failing to consider all of the breaches or harms complained of by the plaintiffs when rendering a decision on the standing issue, (3) finding that the plaintiffs lacked standing despite evidence that the appellees breached their fiduciary duty and committed fraud insofar as they excluded the plaintiffs, as limited partners, from their proper share of the benefits accruing from the limited partnership, NPCA, (4) determining that the harms allegedly suffered by the plaintiffs as not direct and unique to the plaintiffs, and (5) erroneously relying on federal case law, *Kenworthy v. Hargrove*, 855 F.Supp. 101 (E.D.Pa.1994). As discussed below, we respectfully submit that none of the appellant's claims have merit.

Before proceeding, we note that there is a dearth of Pennsylvania appellate case

---

87. We also note that the appellate docket sheets in this matter also indicate that Weston

is the only appellant in this appeal.

law addressing whether a limited partner may maintain a direct against a general partner in a limited partnership for breach of fiduciary duty or fraud.[88] In *Kenworthy v. Hargrove*, 855 F.Supp. 101 (E.D.Pa. 1994), the court noted this lack of guidance and predicted how the Supreme Court of Pennsylvania would rule when addressed with the issue as to whether limited partners could bring direct claims against a general partner. 855 F.Supp. at 106.

The court examined other states' interpretations of the Uniform Limited Partnership Act, and focused particularly on New York jurisprudence on the issue. *Id.* The court then determined that Pennsylvania courts would adopt the New York approach, which is as follows:

[T]he answer to this question depends on whether the primary injury alleged in the complaint is to the partnership or to the individual plaintiffs. When a limited partner alleges wrongs to the limited partnership that indirectly damaged a limited partner by rendering his contribution or interest in the limited partnership valueless, the limited partner is required to bring his claim derivatively on behalf of the partnership. [Further,]

[A] limited partner's power to vindicate a wrong done to the limited partnership and to enforce redress for the loss or diminution in value to his interest is no greater than that of a stockholder of a corporation. As a general proposition, where a corporation suffers loss because of the acts of officers, directors, or others which diminish or render valueless the shares of stock of a stockholder, the stockholder does not have a direct cause of action for such damages, but has a derivative cause of action on behalf of the corporation to recover the loss for the benefit of the corporation.

*Id.* (internal citations omitted).

While the court in *Kenworthy* also noted that since the general partners had also filed suit seeking to enforce the rights of the partnership, the limited partners could not also maintain their causes of action, the defendant had argued that the plaintiffs had brought their claims as derivative actions on behalf of the partnership. *Id.* at 104. Thus, the court addressed two concerns. The court first determined that the limited partners' argument that they could proceed with a direct action was not sustainable. Then, the court concluded that even if the limited partners were attempting to proceed with a derivative claim, the general partners were already pursuing an action on behalf of the limited partnership and Pennsylvania law would not permit a double recovery. *Id.* at 107–08 (citations omitted).

The same rationale espoused in *Kenworthy* has been followed by at least a couple unpublished federal court decisions. *See generally Weaver v. Mobile Diagnostech, Inc.*, No. CIV–A 02–1719, 2007 WL 1830712 (W.D.Pa. June 25, 2007) (describing cases and analyzing difference with direct and derivative suits in partnership

---

**88.** Contrary to a direct action, the right of a limited partner to bring such claims derivatively is clear. More specifically, section 8951 of the Revised Uniform Limited Partnership Act states as follows:

A limited partner may bring an action in the right of a limited partnership to recover a judgment in its favor if general partners with authority to do so have refused to bring the action or if an effort to cause those general partners to bring the action is not likely to succeed. The derivative action may not be maintained if it appears that the plaintiff cannot fairly and adequately represent the interests of the limited partners in enforcing the rights of the partnership.

15 Pa.C.S. § 8951.

context). We also note that the test espoused in *Kenworthy* is similar to that of determining whether a shareholder's action is direct or derivative in the corporate context. *See, e.g., Tyler v. O'Neill,* 994 F.Supp. 603, 609–10 (E.D.Pa.1998). As such, we followed the rationale in *Kenworthy* even though we recognize that as a federal district court decision, it is not binding authority on this court.

As we indicated in our decision in November 2010, almost all of the plaintiffs' claims for breach of fiduciary duty and fraud (especially as mentioned in the Complaint) related to alleged injuries to the partnership and not to the individual plaintiffs. More specifically, some of these indirect claims that should have been brought as a derivative action include (1) the claims relating to SHALP I entering into a twenty-year lease with Kusko to rent the second floor of the medical office building, (2) the Management Committee's decision to pay Kusko six percent of the gross revenue of SHALP I, (3) Kusko's creation and operation of SHALP II, (4) the sharing of employees between SHALP I and SHALP II, (5) SHALP I's loan to Sacred Heart, (6) SHALP I entering into the March 13, 2006 cooperative agreement with SHALP II, and (7) Kusko's running of the SHALP I Management Committee meetings. On the other hand. Weston's claim concerning the termination of his management contract would be an injury distinct from those of the other partners, as would Strecansky's claim that he was promised an ownership interest in the medical office building in exchange for a reduced rate for the construction of the building.[89] Therefore, we determined that

it appeared that almost all of the plaintiffs' claims were indirect claims asserting damages suffered by the partnership itself at the hands of the appellees and the plaintiffs would not have standing to bring those claims.

Nonetheless, even if the plaintiffs had standing, we determined that they did not sustain their burdens of proof on either of their causes of action for breach of fiduciary duty or fraud. We will discuss those issues below.

### C. Breach of Fiduciary Duty Claims

#### 1. *Generally—Pennsylvania Law on Breach of Fiduciary Duty Claims in Partnership Actions*

Partners generally owe a fiduciary duty to one another. *Clement v. Clement,* 436 Pa. 466, 260 A.2d 728, 729 (1970) (citations omitted); *see Bracht v. Connell,* 313 Pa. 397, 170 A. 297, 299 (1933) ("Partners stand in a fiduciary relationship to copartners."); *see also Greenan v. Ernst,* 12 Pa. D. & C.2d 725, 739 (McKean County Ct. C.P.1957) ("Even partners in a partnership composed of experienced businessmen occupy a fiduciary relation toward each other and owe each other the duty of the finest loyalty; not honesty alone, but the punctilio of an honor the most sensitive is the standard behavior to which the law holds them."). In this regard,

> one should not have to deal with his partner as though he were the opposite party in an arms-length transaction. One should be allowed to trust his partner, to expect that he is pursuing a common goal and not working at cross-purposes. This concept of the partnership entity was expressed most ably by Mr. Justice, then Judge, Cardozo in *Me-*

**89.** Arguably, Weston's claim that Kusko told him that all of the partners of SHALP I would receive an ownership interest in the medical office building would not be an injury distinct from those of the other partners as by Weston's own words, all of the partners were supposed to get an interest in the building.

*inhard v. Salmon,* 249 N.Y. 458, 164 N.E. 545, 62 A.L.R. 1 (1928):

'Joint adventurers, like copartners, owe to one another, while the enterprise continues, the duty of the finest loyalty. Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the marketplace. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions. * * * Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court.'

249 N.Y. at 463–464, 164 N.E. at 546.

*Clement,* 260 A.2d at 729.[90]

### 2. *The NPCA Agreement— Relevant Provisions*

Pennsylvania courts have recognized the importance of the terms of the limited partnership agreement when analyzing claims against a general partner. *See, e.g., In re Estate of Hall,* 517 Pa. 115, 535 A.2d 47 (1987) (analyzing issue concerning general partner charging six percent of gross rental income as management fee for management services provided by entity affiliated with acting general partner by reviewing parties' partnership agreement). Here, the NPCA Agreement states, in relevant part that

§ 1.1 The General Partner shall manage the business of the Partnership and the Limited Partners shall not participate in the management of the Partnership business except as otherwise permitted herein.

\* \* \*

§ 3.1 All General Partners shall have the right to vote as to the management and conduct of the business of the Partnership according to their Percentage Share of Profits and Capital . . .

\* \* \*

§ 5.1 . . . [E]ach partner does hereby appoint each General Partner as his or her or its true and lawful attorney, in his or her or its name, place and stead, to purchase, deal with the property and manage the same including, without limitation, to sign, deliver or record all deeds, contracts of sale or other instruments conveying title to the property, either in the names of the Partners or in the name of the Partnership and the

---

90. Generally, the Pennsylvania Revised Uniform Limited Partnership Act ("RULPA") applies to limited partnerships such as Northampton Personal Care Associates, L.P. 15 Pa. C.S. § 8502(a). Nonetheless, we note that section 8311 of the Uniform Partnership Act provides in pertinent part that "[t]his chapter shall apply to registered limited liability partnerships, limited partnerships, limited liability companies and electing partnerships, except insofar as the statutes relating to those associations are inconsistent with this chapter." 15 Pa.C.S. § 8311(b).

Section 8334(a) states that "[e]very partner must account to the partnership for any benefit and hold as trustee for it any profits derived by him without the consent of the other partners from any transaction connected with the formation, conduct or liquidation of the partnership or from any use by him of its property." 15 Pa.C.S. § 8334(a). There does not appear to be any section of the RULPA that is inconsistent with this section. Thus, to the extent applicable, it would appear to apply to the conduct of the instant limited partnership.

members thereof, to establish bank accounts for the Partnership and to deposit and withdraw funds therefrom, solely upon his or her or its signature, to demand, sue for, levy, or recover all sums on money, debts, rents, or other demands or claims of any nature whatsoever which are or shall be due the Partnership in such manner as the General Partner(s) shall determine to be advisable.

[Plaintiffs' Exhibit 1; Defendants' Exhibit 3.]

Pursuant to this agreement, Kusko as the general partner, has discretion to make all management and business decisions related to the Limited Partnership. We respectfully submit that this discretion supports many, if not all, of the appellees' decisions in the case herein.

### 3. The Appellant's Specific Breach of Fiduciary Duty Claims

In this appeal, the appellant claims that we erred in entering a verdict in favor of the appellees as to all of his breach of fiduciary duty claims. The appellant asserts that we erred insofar as we did not find that the defendants breached a fiduciary duty to the plaintiffs by (1) removing Northampton Village, Inc. as the management company of SHALP I, (2) replacing Northampton Village, Inc. with Kusko, (3) paying Kusko a higher fee for his managing services than those paid to Weston and Northampton Village, Inc., (4) having SHALP I pay for employees that Weston previously provided and paid for out of his own pocket, (5) entering into a "disadvantageous" twenty-year lease for the second floor of the medical office building owned and operated by Kusko, (6) having SHALP I provide a loan in the amount of $664.385.00 to Sacred Heart to allow Sa-

cred Heart to contribute the necessary $800,000 as a capital contribution for an interest in SHALP II, (7) using SHALP I employees trained by the plaintiffs and allegedly possessing intellectual property of the plaintiffs to staff and operate SHALP II, and (8) improperly running, operating and chairing the SHALP I Management Committee meetings. [Appellant's Concise Statement of Matters Complained of on Appeal Pursuant to Pa. R.A.P. 1925(b).] As discussed below, none of these claims have merit.

#### a. Management of SHALP I

Preliminarily, we note that the appellant never actually included any claim in the Complaint relating to the termination of his company's management agreement with SHALP I, Kusko's replacement as manager of SHALP I or his management fee, or SHALP I's payment of employees that Weston previously provided and paid for himself. [See Complaint, at ¶ 9.] Nonetheless, in paragraph 9 of the Complaint, the appellant, prior to enumerating the specific alleged breaches by the appellees, did use the words "includ[ing] but are not limited to." [Id.] The appellees never filed preliminary objections to this language or otherwise requested a more specific pleading as they could have pursuant to the Supreme Court of Pennsylvania's decision in Connor v. Allegheny General Hospital, 501 Pa. 306, 461 A.2d 600, 602 n. 3 (1983). The appellees also never objected during the trial or after the trial to the presentation of this particular claim. Accordingly, while it is possible that the appellant has not properly preserved this claim, we addressed it via our verdict in this matter and will explain the reasoning for our decision herein to enable appellate review of our decision.[91]

---

**91.** We also note that it appears that the appellant's claim relating to the termination of his management agreement as of June 30, 2003 would be barred by the applicable statute of

As indicated above, the appellant's first claim is that we erred in refusing to find that the defendants breached their fiduciary duty to him by terminating the management agreement of Northampton Village, Inc. We acknowledge that the record in this matter appears to be undisputed that SHALF was successful while managed by Weston and Northampton Village, Inc. Nonetheless, the appellant has not identified the particular fiduciary duty that the appellees owed him insofar as his management company operated SHALF.

In addition, contrary to the appellant's contentions in his concise statement and in his previous submission with this court after the trial, the Management Committee of SHALP I, and not merely the appellees, determined that it was in the best interests of SHALP I to terminate Weston's Management Agreement. We also disagree with the appellant that simply because it appears that there were no Management Committee minutes of this decision, this conclusively demonstrates that the Management Committee did not meet to discuss Northampton Village, Inc.'s Management Agreement. Instead, we found the testimony from the Management Committee members credible that such a meeting occurred and the record supports our determination that the Man-agement Committee voted to terminate Weston's Management Agreement.

The appellant has also pointed to no obligation on behalf of the appellees or the Management Committee of SHALP I to renew his management contract even if he was providing management services at a price significantly cheaper man Kusko would as manager or providing employees at his own cost. The Management Agreement contained a termination date of June 30, 2003 unless it was renewed, and the Management Agreement did not provide any conditions or limitations on the Management Committee's ability to not renew his Management Agreement.

Further, regarding the management fees charged by Weston, it is inconceivable for Weston to challenge the amount of his management fee when, as he claims (1) Kusko had limited to no experience in assisted living facilities at the start of SHALP I, (2) he (Weston) had significant prior experience in managing assisted living facilities, and (3) mere is no indication that Weston is not a sophisticated businessman. Weston did not have to agree to manage SHALP I and he was not forced to sign the Management Agreement.

Concerning the fact that Weston provided the services of, among others, Blazo and May at his own cost, whereas SHALP I now currently pays May (and did pay

limitations. A cause of action for breach of fiduciary duty is subject to a two-year statute of limitations. *See* 42 Pa.C.S. § 5524(7) (providing for two-year statute of limitation for "[a]ny other action or proceeding to recover damages for injury to person or property which is founded on negligent, intentional, or otherwise tortious conduct or any other action or proceeding sounding in trespass, including deceit or fraud, except an action or proceeding subject to another limitation specified in this subchapter"); *Aquilino v. Philadelphia Catholic Archdiocese,* 884 A.2d 1269, 1275 (Pa.Super.2005) (relying on 42 Pa.C.S.

§ 5524 and explaining that two-year statute of limitations applies to, among other causes of action, claims for breach of fiduciary duty).

The statute begins to run "as soon as the right to institute and maintain a suit arises; lack of knowledge, mistake or misunderstanding do not toll the running of the statute of limitations." *Pocono Int'l Raceway, Inc. v. Pocono Produce, Inc.,* 503 Pa. 80, 468 A.2d 468, 471 (1983). Here, it would appear that the appellant's right to institute suit began to run no later than June 30, 2003, when North-ampton Village, Inc. concluded its employment as SHALP I's managing entity.

Blazo for a period of time after the termination of his management agreement), this argument also does not demonstrate a breach of fiduciary duty. All of the employees that Weston provided as part of his management company indicated that they did not solely work on behalf of SHALP I at the time Northampton Village, Inc. managed the business. Instead, they were also working on other businesses owned and operated by Weston. As employees of only SHALP I, Weston's former employees, such as May, could concentrate their entire attention to the best interests of SHALP I.

We also did not find the appellant's argument availing that Kusko breached a fiduciary duty by paying Blazo out of his own pocket to act as a sporadic consultant should an issue arise with the business of SHALP I. While it is clear that neither Kusko nor Blazo wanted Weston to know about this business relationship, the appellant provided no evidence that Kusko frequently consulted with Blazo during this period or that this relationship negatively impacted Blazo's productivity as Weston's employee in any way.

Finally, concerning Kusko's management fee, the evidence demonstrated that Kusko was an active part of SHALP I's business from its inception (despite Weston's testimony to the contrary). The evidence demonstrated that SHALP's employees recognized Kusko as the manager even before he was formally the manager. Kusko consistently consulted with Blazo as to the operations at SHALF, and he particularly assisted with budgetary and other financial matters. The SHALP I Management Committee recognized that Kusko's experience in cost accounting was highly valuable to SHALP I, and the Management Committee determined that it was in

SHALP's best interest to pay Kusko his management fee.

There was also more than satisfactory evidence produced that Kusko's management fee of six percent of gross revenue was not unreasonable, unique, or excessive in the personal care/assisted living industry even though this resulted in Kusko receiving significantly more compensation than Weston did as SHALP I's manager. Both Foreback and Townsley provided expert testimony of the reasonableness of Kusko's management fee in personal care/assisted living facilities (including those in the Lehigh Valley). Also, although Townsley said that the Management Committee could have hired someone else to manage at a lower fee. we do not find that this somehow created a breach of fiduciary duty by the appellees when the Management Committee's decided to pay Kusko the six percent management fee. Thus, we submit that the Management Committee exercised reasonable business judgment in approving Kusko's aforementioned management fee, and the appellees did not breach any fiduciary duty by accepting this reasonable fee that was approved by the Management Committee. Furthermore, we note that as described in our findings of fact in this matter, Weston has even charged a management fee of six percent of gross sales for his previous services at the Villages at Willow Lane, a personal care/assisted living facility he owns with Cimerola.

b. The Second Floor Lease of the Medical Office Building

The appellant has also alleged that the appellees breached their fiduciary duty by causing SHALP I to enter into an allegedly prohibitive lease for the second floor of Kusko's medical office building. Based on the record presented during the trial, we found that the appellant failed to prove

such a breach by a preponderance of the evidence.

As we indicated in our verdict in this matter, the appellant's claim for breach of fiduciary duty (or fraud) relating to the medical office building is barred by the applicable two-year statute of limitations because the record is clear that the appellant knew about the lease of the medical office building no later than his April 17, 2001 letter to Kusko in which he indicates his concern over the terms of the twenty-year lease.

Nonetheless, should the appellate court determine that the appellant timely brought this claim, we respectfully submit that there was sufficient evidence in the record to support our determination that the SHALP I Management Committee approved SHALP I entering into the twenty-year lease for the second floor of the medical office building. We recognize that Strecansky, who was on the Management Committee at the time, denied that the Management Committee discussed the second floor lease. We also acknowledge that Cooney, the community representative, could not recall discussing the lease during a Management Committee meeting. Further, there were no Management Committee minutes produced reflecting a discussion of the lease terms, but this failure to have written minutes was typical of the Management Committee's conduct during the early years of the business. Despite the foregoing, we relied on Gombert and Kusko's testimony that the Management Committee acquired sufficient information and otherwise was fully aware of the pertinent lease terms before deciding that it was in SHALP I's best interest to enter into the lease.

We also disagreed with the appellant's claim that Kusko persuaded SHALP 1 to enter into the lease simply to arrange for financing of the medical office building. Instead, we found Kusko's testimony credible that the lender only needed a lease signed for the first floor of the medical office building to complete financing.

In addition, the uncontroverted evidence presented during the trial showed that the lease on the second floor of the medical office building was profitable to SHALP I in that SHALP I earned over $2,000,000 during the course of the lease. The appellant's sole support for alleging that the terms of SHALP I's lease of the second floor of the medical office building were commercially unreasonable is through the plaintiffs' disagreement with the length of the lease and their expert's determinations concerning the present value of the lease in October 1999 ($3,800,000) and the total amount of rent that SHALP I would pay over the course of the lease term ($7,000,-000). Despite the financial obligations of the lease, both Townsley and Foreback credibly and persuasively testified that the terms of the lease and the amount of the lease were reasonable and not excessive.

Furthermore, even though SHALP I and, thus, the appellant and the other limited partners of NPCA, did not have an ownership interest in the second floor of the medical office building (or the building itself), the appellant's expert (Waddington) did not consider any of the other expenses of ownership if SHALP I had gained an ownership interest in the medical office building. Moreover, he did not appear to consider the profitability of SHALP I's rental of the second floor of the medical office building. Further, there was no evidence as to what SHALP I would have earned had it acquired an ownership interest in the medical office building.

The appellant also did not offer any evidence to demonstrate that the amount of the rent for the second floor was unreasonable or excessive. Instead, the evi-

dence presented, particularly that of Foreback, showed that the rent was lower than the amount that Sacred Heart was paying in rent to Kusko for the unfinished first floor of the medical office building and significantly lower than the rent Weston paid to Sacred Heart for that same space.[92] In fact, the evidence showed that the rental amount was very favorable to SHALP I and commercially reasonable. Accordingly, for all of the aforementioned reasons, the appellant failed to show that the appellees breached a fiduciary duty to him by SHALP I entering into the twenty-year lease obligation for the second floor of the medical office building.

### c. SHALP I's Loan to Sacred Heart and Creation and Operation of SHALP II

The third subject that the appellant claims that we erred in failing to find a breach of fiduciary duty relates to SHALP I loan to Sacred Heart and the creation and operation of SHALP II. As discussed below, these claims also lack merit.

Concerning the loan to Sacred Heart, although the appellant (and his co-plaintiff, Strecansky) had expressed interest in the fall 2003 of receiving distributions from the partnership, the SHALP I Management Committee, in the exercise of its reasonable business judgment, decided to keep cash on hand to pay off the mortgage before it ballooned in 2005. In 2004, Sacred Heart proposed a reasonable and fair market transaction with SHALP I to borrow from SHALP I a portion of the reserve funds then being held for the payment of the mortgage and in which Sacred Heart possessed a 50% interest in should the partnership make a distribution.

When the Management Committee approved the loan to Sacred Heart (as Sacred Heart had two members on the Management Committee), the loan was at a preferable rate of interest (LIBOR) to SHALP I relative to the interest rate SHALP I was receiving on its cash reserves. Additionally, to ensure that the loan was repaid so that the Management Committee could pay off the loan when it was due to balloon, SHALP I had Sacred heart issue a judgment note using Sacred Heart's interest in SHALP I as collateral. SHALP I also did not hide the loan from the limited partners of NPCA as it was disclosed in the financial statements, audits, and SHALP I's tax returns.

We also note that even though the loan (through the judgment note) had a ten-year term, Sacred Heart repaid the loan in less than two years and, most importantly, in time so that SHALP I could pay off the mortgage prior to the balloon period. Additionally, the Management Committee and not merely the appellees, approved the loan to Sacred Heart; thus, Kusko did not use SHALP I's funds to finance the other business. Even if Kusko had voted against the loan, the other four members of the Management Committee (including two members of Sacred Heart who wanted the loan) would have and did vote in favor of it. While the loan to Sacred Heart enabled it to fully contribute to and gain an ownership interest in SHALP II, we submit that the record does not support a finding that the appellees breached a fiduciary duty to the appellant in this instance.

As for the business of SHALP II, the only issue relating to SHALP II identified in the appellant's concise statement relates to the use of "SHALP I employees trained by Plaintiffs and possessing intellectual property of Plaintiffs to staff and operate

---

**92.** Foreback also testified that the lease term was commercially reasonable.

SHALP II." [Appellant's Concise Statement, at ¶ 9.][93] The record in this matter demonstrated that early on in SHALP II's operation of Sacred Heart—Saucon, SHALP I and SHALP II shared employees despite not having a written agreement to do so. Even though employees such as May and Wallis indicated that they did not maintain contemporaneous time records of their time working for each facility, there was no evidence presented that the evidence concerning the allocation of their time was somehow false, misleading, or otherwise improperly calculated even if merely performed by Kuśko by consulting with these employees. Further, there is no indication that SHALP I was not properly fully reimbursed for its employees' work at and for SHALP II.

After this relationship of sharing employees had already been established between the two businesses, the Management Committee approved the cooperative agreement memorializing how SHALP I and SHALP II were going to share various expenses to achieve economics of scale in the operation of their respective businesses.[94] As Townsley indicated during his testimony and in his report, sharing arrangements by personal care/assisted living facilities (and elsewhere in the healthcare industry) to attempt to save expenses was common in the current economic climate. Thus, we submit that the sharing of employees was not a breach of fiduciary duly by the appellees; instead, it was a reasonable business decision that benefitted both entities.

We also note that the appellant has claimed in his concise statement that these employees possessed certain "intellectual property" of the *plaintiffs*. We presume that the appellant is referring to the intellectual property of SHALP I. Regardless, we have interpreted this part of the concise statement as referencing the report of the appellant's expert, Waddington, in which he found that "[i]t would not be unreasonable or unusual for entities to charge a royalty fee of 5% to 8% of revenues in similar situations. At a level of $5 million in revenue this amounts to $250,000 and $400,000 annually and a value of approximately $2.5 million to $4 million." [Plaintiffs' Exhibit 39, at 14.]

With regard to this part of Waddington's report, we must first point out that Waddington stated that SHALP II, prior to and after the cooperative agreement, allegedly received various intangible assets and resources of SHALP I that are not part of the appellant's concise statement. Nonetheless, Waddington did not point to and the evidence did not demonstrate virtually any instance of SHALP II using these intangible assets and resources, with the exception of the sharing of employees. Additionally, Kusko as the manager of SHALP I who was extensively involved in the operation from its inception, would naturally take his own budgetary and financial acumen to benefit SHALP II. Nonetheless, there was no evidence that Kusko brought any intellectual property from SHALP I with him to use for the benefit of SHALP II. Thus, it is unclear what forms of intellectual property the

93. Thus, we have not addressed the appellant's other allegations relating to SHALP II, which had also included changes with SHALP I's advertising methods and budgets.

94. Even though Granson, as a member of the SHALP I Management Committee, did not

recall seeing the Cooperative Agreement, the other evidence presented by Kusko and Gombert demonstrated that this agreement was discussed, considered, and approved by the Management Committee and it was in SHALP I's best interest to enter into the agreement.

employees possessed that they provided to SHALP II.

The evidence also showed that SHALP I received benefits through the Cooperative Agreement. For example, Haglund, Sacred Heart—Saucon's administrator, testified that while she initially learned about some of the forms and procedures of SHALP I during her short time staying at SHALF, she also added value to SHALP I (which was not reimbursed to SHALP II) by updating SHALP I's procedures, inspection book, and some of the contracts and other forms. Haglund also would assist Yastrop or SHALP I on occasion when needed. Moreover, as pointed out by the appellees during the trial, the Cooperative Agreement ensured that SHALP I would again receive the benefit of the extensive free or low-cost television advertising that it previously enjoyed before Kusko ceased providing the television advertising for SHALP I.

### d. Management Committee Meetings

The appellant's final contention relates to our alleged failure to find in his favor insofar as he asserted that the appellees breached their fiduciary duty by improperly running, operating, and/or chairing SHALP I's Management Committee meetings. As with the appellant's other arguments, this argument also lacks merit.

The record is clear that (1) Kusko ran all of the Management Committee meetings and no meeting was held without him being present, (2) virtually all, if not all, of the votes of the Management Committee were unanimous votes, (3) with the exception of one occasion that occurred in response to a direct request from Weston as he sought addition distributions from the cash reserve, all of the Management Committee's meeting minutes introduced in this case were created during and after meetings that occurred after this litigation commenced, and (4) some of the members of the Management Committee, such as Gombert and Cooney, did not know all of the partners in NPCA. Nonetheless, the appellant did not prove by a preponderance of the evidence that the appellees breached their fiduciary duty relating to the operation of the Management Committee.

First, while the appellant claimed that the fact that Gombert and Cooney did not know all of the limited partners of NPCA, there is no indication that they did not know the plaintiffs in this case. Second, while the appellant referenced this lack of knowledge as precluding the Management Committee from properly being able to address any possible conflicts of interest, the appellant has not identified any such conflicts of interest of how the appellant was injured by any breach of fiduciary duty by the appellees, even if it actually occurred. Third, despite the appellant's arguments to the contrary, there is no support in the record for the appellant's claim on page 22 of his Proposed Findings of Fact, Conclusions of Law and Discussion that Kusko somehow exercised "dictatorship management" of the Management Committee. We found credible evidence that Management Committee meetings were held even if written meeting minutes were not kept, and there is no indication from the members of the Management Committee that testified in this case, including Cooney, Granson, Strecansky, or Gombert, that they did not vote in a manner consistent with what they (and not just Kusko) thought was in the best interests of SHALP I or the community.[95] Therefore,

95. Although we agree with the appellant that it would have been more prudent of Kusko (and the SHALP I Management Committee) to have written meeting minutes for each meeting and have those minutes approved by the committee, we did not find that, even if

we respectfully submit that we did not err in finding against the appellant on this claim.

### D. Fraud

The appellant argues that all of the aforementioned allegedly improper acts by the appellees also constituted fraud. As discussed below, we respectfully submit that we justifiably concluded that the appellant failed to prove by clear and convincing evidence that any of the aforementioned acts constituted fraud.

The elements of intentional misrepresentation (fraud) are as follows: (1) A representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and, (6) the resulting injury was proximately caused by the reliance. *Bortz v. Noon*, 556 Pa. 489, 729 A.2d 555, 560 (1999). Concerning the justifiable reliance element, whether reliance on a misrepresentation is justified depends on whether the recipient knew or should have known that the information supplied was false. *Porreco v. Porreco*, 571 Pa. 61, 811 A.2d 566, 571 (2002). Also, a plaintiff must prove fraud by clear and convincing evidence. *Highmont Music Corp. v. J.M. Hoffmann Co.*, 397 Pa. 345, 155 A.2d 363, 366 (1959).

Here, as indicated above, the appellant alleges that the "same outrageous actions that establish Kusko's breach of his fidu-

ciary duty to [him] ... also establish clearly and convincingly that [Kusko] defrauded [him]." [Plaintiffs' Proposed Findings of Fact, Conclusions of Law and Discussion, at 5.] [96] We have addressed each of those claims below:

#### 1. *SHALF Management Issues*

Regarding the appellant's management agreement with SHALP I, there is no evidence in the record that Kusko provided the appellant with any representations relating to that agreement, that the representations were false, or that he made those with the intention that the appellant rely on them. As explained above, the appellant is a sophisticated businessman who lauded his level of experience when compared to Kusko. The appellant had managed assisted living facilities in the past and was in a position to know the rate he wished to charge SHALP I for his management services. Weston was not forced to sign the management agreement or agree to provide management services to SHALF. Also, mere is no evidence in the record that the Management Committee of SHALP I would, at the time Weston signed the Management Agreement, have paid him the same management fee that Kusko began to receive approximately seven years after SHALF had opened for operation.

Additionally, there was nothing wrong or improper about Kusko learning about a business to which he had provided a significant investment in capital. Also, simply because the Management Committee (and not merely Kusko) decided that it was in

---

this would constitute a breach of fiduciary duty, the appellant would be entitled to an award of damages for the breach.

**96.** We note that the appellant had, in his Complaint and in his proposed findings of fact and conclusions of law, asserted that the appellees committed many different acts of

fraud, most of which are not included by reference as part of this appeal. [*See* Complaint, at ¶ 9; Plaintiffs' Proposed Findings of Fact, Conclusions of Law and Discussion, at 25–29.] Accordingly, we have not addressed them here.

SHALP I's best interest to pay him a management fee that he was originally unwilling to pay the appellant, does not show by clear and convincing evidence that he somehow defrauded the appellant.

Finally, while Kusko and Blazo entered into an oral consulting agreement even after the Management Committee terminated Weston's written consulting agreement, this conduct was not fraudulent, in particular, the appellant has not and cannot show that he suffered any damages resulting from the conduct. There was no evidence that this arrangement interfered with Blazo's work with Northampton Village, Inc., and SHALP I did not pay Blazo for her services. Furthermore, to the extent that Blazo assisted with SHALP I, her work in that regard would have conceivably benefited Weston as a limited partner of NPCA.

The appellant also claims that the appellees should have disclosed the sharing of employees between SHALP I and SHALP II. The appellant can provide no authority that as a limited partner of NPCA, who is supposed to not participate in the business of the partnership, he was entitled to this information insofar as the appellees could be liable for fraud for the failure to disclose. Also, we have already indicated in this opinion that the sharing of employees, while obviously also benefiting SHALP II, benefitted SHALP I as well.[97]

### 2. The Medical Office Building

Concerning the medical office building, Weston failed to prove by clear and convincing evidence that any of the appellees' conduct was fraudulent. In the first instance, we did not find credible Weston's testimony that Kusko represented to him

that all of the partners in SHALP I would receive an ownership interest in the medical office building. In particular, Weston's testimony at least contradicts in part the content of his letters to Kusko upon learning that Strecansky was interested in buying an interest in the medical office building. At no point during that correspondence did Weston assert that Kusko had previously promised him (and all of the other partners) an ownership interest in Kusko's property.

Second, we found that, contrary to Weston's contention, that SHALP I's Management Committee did discuss and determine that the twenty-year lease of the second floor of the medical office building was in SHALP I's best interests. While Weston can claim it was an imprudent business decision and that the Management Committee should have decided on a different arrangement (such as a five year lease with options to renew), this was not fraudulent. Moreover, Weston cannot show that he was damaged by this conduct as the lease of the second floor was very profitable to SHALP I and the partners such as Weston had no right to an ownership interest in the medical office building.

### 3. Failure to disclose the loan to Sacred Heart

We recognize that in fraud claims,

[a] misrepresentation need not be an actual statement; it can be manifest in the form of silence or failure to disclose relevant information when good faith requires disclosure. *In re Adoption of R.J.S.*, 889 A.2d 92, 98 (Pa.Super.2005) ("Fraud is practiced when deception of another to his damage is brought about by a misrepresentation of fact or by silence when good faith required expression." (emphasis in original)).

---

**97.** Regarding the allocation of salaries, as mentioned above, there is no indication in the record that Kusko's allocations were false or otherwise inaccurate.

"Fraud comprises anything calculated to deceive, whether by single act or combination, or by suppression of truth, or suggestion of what is false, whether by direct falsehood or innuendo, by speech or silence, word of mouth, or look or gesture." *Id.* (citation and quotation omitted) (emphasis in original).

*Glover v. Severino*, 946 A.2d 710, 713 (Pa.Super.2008).

Despite the foregoing, Weston did not prove that the appellees committed fraud relating to not disclosing the loan to Sacred Heart. Even though the appellees and Weston had a fiduciary relationship, we do not find that the appellees had an obligation to inform Weston about the loan to Sacred Heart, the testimony at trial showed that the loan to Sacred Heart was disclosed on the SHALP I audited financial statements that were provided to the limited partners.

#### 4. *The Management Committee*

The appellant's final claim of fraud relates to Kusko's alleged operation of the Management Committee. We are somewhat unclear how Kusko's involvement with the Management Committee could have acted to defraud Weston. We have interpreted this claim as the appellant's assertion that (1) Kusko dominated and controlled the Management Committee, and (2) Kusko allegedly did not inform the Management Committee of all of the partners in SHALP I and SHALP II.

As for the first claim, we have already explained and concluded that although Kusko may have been the driving force behind the Management Committee, the evidence shows that the individual members voted in a manner consistent with what they felt was in the best interests of SHALP I. Thus, even though the Management Committee's votes were almost always (if not always) unanimous, we do not find that the committee was simply used as a "rubber stamp" for whatever Kusko wanted to do.

Concerning the second claim, Weston has not articulated how Kusko, even if he did not disclose the identities of all of the partners to the members of the Management Committee, there is nothing in the record to show how the appellant was damaged by this action. The appellant had not identified any conflicts of interest in the record or how such conflicts had adverse results. Moreover, Weston cannot show how the appellees should be liable to him for an alleged failure to disclose to third parties.

#### E. Punitive Damages

The appellant's final contention is that we erred in failing to award him punitive damages insofar as he asserts that we "disregard[ed] the outrageous, self[-]serving and fraudulent acts" of the appellees. As discussed further below, this final claim also lacks merit.

Pennsylvania allows for punitive damages in very limited circumstances. More specifically,

> [p]unitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others. Further, [p]unitive damages are penal in nature and are proper only in cases where the defendant's actions are so outrageous as to demonstrate willful, wanton or reckless conduct. Because punitive damages are intended to punish the tortfeasor for outrageous conduct and to deter him and others like him from similar conduct in the future, [t]he state of mind of the actor is vital. The act, or the failure to act, must be intentional, reckless or malicious.

*Hutchison ex rel. Hutchison v. Luddy,* 896 A.2d 1260, 1265 (Pa.Super.2006) (internal quotation marks and citations omitted).

> The only purpose of punitive damages is to deter outrageous conduct. It is impossible to deter a person from taking risky action if he is not conscious of the risk. Thus, in *Feld v. Merriam,* 506 Pa. 383, 485 A.2d 742 (1984), [our supreme court] addressed the issue of when punitive damages are warranted and stressed that, in determining whether certain conduct is outrageous, '[t]he state of mind of the actor is vital. The act, or the failure to act, must be intentional, reckless or malicious.' Similarly, [Section 500 of] the Restatement explains that 'reckless indifference to the rights of others and conscious action in *deliberate* disregard of them ... may provide the necessary state of mind to justify punitive damages.'

*Id.* at 1266, quoting *Hutchison v. Luddy* ("*Hutchison IV*"), 582 Pa. 114, 123–124, 870 A.2d 766, 771–772 (2005) (additional citations omitted) (emphasis in *Hutchison IV*). "Therefore, an appreciation of the risk is a necessary element of the mental state required for the imposition of such damages." *Id.*

> As the *Hutchison IV* court therefore opined: 'Thus, in Pennsylvania, a punitive damages claim must be supported by evidence sufficient to establish that (1) a defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed and that (2) he acted, or failed to act, as the case may be, in conscious disregard of that risk.'

*Id.,* quoting *Hutchison IV, supra* at 124, 870 A.2d at 772, citing *Martin v. Johns–Manville Corp.,* 508 Pa. 154, 171–172, 494 A.2d 1088, 1097–1098 (1985) (plurality).

*Snead v. Society for Prevention of Cruelty to Animals of Pennsylvania,* 929 A.2d 1169, 1184–85 (Pa.Super.2007).

> As for the term "reckless disregard"

> the actor's conduct is in reckless disregard of the safety of another if he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent.

*Taylor v. Albert Einstein Med. Ctr.,* 723 A.2d 1027, 1037 (Pa.Super.1998) (quoting Section 500 of the Restatement (Second) of Torts), *reversed in part on other grounds,* 562 Pa. 176, 754 A.2d 650 (2000). In addition, for conduct to be considered reckless:

> *It must involve an easily perceptible danger of death or substantial physical harm, and the probability that it will so result must be substantially greater than is required for ordinary negligence* .... [emphasis supplied.] The actor to be reckless must recognize that his conduct involves a risk substantially greater in amount than that which is necessary to make his conduct negligent.

*Moran v. G. & W.H. Corson, Inc.,* 402 Pa.Super. 101, 586 A.2d 416, 423 (1991) (Quoting Comments to Restatement (Second) of Torts § 500). Moreover, "[p]unitive damages may not be awarded for misconduct which constitutes ordinary negligence such as inadvertence, mistake and errors in judgment." *McDaniel v. Merck, Sharp & Dohme,* 367 Pa.Super. 600, 533 A.2d 436, 447 (1987).

As explained in more detail above, the appellant failed to prove by a preponder-

ance of the evidence that the appellees breached their fiduciary duty to him. The appellant also failed to prove by clear and convincing evidence that the appellees committed fraud. We respectfully submit that since the appellees failed to sustain their burdens of proof on their underlying causes of action and since the evidence in the case did not show that the appellees' conduct was so outrageous as to demonstrate willful, wanton or reckless conduct, we did not err in failing to award punitive damages to the appellant in this action.

### III. *Conclusion*

For the reasons discussed above, we respectfully submit that the appellant's various allegations of error lack merit and our verdict of November 9, 2010 made final by the entry of judgment in this matter on August 12, 2011 should properly be affirmed.

BY THE COURT:
EDWARD G. SMITH, J.

Dated: March 19, 2012

**IN THE SUPERIOR COURT EASTERN DISTRICT OF PENNSYLVANIA**

Superior Court Docket No. 2473 EDA 2011

Randall Weston and James Strecansky, Appellants

vs

Northampton Personal Care, Inc. and James Kusko, Individually Appellees

### *CERTIFICATE OF SERVICE*

I, Douglas M. Marinos, Esquire do hereby certify that I have on **July 17, 2012** served two (2) true and correct copies of the Brief of Appellant and the Reproduce Record Of Appellant upon the persons indicated below by first class United States Postal Service mail, which service satisfies the requirements of Pa.R.A.P. 2187:

Charles E. Shoemaker, Jr., Esquire

Attorney For Appellees

Law Offices Of Charles E. Shoemaker, Jr.

727–729 North 19th Street

Allentown, PA 18104

Jill Kelly McComsey, Esquire

Philip Hof, Esquire

Seidel Cohen Hof & Reid LLC

CrownPointe Corporate Center

3101 Emrick Boulevard, Suite 205

Bethlehem, PA 18020

DOUGLAS M. MARINOS & ASSOCIATE, P.C.

/s/ Douglas M. Marinos

Douglas M. Marinos, Esquire

Attorney I.D. # 53104

Attorney for Appellant

101 North Cedar Crest Boulevard

Allentown, PA 18104

(610) 434–0504